

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

MEG:JPM
F. #2018R01984

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 3, 2020

By ECF

The Honorable Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Oneil Allen, et al.
>          Criminal Docket No. 18-561 (S-1) (DLI)

Dear Judge Pollak:

The government respectfully submits this letter in response to defendant Oneil Allen's Motion for an Emergency Bail Hearing (the "Motion") seeking his temporary release from the Metropolitan Detention Center ("MDC") during the pendency of the COVID-19 pandemic. For the reasons set forth below, the Motion should be denied.

I.       Procedural History

The defendant is charged with three felony counts in connection with his daily trafficking of heroin and fentanyl in Staten Island, New York in 2017 and 2018. The drug-trafficking by the defendant and his co-defendant Wyche led to an overdose "save" (i.e., medical resuscitation) of victim "Jane Doe" in October 2017. Count One of the Superseding Indictment charges conspiracy to distribute and possess with intent to distribute heroin and fentanyl, in violation of 21 U.S.C. §§ 846, 841(b)(1)(C); Count Two charges possession with intent to distribute heroin and fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); and Count Four charges distribution of heroin causing serious bodily injury to Jane Doe, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

On September 18, 2018, the defendant was arrested on a criminal complaint containing the same basic charges. That day, the Honorable Robert M. Levy, United States Magistrate Judge, entered a permanent order of pre-trial detention for the defendant. (ECF Dkt. No. 11). On March 5, 2019, the defendant moved for bail, which the government opposed, and the Honorable James Orenstein, United States Magistrate Judge, denied the defendant's application. (ECF Dkt. No. 43).

On April 1, 2020, the defendant filed the Motion seeking temporary release to home confinement in Brooklyn, New York.  The defendant, who is 28 years old, has detailed that he has asthma, anemia, sickle cell disease, and chest pains resulting from sickle-cell disease.  He was identified by the Bureau of Prisons ("BOP") as among the inmates at a higher risk of complications from COVID-19.  His most recent medical tests indicated "mild anemia" and he is receiving ongoing blood screening.  He is presently prescribed an inhaler for his asthma but is not identified as receiving any other medications.

The Motion argues that the defendant is at a high-risk of contracting COVID-19 based on his health conditions.  The Motion further argues that the MDC is not capable of addressing the risk of COIVD-19 infection to the defendant and that, collectively, these constitute "compelling reasons" for release under 18 U.S.C. § 3142(i).

II.     The Defendant Remains a Risk of Flight and Danger to the Community

The defendant remains a danger to the community and a clear risk of flight. As set forth in the government's original detention memorandum (ECF Dkt. No. 6), which is incorporated by reference, the defendant's prior drug-convictions and the serious drug-trafficking charges here each create a presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant or safety of the community.  See 18 U.S.C. §§ 3142(e)(2), (e)(3).  That determination has been made, separately, by two Magistrate Judges and never appealed.

Although the Motion argues that the defendant is incentivized, if released, "to abide by any release condition" because "his life—not only his liberty—is on the line," the facts of the case and this defendant demonstrate quite the opposite.  The defendant faces a 20-year mandatory minimum term of imprisonment (with sentencing guidelines of life imprisonment) if convicted on Count Four of the Superseding Indictment.  His incentive to flee before trial on account of such a charge could not be clearer.  See United States v. Jackson, 823 F.2d 4, 7 (2d Cir. 1987); United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a 15-year statutory maximum sentence, which the court called a "severe sentence," heightened the risk of flight).

The Motion fails to elucidate the serious nature of the defendant's three prior drug felonies:

- April 3, 2017: Pled guilty to criminal possession a controlled substance, with intent to sell, in violation of N.Y.P.L. § 220.06(1) (Richmond County Criminal Court) (6 month prison sentence).
- July 15, 2010: Pled guilty to attempted criminal possession of a controlled substance, with intent to sell, in violation of N.Y.P.L. § 220.16 (Richmond County Criminal Court) (2 year prison sentence).

2

- January 21, 2009: Pled guilty to criminal possession of cocaine, in violation of N.Y.P.L. § 220.06 (Richmond County Criminal Court) (2 year prison sentence).

The defendant also was previously charged with possession of a weapon and narcotics, at age 17, and pled guilty to a misdemeanor drug-possession charge. Thus, the assertion in the Motion that there is no indication of violence in the defendant's criminal history is also mistaken.

The Motion totally fails to provide the Court with any meaningful information about the defendant's past, any of the five unidentified "financially responsible persons" being proposed as co-signers, or the basis for a $150,000 bond. As the Pre-trial Services Report details, the defendant reported being unemployed for nine years and eight months prior to his 2018 arrest. Yet, he was driving a Lexus, traveled internationally, and lived in an apartment in New Jersey. Given the charges, the defendant has a significant incentive to use the current crisis to leave the jurisdiction and hide from law enforcement. Finally, the defendant now also has had the benefit of receiving discovery in the case and knowing potential witnesses against him. His incentive to tamper with witnesses must also be considered in the release calculus.

III. Release Is Not Warranted Under the "Compelling Reason" Clause

The presumption of detention has not been overcome by the mere existence of the COVID-19 outbreak and the generalized risk faced by the defendant. Although, the defendant argues that his health conditions put him at a greater risk of complication from COVID-19, the risks of illness remains, at present, only a generalized risk that applies to many thousands of inmates. The defendant is not sick with COVID-19 and, in view of the charges and his significant criminal history, release based only on the risk of illness, when mitigation efforts have been put in place, is not a "compelling reason" under 18 U.S.C. § 3142(i).

The Bail Reform Act, 18 U.S.C. § 3142(i), provides that a "judicial officer may, by subsequent order, permit the temporary release of [a] person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." As Judge Garaufis recently noted in rejecting an application similar to the instant motion, "[t]his provision has been used sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries." United States v. Hamilton, No. 19-CR-54-01 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020) (citations omitted). Certain extreme medical circumstances may present "compelling reasons" that could warrant a highly circumscribed release. For example, in 1993, Judge Weinstein agreed to the release of Colombo family captain Gregory Scarpa when that defendant was terminally ill with AIDS, was not expected to live until trial, and his medical condition could not be managed appropriately by prison medical facilities. United States v. Scarpa, 815 F. Supp. 88 (E.D.N.Y. 1993). Even in those extreme circumstances, release was

conditioned on the defendant being confined to a hospital under 24-hour guard of the United States Marshal Service, to be reimbursed by the defendant's family.  Id. at 92.

Numerous courts have recognized that being incarcerated at the MDC or Metropolitan Correctional Center ("MCC") during the COVID-19 pandemic is not alone a basis for release, even for those with serious health conditions.  See, e.g., United States v. Scorcia, No. 19-CR-442 (ILG), ECF No. 254 (E.D.N.Y. Mar. 27, 2020) (ruling that court had already determined defendant was a danger to the community and declining to release defendant based on COVID-19 pandemic for 54-year-old who cited poor health and claimed restrictions at MDC interfered with ability to prepare a defense); United States v. Lipsky, No. 19-CR-203 (NGG), Mar. 24, 2020 Order (E.D.N.Y.) (declining to release defendant, previously detained as a danger to the community, based on general risks of COVID-19 pandemic); United States v. Amato, No. 19-CR-442 (ILG), ECF No. 237 (E.D.N.Y. Mar. 20, 2020) (ruling that court had already determined defendant was a danger to the community and declining to release 61-year old defendant with asthma based on COVID-19 pandemic); United States v. Hamilton, No. 19-CR-54 (NGG) 2020 WL 1323036, at *1-2 (E.D.N.Y. Mar. 20, 2020) (declining to release defendant charged with two counts of murder while engaged in narcotics trafficking who had sought release due to the COVID-19 pandemic based on defendant's "advanced age and medical conditions," finding that defendant had not "met his burden to rebut the presumption of danger to the community that attaches based on" the charged acts of violence); United States v. Bradley, 19-CR-632 (GBD), ECF No. 25 (S.D.N.Y. Mar. 25, 2020) (denying bail application for inmate detained in MCC on controlled substances and firearm charges who had recently experienced a stroke and had high blood pressure); United States v. Rivera, 20-CR-6 (JSR), Mar. 25, 2020 Order (S.D.N.Y.) (denying bail application for inmate detained in MCC on controlled substance charge who had a childhood history of asthma); United States v. White, 19-CR-536 (KC), Mar. 25, 2020 Order (S.D.N.Y.) (denying bail application for inmate detained at Valhalla on controlled substance and Hobbs Act charges with history of whooping cough); United States v. Acosta, 19-CR-848 (NRB), ECF No. 14 (S.D.N.Y. Mar. 25, 2020) (denying bail application for inmate detained in MCC that "reli[ed] mainly on a form letter proffering general reasons to release inmates because of the spread of the COVID-19 virus).

As the foregoing cases indicate, the determination of bail remains an individualized one, and the defendant has simply not offered conditions to overcome the strong presumption of detention at play here.  The defendant's Motion instead relies on unsupported assumptions and unspecified hearsay that the MDC (and BOP) are incapable of managing the risk to inmates' health during the COVID-19 epidemic.  The allegations in the defendant's Motion are unfounded.[1]  Based on present information, there have been two confirmed case of COVID-19 among inmates at the MDC.

---

[1] The defendant's reference to United States v. Raihan, 20-CR-68 (BMC) (JO), ECF No. 20 (E.D.N.Y. March 12, 2020), as supportive of the conclusion that MDC is not capable of addressing the present pandemic is misplaced.  In Raihan, there was no specific finding that being housed at the MDC posed any risk that outweighed the operation of all

At the outset of the pandemic, the BOP implemented numerous control at the MDC, included the following:

- Suspension of all social and legal visits:  Social visits and legal visits were suspended for 30 days, with case-by-case accommodations for attorney visits and legal calls.  Inmates will be provided additional inmate telephone minutes.

- Inmate movement:  All inmate facility transfers were suspended for 30 days, with exceptions permitted for forensic studies or medical or mental health treatment.

- Screening and testing of inmates:  All newly-arriving BOP inmates are screened for COVID-19 exposure risk factors and symptoms.  Inmates with exposure risk factors were quarantined.  In addition, inmates exhibiting flu-like symptoms are isolated (either to single rooms or with other patients) and tested for COVID-19 in accordance with local health authority protocols.

- Modified Operations:  The BOP is implementing modified operations nationally to maximize social distancing and limit group gatherings in BOP facilities, among other modifications specific to each facility.

Effective on April 1, 2020, the BOP implemented additional procedures to ensure the safety and wellbeing of inmates, including:

- For a 14-day period, the BOP is implementing a social distancing plan where inmates are secured in their assigned cells/quarters to decrease the spread of the virus.  Inmates are released from their cells three days per week to shower, use the phone, and utilize the BOP computer system.

- To the extent practicable, inmates will still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.

- The BOP, in conjunction with the United States Marshal's Services, is working to significantly decrease incoming movement to all BOP facilities.

On Friday, April 3, 2020, the BOP informed Chief United States District Judge Mauskopf about specific protocols implemented at the MDC and MCC to monitor for COVID-19.

---

other pertinent factors under the Bail Reform Act.  Moreover, unlike the defendant in Raihan, the defendant here was already incarcerated before widespread community transmission of COVID-19 within the United States, and his incarceration therefore poses no risk of new infection to the community within the MDC.

Staff have been tasked with screening every staff member who enters the MDC, which includes taking a temperature and completing a screening form. Medical staff are screening all new inmate arrivals, including by wearing personal protective equipment in accordance with CDC guidelines. Inmates with a fever are placed in isolation and inmates without a fever are quarantined for 14 days. Inmates in isolation receive medical evaluations twice daily, and inmates in quarantine receive temperature checks twice daily. The defendant's Motion accounts for none of these actions nor explains why are they are insufficient to mitigate the risks to the defendant.

In asking the Court to "consider the 'total harm and benefits to prisoner and society' that continued pretrial imprisonment of Oneil Allen will yield," the defendant omits to mention the most important factors that justified his pre-trial detention. The defendant made choices to commit serious crimes prior to this pandemic. The charges here are not his first offense—they would be his fourth set of felony drug conviction. He has never demonstrated a commitment to a law-abiding life, and there's no reason to believe that, in the midst of a pandemic taxing all of society, he will change course or return to face these serious charges.

IV.     Conclusion

The defendant, a career drug dealer charged with serious drug-offenses, remains a risk of flight and a danger to the community. His Motion for emergency bail, based only on the generalized risks from COVID-19 and circumstances that are hardly unique to him, has not presented a "compelling reason" for release under Section 3142(i). The permanent order of detention should remain in effect.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:      /s/
         James P. McDonald
         Assistant U.S. Attorney
         (718) 254-6376

cc:     Defense Counsel (by ECF)
        Clerk of the Court (DLI) (by ECF)