```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   --------------------------------x
                                           18-CR-561(DLI)
 3   UNITED STATES OF AMERICA,
                                           United States Courthouse
 4            Plaintiff,                   Brooklyn, New York

 5            -against-                    February 1, 2023
                                           2:00 p.m.
 6   KEITH WYCHE AND ONEIL ALLEN,
              Defendants.
 7   --------------------------------x
                    TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
 8              BEFORE THE HONORABLE DORA L. IRIZARRY
                 UNITED STATES SENIOR DISTRICT JUDGE
 9                      BEFORE A JURY

10   APPEARANCES
     For the Government:        UNITED STATES ATTORNEY'S OFFICE
11                             Eastern District of New York
                               271 Cadman Plaza East
12                             Brooklyn, New York 11201
                               BY:  GILBERT REIN, AUSA
13                                   IRISA CHEN, AUSA
                                     JAMES MCDONALD, AUSA
14
     For Defendant Wyche:       GARY SCHOER, ESQ.
15                             6800 Jericho Turnpike
                               Syosset, New York 11791
16
                               THE VITALIANO LAW FIRM, PLLC
17                             1492 Victory Boulevard
                               Staten Island, New York 10301
18                             BY:  MICHAEL VITALIANO, ESQ.

19   For Defendant Allen:       LAW OFFICES OF NATALI J.H. TODD, P.C.
                               26 Court Street, Suite 413
20                             Brooklyn, New York 11242
                               BY:  NATALI J. H. TODD, ESQ.
21
                               CODY WARNER, P.C.
22                             11 Broadway, Suite 615
                               New York, New York 10004
23                             BY:  CODY WARNER, ESQ.

24   Court Reporter:           Georgette K. Betts, RPR, FCRR, CCR
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

PROCEEDINGS

1                  (In open court; Jury not present.)

2                  THE COURTROOM DEPUTY:  All rise.

3                  THE COURT:  Please have a seat, everyone.

4                  You can call the case.

5                  THE COURTROOM DEPUTY:  Criminal cause on trial.

6      Docket number 18-CR-561. United States versus Keith Wyche and

7      Oneil Allen.  Please state your appearances.

8                  MR. REIN:  Good afternoon, your Honor, Gilbert Rein

9      for the United States.  I'm joined by Assistant United States

10     Attorneys, Irisa Chen and James McDonald, paralegal Teri

11     Carby, and Special Agent Traveis Guy.

12                 THE COURT:  Good afternoon, to all of you.  Please

13     have a seat.

14                 MR. SCHOER:  Good afternoon, your Honor, for

15     Mr. Wyche, Gary Schoer.

16                 MR. VITALIANO:  And Michael Vitaliano, good

17     afternoon.

18                 THE COURT:  Good afternoon.  Good afternoon,

19     Mr. Wyche.

20                 MS. TODD:  Good afternoon, your Honor, Natali Todd

21     for Mr. Allen.

22                 MR. WARNER:  Cody Warner.

23                 THE COURT:  Good afternoon.  Good afternoon,

24     Mr. Allen.

25                 DEFENDANT ALLEN:  Good afternoon.

PROCEEDINGS

1          THE COURT:  I'm going to remind everyone -- thank

2   you for being properly seated.  I also want to remind everyone

3   to keep your voices up nice and loud so that the mics will

4   pick you up when you're speaking.

5          A reminder again that I will allow the speakers, the

6   witness and the attorneys, to remove their masks while you are

7   speaking.  I think we may want to move the speaker podium back

8   a little bit closer to the government's table.  And probably

9   the microphone too so that it's a little closer.

10          MR. REIN:  Is this okay?

11          THE COURT:  I think that's good, yes.  That should

12  be about six feet away from the jury even though the jury is

13  going to be masked.  I appreciate that everyone else,

14  including in the audience, has their masks on.  We're not out

15  of this pandemic yet, unfortunately, but so we're trying to

16  keep everyone as safe as we can.

17          I'm advised that all of the jurors are present.

18  There are a couple of issues that I do want to address with

19  the parties, some of which I believe you may be aware of all

20  of this already because I believe all of this was already

21  discussed earlier with Judge Kuo during the jury selection

22  process.

23          With respect to alternate three, Ms. Pease, she has

24  a flight out tomorrow from LaGuardia at almost 6 o'clock.  She

25  advised my case manager that she needs to leave the courthouse

4

PROCEEDINGS

1    around 2 p.m. in order to make the flight.  So I imagine that

2    this was already discussed with everybody, and we can make the

3    accommodation.  I know we've gotten a late start to the trial,

4    but if everyone gets here promptly at 9:30 and we can get

5    started right away, we'll just go straight through without a

6    lunch break.  Maybe I'll give a little bit longer morning

7    break, and we'll just break for the day at 2 o'clock, keeping

8    in mind that we're not meeting on Friday.  Okay?  So we'll

9    just advise her of that when we bring the jury in.

10           Alternate number 5, Zi Li, I hope I'm pronouncing it

11   correctly, apparently teaches on Wednesdays, walking distance

12   from the courthouse.  So his class starts at 6 p.m.  I'm not

13   sure how close to the courthouse it is.  I don't know if he

14   mentioned it -- did he mention whether it's at Brooklyn Tech

15   or the NYU campus close by?

16           MR. McDONALD:  CUNY, your Honor, just down the

17   street, I think.

18           THE COURT:  It's right next to Brooklyn Tech, sort

19   of between Westinghouse and Brooklyn Tech.  Okay.  So that

20   shouldn't take him more than 15 minutes at the most to get to.

21           I think that that would still -- we'll keep it in

22   mind.  I intend to break pretty much around 5 o'clock every

23   day anyway, so that should not be a problem with the

24   exception, of course, if we can finish with a witness.  So

25   we'll just try keep that in mind with respect to Wednesdays.

PROCEEDINGS

1        And then the other issue -- and I can just let him

2   know that once we bring out the jury.  And with respect to

3   alternate number two, Jodi Vitali, apparently it was raised

4   during the voir dire.  She had a concerns that she is a

5   teacher of special needs children and was concerned about the

6   length of the trial.  I could bring her in on her own before

7   we bring in the rest of the jury so we can address that some

8   more.  Quite frankly, I still don't see that as an issue.

9   Everybody has to serve.  Everybody's job is important and

10  everybody has concerns about their jobs.  And during the

11  course of this trial, there will be one week where there won't

12  be classes and that will be President's week.

13        It's not the best possible world for a teacher, but

14  I don't think it's nearly as bad as she is making it out to

15  be, and if everyone is efficient, as I hope you will be, and

16  we move along with the presentation of the evidence, then I

17  really would hope that we'll finish earlier than anticipated

18  as opposed to later, even with the delay in jury selection.

19        Would you prefer to bring her in and let us address

20  that before we bring in the rest of the jury, government?

21        MR. REIN:  Yes, Judge.

22        THE COURT:  Okay.  And how about for the defense,

23  the same?

24        MR. SCHOER:  Yes, your Honor.

25        MS. TODD:  Yes, your Honor.

6

PROCEEDINGS

1          THE COURT:  Okay.  So why don't we do that.  Let's

2   bring in Ms. Vitali.

3          And just as a reminder, you are all requesting daily

4   copy?

5          MR. REIN:  Yes.

6          MR. SCHOER:  Yes.

7          THE COURT:  Okay.  Who is going to open for the

8   government?

9          MR. REIN:  I'll be opening, Judge.

10          THE COURT:  Okay.  Juror entering.

11          (Juror enters the courtroom.)

12          THE COURT:  Good afternoon.  Everyone, please be

13   seated.

14          Good afternoon, Ms. Vitali.  How are you?

15          THE JUROR:  Fine.

16          THE COURT:  My name is Dora Irizarry.  I'm the judge

17   who will be presiding over the trial of this matter.  I know

18   you've been in front of Judge Kuo earlier for jury selection.

19   And I understand that you have a concern about your job and

20   the length of the trial.  What exactly is your concern?

21          THE JUROR:  It's the fact that the school is so

22   short staffed, and I take care of a lot in the school.  I'm

23   the busing coordinator.  I'm an after-school coordinator.  And

24   I'm in charge of a classroom.  And my students are very

25   special needs, a very tough class, and they need consistency

PROCEEDINGS

1    in the people that are there and in the -- their education,

2    and, yes, I do have TAs, but it's not the same.  And they even

3    get pulled sometimes to other classrooms because of the short

4    staffed, and then my kids are still in distress with not

5    enough staff in the room to cater to their needs and their

6    education.  And I just feel like I don't feel comfortable

7    being away from the school.

8            THE COURT:  Well, I would imagine that if you are

9    not there, the TAs would not be pulled to other classrooms

10   because they need to cover for you, correct?

11           THE JUROR:  Probably.

12           THE COURT:  Okay.  And the other thing is that there

13   is -- we are off that -- well, school is not in session for

14   the week of president's week, which will probably fall during

15   the time of this trial.

16           THE JUROR:  Uh-huh.

17           THE COURT:  So while yes, we're anticipating three

18   to four weeks, I am hopeful that we will finish before that.

19   These attorneys are working very, very hard, and I'm pushing

20   them really hard to make sure that we can run this trial as

21   smoothly as possible to minimize any delays.  Obviously,

22   things happen in the world of human beings and we can't help

23   that, but the reality is that there will be in terms of the

24   amount of class that you will miss, it's not really three or

25   four weeks because you have that President's week that schools

PROCEEDINGS

1   are closed.

2           THE JUROR:  I also have like reports due.  Reports

3   were due today actually too, and in the beginning of next

4   month as well.  So it's a lot to be away.

5           THE COURT:  But everyone else --

6           THE JUROR:  No, no, I understand.

7           THE COURT:  -- has jobs and so on as well.

8           THE JUROR:  I understand, I understand.

9           THE COURT:  Can I speak to counsel please at the

10  side?

11          THE JUROR:  I don't mean to be --

12          THE COURT:  That's okay.  I understand.

13          (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1        (The following occurred at sidebar.)

2        THE COURT:  I'm not inclined to let her go.  We're

3   already at the barest amount as far as alternates are

4   concerned.  It's really, for her, it's two weeks.  I

5   understand her concern but I'm happy to hear from all of you

6   beginning with the government.

7        MS. CHEN:  I think we agree with you, your Honor.

8        MS. TODD:  We agree.

9        MR. SCHOER:  We agree.

10        THE COURT:  We will let her stay on.

11        (End of sidebar conference.)

12        (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1              (In open court.)

2              THE COURT:  Again, we've given careful consideration

3      to your concerns.  We understand your concerns, but it is

4      going to be very difficult for us to excuse you from this

5      case, which is also very important to the parties.  So we're

6      going to keep you on this case.

7              THE JUROR:  Okay.

8              THE COURT:  All right.  So let's bring in the rest

9      of the jury.

10             THE COURTROOM DEPUTY:  You can come with me.

11             (Juror exits the courtroom.)

12             THE COURT:  I should have reminded her that we don't

13     meet on Fridays, so she has Fridays to work on her reports or

14     go to school if that's what she wanted to.

15             MS. CHEN:  Judge, we just want to note for the

16     record.  We encountered one of the jurors.  The government was

17     riding up the elevator.  I don't think the juror recognized

18     us.  He tried to get into the elevator, and we kind of just

19     said, sorry, and he backed out.  But we wanted to note that

20     for the record that that occurred.

21             THE COURT:  Okay.

22             (Pause in proceedings.)

23             THE COURT:  When they come -- I just want to make

24     sure that they are all properly seated and sworn in, and I

25     want to jump into the openings.  And then before we close,

PROCEEDINGS

1    I'll address the other scheduling concerns, the flight

2    tomorrow, and the Wednesday classes.

3              MR. SCHOER:  Your Honor, are you going to give them

4    any sort of preliminary instructions?

5              THE COURT:  Yes, sir.

6              MR. SCHOER:  You didn't mention that.

7              THE COURTROOM DEPUTY:  All rise.

8              (Jury enters courtroom.)

9              THE COURT:  Thank you.  Everyone may be seated.

10             Do the parties agree that all of the prospective

11   jurors are present and properly seated, government?

12             MR. REIN:  Yes, Judge.

13             THE COURT:  Defense for Mr. Wyche?

14             MR. SCHOER:  Yes, your Honor.

15             THE COURT:  Mr. Allen?

16             MS. TODD:  Yes, your Honor.

17             THE COURT:  Please administer the oath to the jury.

18             THE COURTROOM DEPUTY:  Please raise your right

19   hands.

20             (Jury sworn.)

21             THE JURY:  Yes.

22             THE COURT:  Ladies and gentlemen, welcome.  My name

23   is Dora Irizarry.  I am the judge who will be presiding over

24   the trial of this matter.

25             First of all, I want to extend the thanks on behalf

PROCEEDINGS

1  of the parties and the Court for your willingness to serve.

2  This is a very important part of our duties as citizens.  It

3  is an important right that everyone has the right to have a

4  trial by jury, and it doesn't work unless we have volunteers

5  such as yourselves who are willing to come and serve.

6         Though I see that some of you still have coats and

7  sweaters on, I know it's really cold out today, but just be

8  mindful that I don't want you to get too overheated either.

9  We're going to try to keep the temperature in the courtroom

10 comfortable, not too hot, not too cold.  We try to do our best

11 in that regard.

12        Members of the jury, now that you have been sworn, I

13 will give you some preliminary instructions to guide you in

14 your participation in the trial.

15        It will be your duty to find from the evidence what

16 the facts are.  You, and you alone, will be the judges of the

17 facts.  You then will have to apply those facts to the law as

18 I give it to you.  I, alone, am the judge of the law.  You

19 must follow that law whether you agree with it or not.

20 Nothing that the Court may say or do during the course of the

21 trial is intended to indicate or should be taken by you as

22 indicating what your verdict should be.

23        The evidence from which you will find the facts will

24 consist of the sworn testimony of witnesses, documents, and

25 other things received into the record as evidence and any

PROCEEDINGS

1    facts that the lawyers agree to or stipulate to or that the

2    Court may instruct you to find.

3            Certain things are not evidence and must not be

4    considered by you.  I will list them for you now.

5            Statements, arguments, and questions by the lawyers

6    are not evidence.  Questions in and of themselves are not

7    evidence.  Therefore, you cannot infer any fact from the mere

8    asking of a question.  It is the answer coupled with the

9    question that constitutes evidence.  For example, if a witness

10   is asked the question, do you own an automobile, and the

11   witness answers no, you may not infer from the mere asking of

12   the question that the witness does own an automobile.

13           Objections to questions are not evidence.  Lawyers

14   have an obligation to their clients to make objections when

15   they believe evidence being offered is improper under the

16   rules of evidence.  You should not be influenced by the

17   Court's ruling on it.  If the objection is sustained, ignore

18   the question.  If it is overruled, treat the answer like any

19   other.  If you are instructed that some item of evidence is

20   received for a limited purpose only, you must follow that

21   instruction.

22           Testimony that the Court has excluded or told you to

23   disregard is not evidence and must not be considered.

24           Anything you may have seen or heard outside the

25   courtroom is not evidence and must be disregarded.  You are to

PROCEEDINGS

1   decide the case solely on the evidence presented here in the

2   courtroom.

3           There are two kinds of evidence, direct and

4   circumstantial.  Direct evidence is direct proof of a fact,

5   such as testimony of an eyewitness.  Circumstantial evidence

6   is proof of facts from which you may infer or conclude that

7   other facts exist.

8           I will give you further instructions on these as

9   well as other matters at the end of the case.  But keep in

10  mind that you may consider both kinds of evidence.

11          It will be up to you to decide which witnesses to

12  believe or not to believe, and how much of any witness'

13  testimony to accept or reject.  I will give you some

14  guidelines for determining the credibility of witnesses at the

15  end of the case.

16          As you know, this is a criminal case.  There are

17  certain important basic rules about criminal cases that you

18  must keep in mind.  First, the indictment brought against the

19  defendants by the government is only an accusation, nothing

20  more.  It is not proof of guilt or anything else.

21          Second, the defendants are presumed innocent, and

22  this presumption of innocence remains with the defendants

23  throughout the trial and may be overcome only if and until

24  after appropriate deliberation, the jury unanimously finds

25  that the government has proven the defendants' guilt of each

PROCEEDINGS

1    and every element of the crime charged beyond a reasonable

2    doubt.

3           The defendants have no burden to prove that they are

4    not guilty, or to present any evidence, or to testify.  Since

5    the defendants have the right to remain silent, you must not

6    draw any adverse inference against the defendants from the

7    fact that they may choose not to testify.

8           During the course of the trial, you may hear

9    testimony about other individuals who may have been involved

10   in the crimes charged in the indictment, but who are not on

11   trial before you.  You may not draw any inference favorable or

12   unfavorable towards the government or to the defendants at

13   trial from the fact that no other defendants are present at

14   this trial, nor should you speculate as to why that is.  Your

15   sole concern is the defendants on trial before you.

16          In this case, the defendants, Keith Wyche and Oneil

17   Allen, are charged with conspiracy to distribute and possess

18   with intent to distribute one or more controlled substances,

19   specifically heroin and fentanyl; distribution of and

20   possession with the intent to distribute one or more

21   controlled substances, specifically heroin and fentanyl; and

22   distribution of heroin causing serious bodily injury to

23   another, specifically Jane Doe.

24          Defendant Wyche is charged with an additional count

25   of distribution of fentanyl causing the death of another,

PROCEEDINGS

1   specifically John Doe.  I will give you detailed instructions

2   on the elements of the crimes charged and other legal

3   principles at the end of the case.  Those instructions will

4   control your deliberations and verdict.

5           And now, a few words about your conduct as jurors

6   throughout this trial.  First, I have instructed the parties

7   that they must not have any contact with the members of the

8   jury.  And there's another side to that coin.  The jurors also

9   must not have any exchange of conversation whatsoever with the

10  Court or any of the parties, including witnesses.  So if you

11  see any of the parties in the hallways of the court, or on the

12  street or any other location, and they look away, do not speak

13  to you and keep on walking, please do not hold it against

14  them.  They are following the Court's instructions, and I am

15  instructing you to behave in similar manner.  This is not

16  meant to encourage rudeness or antisocial behavior, but is

17  simply the best method of avoiding any possible appearance of

18  impropriety and of assuring the absolute impartiality required

19  of you as jurors in this trial.

20          If, while serving on this jury, any attempt is made

21  by any person to converse with you about this case or any

22  incident occurs within your knowledge involving an attempt by

23  any person to improperly influence any member of the jury, you

24  must report it promptly to the Court.  I'm not expecting that

25  to happen, but if it should become necessary to report such an

PROCEEDINGS

1    incident, do not discuss with any of your fellow jurors either

2    the incident or the fact that you feel it necessary to bring

3    it to the Court's attention.  Report it only to the Court and

4    please do so as quickly as possible.

5            Any such incident should be reported to my case

6    manager, Christy Carosella, whom you met already, or either

7    one of my law clerks, Rae Berger, who is seated to my right

8    and Brachah Goykadosh, who is seated over there next to

9    Ms. Carosella.

10           Second, I instruct you that during the trial you

11   absolutely must not discuss this case with anyone or permit

12   anyone to discuss it with you.  Until you are directed by the

13   Court to retire to the jury room at the end of the case to

14   deliberate on your verdict, you simply are not to talk about

15   this case.  That's family, neighbors, co-workers, friends,

16   strangers on the street.

17           I know that many of you use cell phones, tablets,

18   smartphones, laptops, the internet, social media, like

19   Instagram or Facebook, for example, and other tools of

20   technology.  And who knows what will be invented by the end of

21   today, right?  You must not talk to anyone about this case or

22   use any such tools to communicate electronically with anyone

23   about the case.  As I said, this includes your family,

24   co-workers, neighbors, and friends.

25           You may not communicate with anyone about the case

PROCEEDINGS

1   on your cell phones, smartphones, or electronic devices

2   through email, instant messaging, text messaging, any blog,

3   website, internet chatroom, or by way of any other social

4   networking websites, such as Twitter, Facebook, Instagram,

5   LinkedIn and YouTube, for example.

6           Third, you must not read or listen to or view

7   anything touching on this case in any way over any media, and

8   this would include newspapers, magazines, radio, television,

9   and internet.

10          Fourth, do not try to do any research or conduct any

11  investigation about this case on your own.  As jurors, you

12  must decide this case only on the evidence presented here

13  within the walls of this courtroom.  I instruct you that you

14  may not visit or view any place where the offenses charged

15  allegedly took place, or that might be mentioned, during the

16  course of the trial.

17          Nor may you conduct any research or investigation

18  over the internet or any other media.  In other words, you

19  should not consult dictionaries or reference materials, search

20  the web, look at blogs, or use any other electronic tools or

21  other media to obtain information about this case or to help

22  you decide the case.  Even something as simple as trial

23  procedure.  I will be advising you as to what you need to know

24  about trial procedure and the law, as I've already done with

25  respect to what you can expect during the trial.

PROCEEDINGS

1            Finally, do not form any opinion until all the

2   evidence is in.  You have -- you will have received my

3   instructions on the law and -- excuse me, let me rephrase

4   that.  Do not form any opinion until all the evidence is in,

5   until you have received my instructions on the law, and until

6   you have begun to deliberate.

7            You must keep an open mind until you have

8   deliberated sufficiently at the end of the case.  These

9   admonitions apply whenever the Court stands in recess, and I

10  will repeat them each time we break, and I assure you every

11  jury that I've ever had can recite them back to me by the end

12  of the trial.  So you're going to hear them over and over

13  again.  It is important.

14           Please be here promptly at the time directed by the

15  Court, as we cannot begin until all of you are here.  I

16  applaud all of you for coming back here promptly this

17  afternoon.  Each and every one of you is important.  We do

18  have some challenges downstairs because one of the mag

19  machines is broken.  They are working very hard to try to fix

20  that, so please take that into account and work that in.  It

21  takes awhile to go through security.  If even one of you is

22  missing, we cannot go forward without you.

23           The trial will now begin.  First the government will

24  make an opening statement, which simply is an outline to help

25  you understand the evidence as it comes in.  Next, each

PROCEEDINGS

1  defendant's attorney may make an opening statement, but

2  remember that they are not required to do so.  Opening

3  statements are neither evidence nor arguments.  You may

4  consider the opening statements as a preview of what each side

5  expects the evidence in the case will show.

6        Then the government will present its witnesses.

7  This is called direct examination.  Counsel for the defendants

8  may cross-examine them.  Then there may be further questions

9  on what we call redirect and recross.  This process will be

10  repeated with each witness.

11        Following the government's case, the defendants may,

12  if they wish, present witnesses whom the government may

13  cross-examine.  Again, bear in mind, that there is no

14  obligation on the defendants to offer evidence because the

15  entire burden of proof remains upon the government at all

16  times.

17        After all the evidence is in, the attorneys will

18  present their closing arguments to summarize and interpret the

19  evidence for you.  However, these closing arguments are not

20  evidence.  The Court then will instruct you on the law.  After

21  that, you will retire to deliberate on your verdict.

22        We now will proceed with the next step in the trial,

23  which is the opening statement by the Assistant United States

24  Attorney, and I believe, Mr. Rein, you will be opening?

25        MR. REIN:  Yes, Judge, thank you.

OPENING STATEMENT – MR. REIN

1    THE COURT:  You may proceed when you are ready.

2    MR. REIN:  The defendants, Keith Wyche and Oneil

3  Allen, sold drugs.  They sold drugs including heroin and

4  fentanyl all across Staten Island.  They sold drugs that were

5  dangerous and that were deadly.

6    A Staten Island man named Vincent Price is dead.  He

7  died from a fatal dose of fentanyl.  His lifeless body was

8  found in a bathroom by his father, a needle full of lethal

9  fentanyl by his side.  That fentanyl was sold to him by

10  Defendant Wyche.  A woman named Sarah Wieboldt could have died

11  if she was not quickly given life-saving care.  She overdosed

12  on heroin sold to her by Defendants Wyche and Allen.

13    This is a case about drug dealing, about the illegal

14  sale of potent and powerful drugs, but it's also a case about

15  money.  Because for the defendants, this was business.  And it

16  was all about money.  That's what it came down to.  No matter

17  the cost, no matter the danger, no matter the risk of death.

18    Ladies and gentlemen, my name is Gilbert Rein.  I'm

19  an Assistant United States Attorney here in the Eastern

20  District of New York, and along with my colleagues, Assistant

21  United States Attorneys, Irisa Chen, James McDonald, paralegal

22  Teri Carby, and Eileen Rosado, and Special Agent Traveis Guy

23  of the FBI, I have the honor of representing the United States

24  in this case.

25    In 2017 and 2018, the defendants ran a drug

OPENING STATEMENT – MR. REIN

1   distribution service delivering heroin and other drugs

2   directly into the hands of paying customers, people who were

3   drug users and drug addicts.  And as you will hear, cell

4   phones were crucial to their operation.  Each day that they

5   were selling drugs they would send out a text message to their

6   customers signaling that they were open for business.

7           The evidence will show that cell phones allowed them

8   to cover their tracks, and they would frequently change their

9   phone numbers.  They would also hide their identities by at

10  times going by nicknames, Marco and James.

11          When customers would respond to the defendants' text

12  messages or communications and order drugs, the defendants

13  would arrange where and when to meet them, and then they would

14  drive to a meet-up spot.  Once they arrived, customers would

15  hand over money, in exchange for small, thin, paper packages,

16  which the defendants had filled with heroin, fentanyl, or

17  both.

18          Customers could then snort drugs right out of the

19  envelopes, or prepare them and inject them with a needle

20  directly into their bodies.  That's the way Vincent Price used

21  the drugs that he bought from Keith Wyche on April 18th, 2017,

22  the date that he would buy drugs for the last time.

23          After buying from Defendant Wyche near his home in

24  Staten Island, Vincent Price went into a bathroom, injected

25  fentanyl into his arm and died.  He was 43 years old.  The

1  father of a young child.

2       And as I mentioned, his own father would find him

3  dead in the bathroom, a belt had been around his arm, a needle

4  was by his side, and his body was lifeless.  A few months

5  after Vincent Price's death in October 2017, a woman named

6  Sarah Wieboldt was looking to buy heroin and get high.  She

7  had been introduced to the defendants over the prior summer

8  and regularly bought heroin from them by calling or texting

9  the cell phone number that they shared.

10      On October 27th, 2017, she went with her friend to

11  buy heroin after arranging when and where to make that

12  purchase.  She bought bags of heroin, snorted them, and she

13  overdosed.  Unlike Vincent Price, she lived because she was

14  given an emergency dose of something called Narcan by first

15  responders.  As you'll hear, Narcan is a drug that counteracts

16  the dangerous effects of substances like heroin.

17      The defendants continued to sell drugs with no end

18  in sight, changing their shared phone number and meeting

19  customers all over Staten Island.  But after the overdose of

20  Sarah Wieboldt, one thing was now different, many of these

21  sales were now being made to confidential informants, drug

22  users, who in exchange for money, worked with the police to

23  buy drugs from drug dealers and provide the police with

24  information.  As a result, many of the defendants' sales now

25  took place with detectives watching.

OPENING STATEMENT - MR. REIN

1    After these sales occurred, detectives would meet

2    with the informants, collect fentanyl that the defendants had

3    sold the informants.  And as you'll see, these drugs became

4    valuable evidence against the defendants.  The defendants were

5    arrested and charged with several federal crimes.  They're

6    charged with conspiracy to distribute and possess with intent

7    to distribute heroin and fentanyl.  Because as the evidence

8    will show, they agreed with each other to sell those drugs.

9    They're charged with the actual distribution and

10   possession with intent to sell heroin and fentanyl because the

11   evidence will show that that's what they did, they sold those

12   drugs to others.  Defendant Wyche is charged with selling the

13   fentanyl that killed Vincent Price.  And the defendants are

14   charged together with selling the heroin that caused Sarah

15   Wieboldt overdose, that caused her serious injury.

16   Here is how the evidence will prove that the

17   defendants committed these crimes.  You're going to hear from

18   witnesses who will tell you what happened.  You will see with

19   your own eyes evidence of the defendants' crimes, which will

20   be produced here in this courtroom, including some of the

21   actual drugs the defendants sold and drugs recovered before

22   they could be sold.  You'll also be shown phone records and

23   phone data which further linked the defendants to their drug

24   distribution operation.  This will include messages from

25   several cell phones found in the defendants' possession.

OPENING STATEMENT – MR. REIN

1          In addition, experts from the Office of the Chief

2    Medical Examiner will explain how Vincent Price died and the

3    extreme potency and danger of the drugs that he was sold.

4    You'll hear from Vincent Price's father about the moment he

5    discovered his son dead in a bathroom from a drug overdose.

6    He had seen him alive only hours earlier.  He tried to help

7    his son.  He called 9-1-1.  But there was nothing that first

8    responders could do when they arrived.  His son was gone,

9    leaving behind a young child.

10          You'll also hear from Sarah Wieboldt.  The evidence

11    will show that she struggled with addiction for years.  She

12    started with pills and eventually she was introduced to

13    heroin.  She's had periods of sobriety, been in and out of

14    treatment, and it's been a struggle.  She'll tell you about

15    first being introduced to the defendants and buying drugs from

16    them regularly and about her overdose in October 2017.  And

17    you'll also learn that she later worked as a confidential

18    informant for law enforcement helping to buy drugs from the

19    defendants and gather evidence against them.  That was all a

20    part of law enforcement's efforts to investigate and identify

21    the defendants.

22          And you'll learn how law enforcement used

23    confidential informants, like Sarah Wieboldt, to conduct these

24    controlled purchases of drugs from the defendants.  The

25    confidential informants would arrange to buy the drugs from

OPENING STATEMENT – MR. REIN

1   the defendants, then actually buy the drugs using money

2   provided by law enforcement, all while detectives were

3   watching.

4          You're going to hear about how detectives knew where

5   and when these sales were going to occur so they could

6   position themselves to see the defendants coming.  NYPD

7   detectives would meet with informants right afterward, right

8   after these sales occurred and collect the drugs that the

9   defendants had just sold.  You'll see the drugs that the

10  defendants sold to these informants.  You'll see how they were

11  packaged, how the defendants prepared them.  You'll also see

12  photographs of some of the areas where the defendants would

13  sell to their customers, and you'll be able to understand how

14  it was that the defendants could be seen by the detectives as

15  they were engaging in these drug sales.

16         Photos will be shown in this case of the scene that

17  Vincent Price's father saw when he opened the bathroom door

18  and saw his son lifeless and dead from a drug overdose.  And

19  you'll see a syringe containing fentanyl directly next to

20  Vincent Price's body and toilet full of now empty paper

21  envelopes, which previously contained the fentanyl Defendant

22  Wyche sold to Vincent Price.

23         You'll hear from independent medical examiners from

24  the city's Office of the Chief Medical Examiner who will

25  testify about the examination of Vincent Price's body and the

OPENING STATEMENT – MR. REIN

1    results of tests done on his blood.  Those tests showed a

2    large amount of fentanyl, an amount which you will hear, which

3    the evidence will show was lethal.  Those tests also show the

4    presence of other drugs, including cocaine and alprazolam.

5    The doctors will explain to you how fentanyl works and why it

6    caused Vincent Price's death.

7            You'll hear that in connection with the defendants'

8    arrests, their homes and cars were searched and additional

9    evidence was recovered.  Among the things found, which I

10   expect you'll see, are the materials that the defendants used

11   to package and prepare their drugs and the money, the cash

12   that they were paid by their customers.

13           You'll also see the protective equipment that the

14   defendants had, including masks.  All necessary to protect

15   themselves against the harmful effect of the dangerous drugs,

16   the dangerous substances that they were selling their

17   customers, highly potent drugs like fentanyl.  You'll also

18   have the opportunity to review phone messages taken from many

19   cell phones recovered at the defendants' homes, messages which

20   detailed the defendants' many drugs sales and show how their

21   operation works.

22           Then there are the drugs themselves.  There are

23   drugs seized from Defendant Allen's car, which were all

24   packaged and ready for sale, but which the efforts of law

25   enforcement prevented from being distributed.

OPENING STATEMENT - MR. SCHOER

1          The evidence in this case is about to be presented,

2   so please listen carefully because it will show how the

3   defendants conspired to sell heroin and fentanyl, how they

4   sold those drugs, and how their actions had dangerous and

5   deadly consequences.

6          And that is why at the end of this trial, we will

7   come back before you and ask you to reach the only verdict

8   supported by the evidence, guilty.

9          THE COURT:  Thank you.  Does the defense for

10  Mr. Wyche wish to open?

11         MR. SCHOER:  Yes, your Honor.

12         THE COURT:  You may proceed when you're ready.

13         MR. SCHOER:  May it please the Court, members of the

14  prosecution team, my colleagues at the defense table,

15  Mr. Allen, Mr. Wyche, and most importantly, good afternoon,

16  ladies and gentlemen of the jury.  As you know, my name is

17  Gary Schoer.  I'm an attorney, and together with Michael

18  Vitaliano, we are privileged to be able to represent Keith

19  Wyche in this trial that you're about to hear.

20         Today, you as jurors take on a duty and a

21  responsibility.  You take on the duty that you swore to in

22  your oath this afternoon as jurors, your oath as jurors.  The

23  duty to uphold the law, to follow the law as Judge Irizarry

24  will give it to you.  You take on the duty to try this case

25  fairly and impartially, and you take on the duty to presume

OPENING STATEMENT - MR. SCHOER

1    Keith Wyche innocent.

2           You take on the duty to hold the prosecution to

3    their burden of proof, proof beyond a reasonable doubt, and

4    not one scintilla less.  They must prove beyond a reasonable

5    doubt that Keith Wyche participated in a drug distribution

6    conspiracy.  That he acted knowingly and intentionally.  They

7    must prove beyond a reasonable doubt that he was the person

8    who sold drugs to Vincent Price on the day of Mr. Price's

9    death, and they have to prove beyond a reasonable doubt that

10   he was the person that sold drugs to Sarah Wieboldt on the day

11   she overdosed.

12          And finally, they have to prove beyond a reasonable

13   doubt that those drugs were the but for cause, the but for

14   cause of Mr. Price's death and Ms. Wieboldt's overdose.  You

15   take on those duties and you take on the responsibility.  You,

16   and you alone, hold the fate of Keith Wyche in your hands.

17   He's pled not guilty.  He denies all these charges that are

18   brought against him.  You, and you alone, must determine

19   whether the prosecution has proven each of the elements of the

20   crimes charged beyond a reasonable doubt, each of the elements

21   of the crimes that they have chosen to charge him with.

22          You have to use your common sense.  You have to

23   judge the credibility of each witness that takes the witness

24   stand.  You have to determine whether they are telling you the

25   truth, the whole truth, and nothing but the truth.  You have

OPENING STATEMENT - MR. SCHOER

1   to judge the evidence that the prosecution will present, and

2   you have to make sure that it is credible, believable, and you

3   have to make sure that it establishes beyond a reasonable

4   doubt that Keith Wyche committed the crimes charged.

5            You have to use your common sense, and most

6   importantly, you have to apply the law that Judge Irizarry

7   will give you at the end of the case.  That's the purpose of

8   this trial and that's the purpose of every trial.  It comes

9   down to a simple question:  Did the prosecution prove beyond a

10  reasonable doubt, based upon the credible evidence, your

11  common sense, and the law each of the elements that are

12  charged in the crimes against Keith Wyche.  And I submit to

13  you that at the end of the case, you're going to find they

14  haven't.  You're going to find that you have reasonable doubts

15  as to whether Mr. Wyche sold those drugs on April 18th, 2017

16  to Vincent Price.  And you're going to have doubts as to

17  whether he sold drugs to Sarah Wieboldt on October 27th, 2017.

18  And you're going to have reasonable doubts as to whether those

19  drugs were the but for cause of Vincent Price's death and

20  Sarah Wieboldt's overdose.

21           Now, to help you in this task, the law permits me to

22  make this opening statement, to give you a preview of what we

23  think the facts will show.  Before I do, I want to remind you

24  that nothing I say is evidence, just as nothing that Mr. Rein

25  said to you in his opening statement is evidence.  The

OPENING STATEMENT - MR. SCHOER

1    evidence, as the judge told you, comes from one place alone,

2    from the mouths of the witnesses, from the exhibits that are

3    introduced into evidence through those witnesses.  Remember

4    that.  Focus on that.  But remember also that it is not

5    everything that comes out of the mouth of a witness that's

6    evidence.  It's not -- it's only the credible, believable

7    facts upon which you must base your decision.

8           The prosecution told you what they think they are

9    going to prove.  They weaved a spider web of a story of what

10   they claim happened.  It's a web in which they attempt to

11   catch everything that goes through that web.  But it's a web.

12   And it's one that you're going to learn has holes in it.

13   Holes that doesn't catch everything that goes through it.

14   Reasonable doubts in that web.  Reasonable doubts through

15   which those they seek to trap can fly and can escape.

16          They didn't tell you certain things in their opening

17   statement.  They didn't tell you that they can't establish

18   that the cell phone that was used on April 18th, 2017 was

19   possessed by Keith Wyche.  They didn't tell you that with

20   respect to Vincent Price there are no photos of someone

21   selling him drugs.  There are no photos -- I'm sorry, there

22   are no fingerprints.  There is no DNA.  And they didn't tell

23   you that the death certificate that the ME's office signed and

24   prepared with respect to Mr. Price's death says it's a

25   combination -- a combination of cocaine, fentanyl, and

OPENING STATEMENT - MR. SCHOER

1    alprazolam.  And you're going to learn also that he had

2    alcohol in his system.  There was no autopsy done.  There is

3    no evidence as to what his health condition was.

4           You will learn that there's no way that they can and

5    have proved that it wasn't the combination of all those things

6    in his body that was the but for cause of his death.  Not just

7    solely fentanyl, which is what is charged in this case.

8           You're going to learn that with respect to

9    Ms. Wieboldt, she was taken to the hospital.  I think the

10   medical records said she eloped from the hospital.  She didn't

11   even wait for any tests to be done.  There's no medical

12   evidence as to what caused her overdose.

13          (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

OPENING STATEMENT - MR. SCHOER

1    (Continuing.)

2              MR. SCHOER:  Those are the facts you're going to

3    hear.  Facts.  I've used that word a lot in this very short

4    statement.  It's the facts and the credibility of the

5    witnesses and the law that are the keys to the task you face.

6    You have to analyze the facts, you have to judge the

7    credibility, and you have to apply the law that Judge Irizarry

8    will give you.  And I submit to you that when I return to you

9    at the end of this case, when I review with you all of the

10   credible, the believable evidence, that upon that credible

11   evidence, upon those facts and the law, there will be one and

12   only one conclusion that you can reach in this case, and that

13   is that the prosecution has not proven their case, that they

14   haven't proved beyond a reasonable doubt, the charges against

15   Keith Wyche.  Thank you.

16             THE COURT:  Thank you, Mr. Schoer.

17             Does counsel for Mr. Allen wish to open?

18             MS. TODD:  Yes, Your Honor.  Thank you.

19             THE COURT:  You may proceed when you're ready,

20   Ms. Todd.

21             MS. TODD:  May it please the Court.  Counsel for the

22   Government, Mr. Schoer, Mr. Vitaliano, Mr. Wyche, Mr. Warner,

23   and Mr. Allen, ladies and gentlemen of the jury, good

24   afternoon.

25             Mr. Allen is charged in an indictment alleging a

OPENING STATEMENT – MS. TODD

1   drug conspiracy and that someone suffered serious bodily

2   injury from a drug overdose.  The Government alleges that

3   Mr. Wyche and Mr. Allen are to be held responsible for serious

4   bodily injury caused by the overdose on October 27th, 2017.

5   The ultimate determination whether Mr. Allen actually sold

6   heroin on October 27th, 2017, which caused the overdose of

7   Ms. Wieboldt is yours and yours alone to decide, based on the

8   evidence.

9           It is a fact that is not in dispute that Mr. Allen

10  was not physically meant in Staten Island on March 20th, 2017,

11  through July 6th, 2017, and was not capable of distributing or

12  assisting in the distribution of Fentanyl or heroin during

13  that time.  This period of time is critical.  It is important,

14  because you will hear about other incidents that may have

15  occurred during that time when he was not present and could

16  have not participated in those occurrences for the other times

17  relevant to the charges, and you will decide whether the

18  Government has proven each and every element of the crimes

19  charged.  That is your decision alone, and you will make that

20  determination based on the evidence and whether they have

21  proven their case beyond a reasonable doubt.

22          You're going to hear testimony from a number of

23  witnesses including law enforcement and a witness by the name

24  of Sarah Wieboldt who is the witness who overdosed on

25  October 27th, 2017.  You will learn from the evidence that

OPENING STATEMENT – MS. TODD

1    Ms. Wieboldt has many years of being a drug addict, that she

2    is a habitual opioid user, and that as a result, she has had

3    multiple drug overdoses over time.

4            At the conclusion of this case, after you've heard

5    all of the evidence and Judge Irizarry has given you the

6    instructions on the law, your only determination and decision

7    will be a legal decision based on the evidence.  Not a moral

8    one; a legal decision.  It is expected that you will hear

9    evidence that Ms. Wieboldt bought heroin on October 27th,

10   2017, that she ingested the heroin on that date, and the

11   Government alleges that the ingested heroin caused her to

12   suffer an overdose.  I expect that as you listen to the

13   evidence, you will have many doubts and those doubts will be

14   among the many reasons that I stand up before you at the end

15   of this trial and ask you to find Mr. Allen not guilty.

16           Thank you for listening.

17           THE COURT:  Thank you, Ms. Todd.

18           The Government may call its first witness.

19           MS. CHEN:  Your Honor, the Government calls Vincent

20   Price senior.

21

22           (Continued on the following page.)

23

24

25

PRICE – DIRECT – MS. CHEN

1          (The witness takes the stand.)

2          THE COURTROOM DEPUTY:  Please raise your right hand,

3     sir.

4          (The witness was sworn and/or affirmed in by the

5     courtroom deputy.)

6          THE WITNESS:  I do.

7          THE COURTROOM DEPUTY:  Thank you.  Please be seated,

8     sir.

9          Please state and spell your name for the record.

10          THE WITNESS:  Vincent Price, V-I-N-C-E-N-T,

11     P-R-I-C-E.

12          THE COURTROOM DEPUTY:  Thank you.

13          THE COURT:  Good afternoon, Mr. Price.  And if you

14     feel comfortable speaking with your mask off, you may take

15     your mask off.  If you would prefer to keep it on, you may.

16          THE WITNESS:  I'll leave it on.

17          THE COURT:  It's your choice.

18          THE WITNESS:  Okay.  Thank you.

19          THE COURT:  You may inquire when you're ready.

20          MS. CHEN:  Thank you, Your Honor.

21     **VINCENT PRICE SENIOR**, called as a witness, having been first

22     duly sworn/affirmed, was examined and testified as follows:

23     DIRECT EXAMINATION

24     BY MS. CHEN:

25     Q    Mr. Price, how old are you?

PRICE – DIRECT – MS. CHEN

1    A    Seventy.

2    Q    And where do you live?

3    A    Staten Island, New York.

4    Q    And specifically, what's your address?

5    A    Sixty-nine Carlyle Green, Staten Island, New York.

6    Q    Is that a particular neighborhood in Staten Island?

7    A    No, just a regular neighborhood.

8    Q    And do you own your house, Mr. Price?

9    A    Yes, I do.

10   Q    And how long have you lived there?

11   A    I believe it's 32 years.

12   Q    Prior to Staten Island, where did you live?

13   A    Brooklyn.

14   Q    And how long were you in Brooklyn?

15   A    All my life until 33 years until I moved to Staten

16   Island.

17   Q    Mr. Price, can you have the microphone pulled just a

18   little bit closer to you?

19   A    Oh, I'm sorry.

20   Q    That's all right.  Thank you.

21        Mr. Price, how far did you go in school?

22   A    Not far.  I went to ninth grade, but I was basically

23   pushed through the ninth grade.  Let's put it that way.

24   Q    After you left school, what did you do?

25   A    I got a job as a pipefitter.

PRICE - DIRECT - MS. CHEN

1   Q    Okay.  And do you currently work, Mr. Price?

2   A    No, I do not.

3   Q    What was the last job that you had?

4   A    Pipefitter.

5   Q    And can you explain for the jury what a pipefitter does?

6   A    I install sprinkler symptoms for fires and standpipes for

7   the fire hoes in the hallways.

8   Q    When you say sprinkler, are those indoor --

9   A    Those are indoors, yes.

10  Q    And can you talk a little bit about what that means to

11  install pipes.

12       You know, are you at a desk, are you doing --

13  A    No.  I'm in a truck and I go to all five boroughs,

14  depending where they send me, and install the pipe or fix the

15  system or dismount the system.  Whatever the job requires.

16  Q    And I apologize, do you mind explaining what installing a

17  pipe would actually mean?

18  A    Well, you got to basically load the truck up, bring it to

19  the job, bring it up to the building in the elevators, cut the

20  pipe, thread the pipe, hang it on the ceiling, and it's ready

21  for use.

22  Q    Is it manual labor, Mr. Price?

23  A    Very manually, yes.

24  Q    Okay.  Mr. Price, when did you stop working?

25  A    In '99, I believe it was.

PRICE – DIRECT – MS. CHEN

1  Q   Mr. Price, are you married?

2  A   Yes.

3  Q   To whom?

4  A   Kathleen Price.

5  Q   And how long have you been married?

6  A   Fifty years.

7  Q   Do you have any children?

8  A   Four.  Three now.

9  Q   Can you provide their names, please.

10 A   Vincent was the oldest, Kathleen, Tammy, and Kevin.

11 Q   And did you just list them in the order of eldest to

12 youngest?

13 A   Yes, from the oldest to the youngest.

14 Q   Do you have any grandchildren, Mr. Price?

15 A   Yes.  Six.

16 Q   Are you close with your children?

17 A   Very close.

18 Q   Are you close with your grandchildren?

19 A   Very close.  See them every day.

20 Q   Mr. Price, I want to direct your attention to

21 April 18th, 2017, okay.

22 A   Yes.

23 Q   Do you recall whether anything happened that day?

24 A   Yes.

25 Q   What happened?

PRICE – DIRECT – MS. CHEN

1   A     I woke up, I did not know what time it was, because I was

2   very tired from the night before, my wife was in the hospital.

3   Q     Mr. Price, if I could stop you there.

4   A     Go ahead.

5   Q     Let's talk about the day before, so April 17th, okay.

6   A     Okay.

7   Q     On April 17th, you said you were in the hospital; is that

8   right?

9   A     Yes.

10   Q     Were you there seeing anybody?

11   A     My wife.

12   Q     Why was your wife in the hospital?

13   A     She had COPD.

14   Q     And what is that, more generally?

15   A     From smoking.  I think it's a lung disease, I believe.

16   Q     And how long had she been in the hospital?

17   A     She's been in and out that whole week, and I believe she

18   was in the hospital when this all happened, four days, I

19   believe she was in the hospital.

20   Q     Okay.  And do you remember on April 17th when you got to

21   the hospital that day?

22   A     No, I don't.

23   Q     Okay.  Was it in the morning time?

24   A     I don't remember.

25   Q     Was it in the evening?

PRICE - DIRECT - MS. CHEN

1   A    It most likely was in the afternoon some time, yeah.

2   Q    In the afternoon.  And how long did you stay at the

3   hospital?

4   A    I stayed there until about 1:00 o'clock.

5   Q    1:00 o'clock in the afternoon?

6   A    In the morning.

7   Q    1:00 o'clock in the morning, okay.

8        What did you do after you left the hospital?

9   A    I believe I went to the -- well, I went to -- not a

10  restaurant, but a store that was open 24 hours.  I got myself

11  a coffee and a piece of cake.

12  Q    And what did you do after that?

13  A    I went right home.

14  Q    Did you see anybody when you got home?

15  A    No.

16  Q    Did you do anything when you got home?

17  A    I went right up to bed.

18  Q    Before we get to April 18th, Mr. Price, I want to show

19  you what's been marked for identification as Government

20  Exhibit 601.

21       MS. CHEN:  Ms. Carosella, can we just show the

22  witness that?

23  Q    Mr. Price, do you recognize this?

24  A    That's my son.

25  Q    Do you know about what age --

PRICE – DIRECT – MS. CHEN

1        THE COURT:  Which son?

2        THE WITNESS:  Oh, I'm sorry.  That's my son,

3   Vincent.

4   Q    Okay.  Do you know about what age he is in that picture?

5   A    I'm going to say 39, 40, maybe.

6   Q    Okay.  And is this a true and accurate depiction of your

7   son, Vincent Price?

8   A    Yes, it is.

9        MS. CHEN:  Your Honor, at this moment, we move to

10   admit Government Exhibit 601.

11        THE COURT:  Any objection?

12        MR. SCHOER:  No objection.

13        THE COURT:  Ms. Todd.

14        MS. TODD:  No objection, Your Honor.

15        THE COURT:  It's admitted.

16        (Government Exhibit 601, was received in evidence.)

17        MS. CHEN:  May we please publish that.

18        (Exhibit published.)

19        MS. CHEN:  Thank you.

20   Q    Mr. Price, can describe again for the jury who is

21   depicted in this picture?

22   A    That is my son Vincent.

23        THE COURT:  Can I just stop you for one second.

24        I'm sorry to interrupt you.  In between each of the

25   jurors, if you open up that panel there -- there you go.

PRICE - DIRECT - MS. CHEN

1    There's a monitor in there.  If you want to pull it out and

2    then you'll be able to see what is posted.  There you go.

3               Okay.  It may take some time for it to come up.

4    Okay.  All right.

5               And is everyone's monitor working, yeah?

6               THE JURY:  Yes.

7               THE COURT:  Okay.  Perfect.  I'm sorry, can we just

8    read back the last question and answer.

9               (Whereupon, the record was read.)

10              MS. CHEN:  May I proceed, Your Honor?

11              THE COURT:  Yes.

12   Q    Mr. Price, can you tell us in your own words what your

13   son was like?

14              MR. SCHOER:  Objection.

15   A    He was a very good kid.

16              MR. SCHOER:  Objection.

17              THE COURT:  Overruled.

18   Q    You can go ahead, Mr. Price.

19   A    I had no problem with him all his life.  He was a very

20   good kid, very respectful to me.

21   Q    Mr. Price, did your son have his own children?

22   A    Yes.  He had a --

23   Q    How many children did he have?

24   A    He had one daughter, Nancy.

25   Q    And how old is she now?

PRICE – DIRECT – MS. CHEN

1    A    Seventeen.

2    Q    Who's Nancy's mother?

3    A    Tara Brown.

4    Q    And was Tara Brown ever married to your son,

5    Vincent Price?

6    A    No.

7    Q    What was your son's birthday, Mr. Price?

8    A    March 18, '74.

9    Q    And how far did your son go in school?

10   A    Ninth grade.

11   Q    And do you know if at the time he passed away, he was

12   working?

13   A    Yes, he was.

14   Q    What was his job?

15   A    He also was a pipefitter.

16   Q    And how did he start working as a pipefitter?

17   A    I brought him in when he was 17 to help us out, clean up

18   the work areas.

19   Q    And can you explain just briefly what his job was as a

20   pipefitter?

21   A    Basically the same things, hanging pipe, troubleshooting

22   when there was a problem with the sprinkler system, and the

23   alarm bells, to fire test the sprinkler for the fire

24   department.

25   Q    Did he also install pipes?

PRICE - DIRECT - MS. CHEN

1   A    Yes.  Yes, he did.

2   Q    And did that involve the same process that you described

3   earlier?

4   A    Yes, it does.

5   Q    Do you know if he was working for a specific company at

6   the time he passed away?

7            MS. TODD:  Objection.

8            THE COURT:  I will allow it.

9            You may answer.

10  A    He was working for my nephew who had his own business,

11  but he passed away from a heart attack.  He was doing that.

12  I'm not sure of the name.  I think it was Independence

13  Sprinkler.  I'm not sure.

14  Q    Okay.  In April, 2017, do you know where your son was

15  living?

16  A    He was staying with me at the time.  They were selling

17  the house he was living in, so we -- he was staying in -- I

18  have an extra bedroom upstairs, and my kids are welcome any

19  time.

20  Q    I just want to talk about your house a little bit to

21  understand how many rooms.

22           Can you explain what type of house you live in?

23  A    It's -- I don't understand that question.  It's just a

24  house with three bedrooms, three bathrooms, a basement, full

25  basement, a yard.  I don't know what else to say.

PRICE – DIRECT – MS. CHEN

1    THE COURT:  Is it a single-family home?

2    THE WITNESS:  It's a single family, yes, I'm sorry.

3    Q    How many floors does it have, Mr. Price?

4    A    With the basement, it's three floors.

5    Q    And how many bedrooms?

6    A    There's three bedrooms.

7    Q    And what floor are those bedrooms?

8    A    That would be on the top floor.

9    Q    Okay.  How many bathrooms?

10   A    Three bathrooms.

11   Q    And can you tell us on what floors are those bathrooms?

12   A    There's two bathrooms on the top floor and one on the

13   middle floor which would be the first floor.  I'm sorry.

14   Q    Okay.  First floor.  Understood.

15        For the bathroom on the first floor, can you

16   describe about how big it is?

17   A    It's about 3-foot by 3-foot.

18   Q    And what's in the bathroom?

19   A    There's a toilet and a sink.

20   Q    No shower?

21   A    No shower.

22   Q    Okay.  In April 2017, do you know where Vincent Price's

23   daughter, Nancy, was staying?

24   A    She was staying with us.

25   Q    Okay.  And -- okay.  How long had your son,

                    PRICE – DIRECT – MS. CHEN

1   Vincent Price, been staying with you since, I guess, in

2   April 2017?

3   A     It was a few months, I believe.

4   Q     And what about his daughter, Nancy?

5   A     She also -- she was with us for a while.

6   Q     Can you explain --

7   A     We were getting custody for her, trying to get custody

8   for her.

9   Q     Can you explain how long for a while was?

10  A     Since she was about three years old, I guess.

11  Q     Mr. Price, when your son was living with you in 2017, did

12  you see any medication with his name on it in the house?

13  A     I haven't seen none, no.

14  Q     Were you able to see him, was he able to walk up the

15  stairs?

16  A     When he came home from work, he normally went right

17  upstairs, and most of the time, I wasn't home myself.

18  Q     How would you describe his health in April 2017?

19  A     He looked -- when I did see him, he looked fine to me.

20  Q     Did you ever see him struggling physically?

21  A     No.

22  Q     Are you aware of any health issues that your son had in

23  April 2017?

24  A     I do not.

25  Q     Are you aware of any health issues that your son had at

PRICE - DIRECT - MS. CHEN

1   any time prior to April 2017?

2   A    I do not.

3   Q    Mr. Price, I want to direct your attention back now to

4   April 18th, okay.

5        Can you tell me the first thing you remember that

6   day?

7   A    I woke up, I got out of bed to make breakfast for my

8   granddaughter which I always do, and when I walked down the

9   stairs, I got to about three quarters of the way and my son

10  was sitting on the couch, his back to me.  I asked him, are

11  you taking her to school and are you going to work, the answer

12  was yes, and I went right back to bed.

13  Q    Do you know around what time of day that was?

14  A    I do not know, because I do not have a clock upstairs.  I

15  never used a clock upstairs.

16  Q    Was that in the morning time?

17  A    It was in the morning.

18  Q    But you're not sure when, specifically?

19  A    No, I'm not sure.

20  Q    Okay.  What happened after -- I'm sorry, you said you

21  went back to sleep.

22        Did you wake up again?

23  A    I woke up a little after 12:00, I believe it was.  I went

24  downstairs.  My granddaughter was on the couch sleeping.  I

25  told her to go upstairs.

PRICE – DIRECT – MS. CHEN

1  Q   And why did you tell her that?

2  A   Because I knew she didn't go to school, so I told her to

3  go upstairs.

4  Q   Did you go upstairs with her?

5  A   No.

6  Q   Did she, in fact, go upstairs?

7  A   She went upstairs, yes.

8  Q   What did you do next?

9  A   Then I walked over to the bathroom, it was locked.

10  Q   And did that -- was that strange to you, at all?

11  A   I got six grandkids; the door is always locked.

12  Q   What did you do --

13  A   I took a butter knife and I opened it up which I normally

14  do when it's locked.

15  Q   Can you explain how you did that, Mr. Price?

16  A   I just -- it's not a fancy lock.  I just pried it open a

17  little bit and opened the door.

18  Q   And when you opened the door, what did you see?

19  A   My son started falling out.  His head was leaning against

20  the door -- his whole body, basically.

21  Q   At that point, did you do anything?

22  A   I slammed the door closed and I yelled up to my

23  granddaughter, Don't come down, whatever you do.

24  Q   After you did that, what did you do next?

25  A   I opened the door, my son fell out, I tried to -- I

PRICE - DIRECT - MS. CHEN

1   couldn't move him too much.  He was pretty heavy.  I tried to

2   straighten him out, and I called 9-1-1 as fast as I could.

3   Q    Mr. Price, I know this is difficult, but I want to talk

4   to you about what you saw specifically when you opened that

5   door, okay.

6        Were you able to see your son's face before he fell?

7   A    No.  I seen the back of his head.

8   Q    Okay.  Can you describe what his head looked like that

9   day?

10  A    It was a light purple.

11  Q    Were you able to see his arms?

12  A    Not when I -- not until I pulled him out.

13  Q    And when you were able to see his arms when you pulled

14  him out, were you able to see his bare skin or was he wearing

15  a shirt?

16  A    I believe he had a short-sleeved shirt on.

17  Q    Okay.  So you were able to see his arm --

18  A    Yes.

19  Q    -- past his shirt?

20  A    Yes.

21  Q    Was there anything on his arm?

22  A    There was a belt.

23  Q    Can you explain when you say, There was a belt, how was

24  the belt on his arm?

25  A    It was wrapped around, above his elbow.

PRICE – DIRECT – MS. CHEN

1    Q    Whether you say, Wrapped around, was it tied?

2    A    It was just around his arm.  I don't know how -- I

3    assumed he just grabbed it and pulled on it.

4    Q    Do you remember which arm it was on?

5    A    I do not.

6    Q    But it was on one arm, not both?

7    A    It was on one arm, yes.

8    Q    Mr. Price, do you have an understanding as to why a belt

9    would be around his arm?

10              MR. SCHOER:  Objection.

11              THE COURT:  If he knows.

12              Do you know why a belt would be around his arm?

13              THE WITNESS:  Yes.

14   Q    And why would that be?

15   A    I grew up in the '70s.  I had a lot of friends that died

16   of AIDS from shooting up.

17   Q    When you say, Shooting up, can you explain what that

18   means, Mr. Price?

19   A    People that shoot up drugs, needles.

20   Q    And how is a belt used in connection with that?

21   A    I don't know much about it.  I don't take drugs, so I

22   assume it's just what the doctor does, wraps around before

23   they take your blood.

24   Q    Were you able to see your son's torso before he fell out?

25   A    I don't remember what I seen.

PRICE - DIRECT - MS. CHEN

1   Q    Okay.  When you opened the bathroom door, can you

2   describe the position of your son's body?

3   A    His backside was on the toilet, and his head was in the

4   corner of the door.  It's a very small bathroom.

5   Q    So if I'm understanding correctly, you're saying the

6   corner was a wall and the door; is that right?

7   A    The door -- the door and the wall is basically about

8   2 inches apart.

9   Q    Okay.

10  A    Of the buck of the door, the door buck.

11  Q    And does your bathroom door on the first floor, does that

12  open out or does that open in?

13  A    It opens out.

14  Q    So when you opened the door, you opened the door out, and

15  then Mr.-- I'm sorry, your son fell out?

16  A    A little bit of his body started moving, and I again,

17  closed it, and went to my granddaughter to yell not to come

18  down.

19  Q    Okay.  Mr. Price, when your son fell out of the bathroom,

20  did you hear anything?

21  A    I heard -- I don't know how to explain it.  I assumed it

22  was air in his lungs, and it escaped.

23  Q    Mr. Price, what was your reaction to your son falling out

24  of the bathroom?

25  A    I was shocked.  I was -- everything turned into, like,

53

PRICE - DIRECT - MS. CHEN

1   cloud nine, basically.  I didn't know where I was.

2   Q    Mr. Price, were you able to see what was in the bathroom

3   on the sink, for example?

4   A    No, I did not.

5   Q    Did you see what was on the floor in the bathroom around

6   your son?

7   A    I was not looking for nothing.  No, I did not.

8   Q    So Mr. Price, I think you said you called 9-1-1; is that

9   right?

10  A    That's correct.

11  Q    What did you tell the 9-1-1 operator?

12  A    I'm not 100 percent sure.

13  Q    Did you alert them to what you had seen?

14  A    Yes.

15  Q    Did someone respond to your house in connection with that

16  9-1-1 call?

17  A    Yes.  EMS, I believe it was the Fire Department EMS was

18  about -- not even two minutes away.

19  Q    Mr. Price, going back to what you saw.

20       Did you touch your son's body when he fell out of

21  the bathroom?

22  A    I tried to straighten him out, pull him, you know, from

23  the position he was in.

24  Q    Do you remember where on your son's body you touched him?

25  A    I do not.

54

PRICE − DIRECT − MS. CHEN

1  Q    Okay.  Did you try to revive your son?

2  A    I did not.

3  Q    Did you hear your son breathing?

4  A    I did not.

5  Q    Who was the first to arrive at your house in connection

6  with the 9-1-1 call you made?

7  A    I believe it was the Fire Department EMS.

8  Q    And did you dell that EMS personnel anything when he or

9  she arrived?

10  A    No.  When she arrived and she told me he's gone, there's

11  nothing we can do, I walked over to the steps, and I had a

12  heart attack in '08, so I was kind of messed up, and she asked

13  me, are you okay, and I said, I believe I'm okay.

14  Q    Did you see the EMS personnel do anything to your son?

15  A    I did not.

16  Q    Did you see the EMS personnel touch your son?

17  A    I did not.

18  Q    Were you in the room when the EMS personnel was near your

19  son?

20  A    Yes, I was.

21  Q    Okay.  Did other individuals arrive at your home in

22  connection with that call?

23  A    There was quite a few police officers in and out.

24  Q    Did you speak with any of them?

25  A    I spoke to, I believe, two of them.

PRICE - DIRECT - MS. CHEN

1    Q    Do you remember what you told them?

2             MR. SCHOER:  Objection.

3    A    I do not.

4             THE COURT:  Overruled.

5    A    I do not.

6    Q    Mr. Price, at some point, did you speak with your

7    granddaughter later that day?

8    A    After everything went on, once they came, I went upstairs

9    and told my granddaughter that your father has passed and we

10   both sat there and cried.  That's about it.

11   Q    Mr. Price, when is the last time you saw your son's body

12   that day?

13   A    Alive or...

14   Q    When you saw your son at all, dead or alive?

15   A    It was when I opened the door.  I don't know the time.

16   Q    Was your son -- was your son's body taken out of your

17   house that day?

18   A    Oh, yes.  It was a while went by, I don't know how long,

19   and they finally came to take him out and they had him in the

20   body bag, and outside, I touched the bag...

21            THE COURT:  Take your time.

22   A    I'm sorry.  I touched the body bag and told him good bye.

23            I'm okay.

24   Q    Mr. Price, are you okay?

25   A    I believe so.

PRICE – DIRECT – MS. CHEN

1  Q    Mr. Price, did you tell anyone else what happened that

2  day?

3  A    I called my son-in-law to go get -- to get his wife to

4  pick him up, but don't tell him what happened, because I

5  didn't want her to get upset while she was driving.

6           MR. SCHOER:  Objection.

7           THE COURT:  Overruled.

8  Q    Did you tell your wife what happened that day?

9           MR. SCHOER:  Objection.

10          THE COURT:  Overruled.

11 A    I called my wife and told my wife our son was gone.

12 Q    How did your wife react to that?

13 A    She was in the hospital.  I was on the phone.  I have no

14 idea.

15 Q    Mr. Price, do you have a belief as to what happened to

16 your son that day?

17          MR. SCHOER:  Objection.

18          THE COURT:  Sustained.

19 Q    Mr. Price, do you remember being asked whether or not an

20 autopsy could be performed on your son?

21 A    I don't remember, to tell you the truth.

22 Q    Do you know if an autopsy was conducted on your son?

23 A    I really don't know.

24 Q    Do you recall telling -- talking to anyone about an

25 autopsy on your son?

PRICE – CROSS – MR. SCHOER

1   A     I really don't recall.

2   Q     Do you ever recall talking to your son about an autopsy

3   being done?

4            MR. SCHOER:  Objection.

5            THE COURT:  Which son?

6   Q     I'm sorry, do you recall speaking with your son,

7   Vincent Price, about an autopsy being done on him?

8            MR. SCHOER:  Objection.

9            THE COURT:  Sustained.

10           MS. CHEN:  Can I have one moment, Your Honor?

11           THE COURT:  Yes.

12  Q     Mr. Price, I just have one more question.

13           The morning of April 18th, 2017, other than you,

14  your son, Vincent Price, and his daughter, Nancy, was there

15  anybody else that you're aware of being in the house?

16  A     Not that I was aware of.

17  Q     Okay.

18           THE COURT:  Does counsel -- are you done?

19           MS. CHEN:  Yes, Your Honor.

20           THE COURT:  Does counsel for Mr. Wyche wish to cross

21  examine?

22           MR. SCHOER:  Yes, Your Honor.

23           THE COURT:  You may proceed.

24  CROSS-EXAMINATION

25

PRICE – CROSS – MR. SCHOER

1   BY MR. SCHOER:

2   Q    Mr. Price, good afternoon.

3   A    Good afternoon.

4   Q    My name is Gary Schoer and I represent Keith Wyche.  I

5   want to indicate to you that we're sorry for your loss.

6   A    Thank you.

7   Q    You've been interviewed many time about what happened on

8   April 18th, correct?

9   A    No, I haven't.

10  Q    Well, did you meet with the Government, the prosecutor's

11  office to talk about what happened that day?

12  A    A few days ago, yes.

13  Q    Do you remember meeting with them on Tuesday,

14  January 23rd, about 20 days ago?

15  A    No, I do not.

16  Q    I'm sorry, January 10th, 2023, about 20 days ago.

17          Do you remember that?

18  A    No, I did not.

19  Q    Do you remember meeting with Mr. Rein and a Detective

20  Vaccarino on that day?

21  A    Somebody did come to my house that day.  I don't know

22  what day it was, but I did have him come to my house.

23  Q    Okay.  And do you remember telling them that on that

24  day -- well, do you remember telling them on that day that you

25  weren't sure when you had last seen your son alive, either

PRICE – CROSS – MR. SCHOER

1   that morning or maybe it was the night before that you had

2   seen him?

3   A     I did say that because -- yes, I did.

4   Q     Now, you indicated that -- well, let me ask you this:

5   Were you aware that your son had a heroin problem?

6   A     No, I did not.

7   Q     Well, do you remember telling the police officers who

8   arrived there that morning that your son had a heroin problem?

9   A     No, I do not.

10          THE COURT:  I'm sorry, you said when the police

11   arrived.

12          What morning?

13          MR. SCHOER:  I'm sorry, April 18th, 2017.

14   Q     You don't remember telling them that?

15   A     No.  I do not remember telling them that.

16   Q     Do you remember telling the 9-1-1 operator when you

17   called that your son had a heroin problem?

18   A     No.  I don't remember that either.

19   Q     Do you remember meeting with the Government on

20   September 24th, 2019, concerning what happened on April 18th,

21   2017?

22   A     I do not remember meeting with them, no.

23   Q     Do you remember telling the Government well -- withdrawn.

24          Do you remember on that day meeting with Agent Guy,

25   who's sitting here at the end of the table, and another FBI

PRICE - CROSS - MR. SCHOER

1   agent concerning what happened on April 19 -- April 18th,

2   2017?

3   A    I remember meeting them, but I don't remember the date.

4   Q    And do you remember meeting them with your wife present?

5   A    I don't remember that.

6   Q    Well, do you remember telling them that you and your wife

7   were aware of your son's drug use?

8   A    No, I don't remember that, saying that.

9   Q    And that you allowed him to move into your home,

10  notwithstanding the fact that he had a drug problem?

11  A    No.  I know -- I knew he smoked pot.  To me, that's

12  drugs.

13  Q    Well, did you know that he had overdosed on occasions

14  prior to April 18th?

15  A    No, I did not.

16        MS. CHEN:  Objection, Your Honor.

17        THE COURT:  I will allow it.  The question is

18  whether he knew.

19        The answer will stand.

20  Q    Well, do you remember telling the agents that day that

21  you were made aware of your son's previous overdose?

22  A    No, I do not.

23  Q    Are you familiar with your son's girlfriend, Marla

24  Milano?

25  A    I know as Mara.  I met her once.

PRICE – CROSS – MR. SCHOER

1    Q    Okay.  Mara?

2    A    Yes.

3    Q    And she's a nurse, correct; do you know that?

4    A    I believe that's what she is.

5    Q    And when they were living together, your son and --

6             THE COURT:  First of all, that's assuming facts not

7    in evidence.

8             MR. SCHOER:  I'm asking him.

9             THE COURT:  No, you're not asking.  You're assuming

10   facts not in evidence.

11            Rephrase your question.

12            MR. SCHOER:  I'm sorry.

13   Q    Your son and Mara, did they live together at times?

14   A    Yes, they did.

15   Q    And when they were living together, were you aware that

16   your son had overdosed on several occasions?

17   A    No, I do not.

18   Q    Were you aware that that Mara, Ms. Milano, had to NARCAN

19   him in order to revive him?

20   A    No, I do not.

21   Q    When you met with agents, did you indicate to them that

22   you thought that your son was buying heroin at a gas station

23   down the road?

24            MS. CHEN:  Objection, Your Honor.

25            The witness has already said he does not recall

PRICE - CROSS - MR. SCHOER

1  meeting with agents.

2        MR. SCHOER:  Well, I think he said he didn't --

3        THE COURT:  Excuse me.  No argument.  If you want to

4  argue it, then we'll have a sidebar.

5        MR. SCHOER:  Sorry, Judge.

6        THE COURT:  The objection is sustained.

7  Q    Mr. Price, you indicated that you remember meeting with

8  the agents, but you don't remember what day that was, correct?

9  A    That's correct.

10 Q    And when you met with the agents, do you remember telling

11 them that your son -- it was your understanding that your son

12 went down to the gas station down the road and that's where he

13 got the drugs?

14 A    No.  I believe the question was they were looking for any

15 kind of video, and my -- I believe my wife said, he's been --

16 he always goes to the gas station for paper.  Maybe you should

17 check that.  That, I remember.

18 Q    Okay.  And in addition, your wife gave the agents some

19 e-mails, correct?

20 A    I don't know that.

21        MR. SCHOER:  May I just have a second, Judge?

22        THE COURT:  Yes.

23        (Pause in the proceedings.)

24        MR. SCHOER:  No further questions, Judge.

25        THE COURT:  And does counsel for Mr. Allen have any

PRICE – REDIRECT – MS. CHEN

1   questions?

2            MS. TODD:  No, Your Honor.

3            THE COURT:  Is there any redirect?

4            MS. CHEN:  Just a couple of questions, Your Honor.

5            THE COURT:  Okay.  You may proceed.

6   REDIRECT EXAMINATION

7   BY MS. CHEN:

8   Q    Mr. Price, I believe Mr. Schoer just asked you whether

9   you recall originally telling individuals that you may have

10  seen your son the night before or the morning of his death.

11           Do you recall that?

12  A    As I said, I really don't remember seeing him the night

13  before.  I might have passed him by, but I was so tired, I

14  couldn't tell you whether I seen him or not.  The morning is

15  when I first went down the stairs to make breakfast for my

16  granddaughter and he was sitting on the couch with his back

17  towards me.  That was the last time I seen him alive.

18  Q    Okay.  And you're sure of that now, Mr. Price?

19  A    I'm positive.

20           MS. CHEN:  No further questions, Your Honor.

21           THE COURT:  Anything further for the defense, either

22  defendant?

23           MR. SCHOER:  No, Your Honor.  Thank you.

24           THE COURT:  Ms. Todd.

25           MS. TODD:  No.

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*

PRICE – REDIRECT – MS. CHEN

1          THE COURT:  Thank you, sir.  You may step down.

2          THE WITNESS:  Thank you.

3          (The witness steps down.)

4          (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1          THE COURT:  You may call your next witness.

2          MR. REIN:  Your Honor, the government has a

3    stipulation to read into the record.

4          THE COURT:  You may read it in the record.  What is

5    the government's exhibit?

6          MR. REIN:  It's Government's Exhibit 101, your

7    Honor.  May I proceed, Judge?

8          THE COURT:  Yes, you may.

9          MR. REIN:  Government Exhibit 101 contains a

10   caption, United States District Court, Eastern District of New

11   York, United States of America against Keith Wyche and Oneil

12   Allen.

13          And it states, it is hereby stipulated and agreed by

14   and between the United States of America and the Defendant

15   Keith Wyche, through his attorneys Gary Schoer and Michael

16   Vitaliano, and the Defendant Oneil Allen, through his

17   attorneys Natali Todd and Cody Warner that, one, Government

18   Exhibit 401 -- I'm sorry, Judge.  Government Exhibit 401 is a

19   true and accurate copy of title and registration records

20   reflecting that an Infiniti bearing New York license plate

21   number HRD5545, was registered to Terry Torres at 70 East

22   11 -- I'm sorry, 70 East 115th Street, Apartment 2H, New York,

23   New York, 10029, and was maintained by the New York State

24   Department of Motor Vehicles as part of its regularly

25   conducted business activity.

PROCEEDINGS

1        Two, Government Exhibit 402 is a true and accurate

2   copy of title and registration records reflecting that a Jeep,

3   bearing New York license plate number HRD7229, was registered

4   to Keith T. Wyche at 801 Manor Road, Apartment 2C, Staten

5   Island, New York, 10314, and was maintained by the New York

6   State Department of Motor Vehicles as part of its regularly

7   conducted business activity.

8        Three, Government Exhibit 403 is a true and accurate

9   copy of title and registration records reflecting a Lexus,

10  bearing New York license plate number JAG1606 was registered

11  to Oneil A. Allen, Jr. at 218 Ada Drive, Staten Island, New

12  York, 10314, and was maintained by the New York State

13  Department of Motor Vehicles as part of its regularly

14  conducted business activity.

15       Four, Government Exhibit 404 is a true and accurate

16  copy of an external examination report, toxicology report,

17  case worksheet, certificate of death, and related forms and

18  reports concerning the April 18th, 2017 death of Vincent Price

19  that were maintained by the Office of the Chief Medical

20  Examiner for the City of New York as part of its regularly

21  conducted business activity.

22       Five, Government Exhibit 405 is a true and accurate

23  copy of hospital treatment records, including physician notes

24  and discharge plan, concerning the October 27th, 2017

25  treatment regarding the overdose of Sarah Wieboldt that were

PROCEEDINGS

1    maintained by Richmond University Medical Center as part of

2    its regularly conducted business activity.  The redactions in

3    Government Exhibit 405 are agreed upon by the parties.

4           Six, Government Exhibit 406 is a true and accurate

5    copy of a pre hospital care report in connection with

6    treatment provided to Sarah Wieboldt on October 27th, 2017 by

7    individuals from the Fire Department of the City of New York

8    that were maintained by the Fire Department of the City of New

9    York as part of its regularly conducted business activity.

10          Seven, Government Exhibits 401, 402, 403, 404, 405,

11   and 406, and this stipulation, marked as Government

12   Exhibit 101, are admissible in evidence.

13          The stipulation is dated January 18th, 2023, signed

14   by counsel for the government and counsel for Defendant Oneil

15   Allen and counsel for Defendant Keith Wyche.

16          And, your Honor, on the basis of this stipulation,

17   the government moves to admit Government's Exhibits 401, 402,

18   403, 404, 405, and 406, and the stipulation itself, which is

19   Exhibit 101.

20          THE COURT:  Based on the stipulation entered into by

21   the parties, both the stipulation, which is Government

22   Exhibit 101 and Government Exhibits 401 through 406, are

23   admitted.

24          And so, ladies and gentlemen, the evidence in this

25   case now includes facts to which the parties have agreed or

PROCEEDINGS

1   stipulated.  A stipulation means simply that the government

2   and the defendants accept the truth of a particular

3   proposition or fact.  As there is no disagreement, there is no

4   need for evidence apart from the stipulation.  You must accept

5   the stipulation as evidence and regard that fact and give it

6   whatever weight you chose.

7           And at the end of the case when we then give you

8   further instructions, I will discuss with you how you will be

9   able to take a look at certain exhibits and so on during your

10  deliberations.

11          (Government Exhibit 10, was received in evidence.)

12          (Government Exhibits 401, 402, 403, 404, 405, and

13  406, were received in evidence.)

14          THE COURT:  You may call your next witness.

15          MR. REIN:  Thank you, Judge.  The government calls

16  Investigator Leashawn Peaks.

17          THE COURTROOM DEPUTY:  You may step up.  Please

18  raise your right hand.

19          (Continued on next page.)

20

21

22

23

24

25

PEAKS – DIRECT – MR. REIN

1          (Witness takes the witness stand.)

2    **LEASHAWN PEAKS**, called as a witness, having been first duly

3    sworn/affirmed, was examined and testified as follows:

4          THE COURTROOM DEPUTY:  Please be seated.  Please

5    state and spell your name.

6          THE WITNESS:  Leashawn Peaks.  L-E-A-S-H-A-W-N.

7    P-E-A-K-S.

8          THE COURTROOM DEPUTY:  Thank you.

9          THE COURT:  And good afternoon, ma'am.  You can keep

10   the mask on or take it off, however you feel most comfortable.

11   I leave that decision up to you.  Okay?

12         THE WITNESS:  Okay.

13         THE COURT:  Just keep your voice up nice and loud.

14   You can adjust the mic to make yourself comfortable.

15         THE WITNESS:  Thank you.

16         THE COURT:  You may inquire when you're ready.

17         MR. REIN:  Thank you, Judge.

18   DIRECT EXAMINATION

19   BY MR. REIN:

20   Q    Good afternoon.

21   A    Good afternoon.

22   Q    Investigator Peaks, are you currently employed?

23   A    Yes.

24   Q    Where do you work?

25   A    The Office of Chief Medical Examiner.

PEAKS – DIRECT – MR. REIN

1  Q    Is that for the City of New York?

2  A    Yes.

3  Q    What is the Office of Chief Medical Examiner for the City

4  of New York?

5  A    The medical examiner's office.

6        THE COURT:  I'm sorry.  Can I ask you to keep your

7  voice up a little bit louder?  Thank you.

8  A    The medical examiner office conducts independent

9  investigation to establish cause and manner of death.

10  Q    Is it also known as OCME?

11  A    Yes.

12  Q    What is your position with OCME?

13  A    I am a medical legal investigator.

14  Q    What is your highest level of education?

15  A    I have a bachelor's degree in psychology and a bachelor's

16  degree in health science.

17  Q    And prior to joining the Office of Chief Medical Examiner

18  were you previously employed?

19  A    Yes.

20  Q    What did you do for a living?

21  A    I'm a physician assistant.

22  Q    Can you explain to us what is a physician's assistant?

23  A    I'm a clinician who diagnose and treat patients under the

24  supervision of a physician.

25  Q    How long have you held the position of medical legal

PEAKS - DIRECT - MR. REIN

1    investigator with OCME?

2    A     Twenty-two years.

3    Q     Can you describe for us what your duties and

4    responsibilities are in that role?

5    A     I investigate death of unusual or suspicious

6    circumstances and death that occur, sudden and unexpected.

7    Q     And how do you actually go about investigating deaths

8    that occur?

9    A     A call is placed to our communication center, and a

10   notice of death is generated with a case number, and then the

11   case is assigned to an investigator.

12   Q     When you first joined the Office of Chief Medical

13   Examiner, what type of training did you receive?

14   A     I had six months' training shadowing a senior

15   investigator.

16   Q     Can you describe for us during that training what types

17   of things would you do?

18   A     Go out to scene investigations and take telephone calls,

19   consultations.

20   Q     Do you continue to receive training?

21   A     Yes.

22   Q     What does that training consist of?

23   A     It is lectures, continuing medical education lectures on

24   topics of blunt injury, sharp injury, gunshot wound,

25   environmental exposure, just to name a few.

PEAKS - DIRECT - MR. REIN

1  Q    How do you as an investigator actually become involved in

2  an investigation?

3  A    The case is assigned by a supervisor.

4  Q    And once a case is assigned to you -- well, once a case

5  is assigned to you, what steps will you take at first?

6  A    On the notice of death, there is a reporter, and I will

7  return the call to the reporter to find out the circumstances

8  of the death.

9  Q    After you -- who is the reporter that you're referring to

10 on a notice of death?

11 A    More than likely the police.

12 Q    After you confer with the reporter listed on a notice of

13 death, what will you do in furtherance of your investigation?

14 A    After our conversation, I will determine if a scene

15 investigation is warranted, and if so, I respond to the scene.

16 Q    When you say a scene investigation, what does that mean?

17 A    I will arrive to the location of death and start an

18 investigation by initially introducing myself to the police

19 once I arrive on scene and to witnesses, and then I conduct my

20 investigation with photo documentation, written documentation,

21 and examination of the body, followed by an identification of

22 the body and autopsy wishes from the family.

23 Q    You mentioned that when you first arrive at a scene

24 you'll confer with the police.  Why do you do that?

25 A    I introduce myself and to see if there's any new

PEAKS - DIRECT - MR. REIN

1    information that became available since we last spoke.

2    Q    When you're first assigned a case, how does the Office of

3    Chief Medical Examiner keep track of your investigation?

4    A    Each case has a case number.  Each county has a letter

5    indicating which county the death occurred.

6    Q    In the case of Staten Island, what's the letter that's

7    assigned to a case investigation number?

8    A    R for Richmond.

9    Q    And the case investigation number that you're referring

10   to, is that unique?

11   A    Yes.  To that case only.

12   Q    You mentioned that when you respond to a scene you'll

13   document it with a written report and photographs.  Why do you

14   do that?

15   A    Policy and procedure.

16   Q    When you arrive at a scene of a death, what types of

17   things will you do to the body of a decedent itself in

18   furtherance of your investigation?

19   A    Perform an examination by looking for injury, bruising or

20   wounds, and take photo documentation if there are bruises and

21   wounds or tattoos.

22   Q    In order to do that, do you have to move the body?

23   A    Yes.

24   Q    Why does the body have to be moved?

25   A    It's policy and procedure to examine the anterior and

PEAKS - DIRECT - MR. REIN

1   posterior aspects of the body.

2   Q    When you say the anterior aspects of the body, can you

3   describe for us what you're referring to?

4   A    The front and the back.

5   Q    Is the back the posterior?

6   A    Yes.

7   Q    When you are finished with an investigation at a scene,

8   what happens to the decedent's body?

9   A    It's -- I notify the transportation team, and they

10  transport the decedent to our office, the medical examiner's

11  office.

12  Q    Have you ever responded to the scene of a suspected drug

13  overdose in your career?

14  A    Yes.

15  Q    If you can, approximately, can you approximate for us how

16  many times you have?

17  A    Several.  There's no way to really generate.  Our IT

18  department cannot put deaths related to drug use in a

19  category, so it's many.

20  Q    Is it fair to say is it over a dozen times?

21  A    Sure.

22  Q    And is there anything in particular that you'll do when

23  you respond to that type of case?

24  A    No.

25  Q    So is it treated like any other death you're

PEAKS – DIRECT – MR. REIN

1    investigating?

2    A    Yes.

3    Q    I want to direct your attention now to April 18th, 2017.

4    Were you working on that day?

5    A    Yes.

6            MR. REIN:  At this time, can we show the witness --

7    I'm sorry.  Can we publish what's in evidence as Government

8    Exhibit 404 and turn to page 18.

9    Q    Investigator Peaks, are you able to see what's in front

10   of you?

11   A    Yes.

12   Q    We're looking at an exhibit.  It says Notice of Death at

13   the top.  Can you explain to us what this is that we're

14   looking at?

15   A    A notice of death is a document that provides demographic

16   information of the decedent and the circumstances of the

17   death.

18   Q    In looking at the exhibit, can you tell us to whom does

19   this notice of death pertain?

20   A    The name is Vincent C. Price.

21   Q    And how old was Vincent C. Price?

22   A    Forty-three years old.

23   Q    What was the place of death that is noted?

24   A    69 Carlyle Green, Staten Island, New York, 10312.

25   Q    In looking at this exhibit, can you describe for us what

PEAKS – DIRECT – MR. REIN

1   was the nature of death as noted in this notice?

2   A    Notes read:  Found by his father face down on the

3   bathroom floor.  Last seen/spoken to around 9 a.m. by his

4   father.  No trauma, just a belt wrapped around the right arm.

5   Medical history, drug abuse, no doctor, no meds present.

6   Q    Was there a medical legal investigator assigned to this

7   death after it was -- after this notice was received?

8   A    Yes.

9   Q    Who was that?

10  A    Myself.

11  Q    What time were you assigned this case?

12  A    13:46.

13  Q    Is that 1:46 p.m.?

14  A    Yes.

15  Q    I'm sorry, what is the date of this notice of death?

16  A    4/18/2017.

17  Q    You mentioned that there is -- I'm sorry, are you able to

18  tell us in connection with this investigation what the medical

19  examiner number was?

20  A    R-17-8978.

21  Q    After you received this notice of death, what steps did

22  you take -- what were the initial steps you took as part of

23  your investigation?

24  A    I made a call to the reporter, which is the police

25  officer, on -- indicated here as the caller name, and get

PEAKS - DIRECT - MR. REIN

1  circumstances surrounding the death.

2  Q    After you spoke with that reporter, what did you do?

3  A    I responded to the scene.

4  Q    So you went to 69 Carlyle Green?

5  A    Yes.

6  Q    How did you get there?

7  A    I drove an Office of Chief Medical Examiner's vehicle.

8  Q    When you receive this notice of death, where are you

9  located physically?

10 A    Well, it all depends.  I could be in the office, if I

11 didn't have a prior scene.  If I had a prior scene, I will

12 leave from that scene to this location.

13 Q    I want to turn now to --

14      MR. REIN:  Can we turn to page 11 of the exhibit?

15 Q    Investigator Peaks, what are we looking at on page 11 of

16 the exhibit?

17 A    The investigation report.

18 Q    Who completed this report?

19 A    Myself.

20 Q    Can you describe for us what is an investigation report?

21 A    An investigation report is the information that is

22 gathered during the scene investigation and placed into a

23 report.

24 Q    Describe for us when is this type of report completed in

25 relation to when your initial investigation of a death begins?

PEAKS – DIRECT – MR. REIN

1    A     The report is written at the office.  It could be -- I

2    can't tell you what time of the day, but I would have to refer

3    to my notes here, but it's written once I return to the

4    office.

5    Q     You mentioned that you responded to 69 Carlyle Green.

6    Approximately what time did you get there?

7    A     Can I refer to my scene investigation report?

8    Q     Yes.  One moment.

9              THE COURT:  Do you have an independent recollection?

10             THE WITNESS:  No, I do not.

11             THE COURT:  Will this document refresh your

12   recollection?

13             THE WITNESS:  Yes.

14             MR. REIN:  We can -- I'm sorry, Judge.  If we could

15   just turn to page 13 of the exhibit.

16   Q     Investigator Peaks, what are we looking at on page 13 of

17   the exhibit?

18   A     The scene investigation form.

19   Q     In looking at this document, can you tell us what time

20   you arrived at 69 Carlyle Green?

21   A     3 p.m.

22   Q     When you first arrived at 69 Carlyle Green on April 18th,

23   2017, what did you do first?

24   A     I introduced myself to police and witnesses.

25   Q     What was the purpose of that?

                        PEAKS - DIRECT - MR. REIN

1   A    Policy and procedure.

2   Q    After you introduced yourself to law enforcement and

3   witnesses, was your attention directed to anywhere in

4   particular?

5   A    Yes, the location of the decedent.

6   Q    What did you actually observe to be located at 69 Carlyle

7   Green?

8   A    The location of the decedent?

9   Q    When you got to that address, what did you observe to be

10  physically at that location at that address?

11            THE COURT:  That's -- that's too vague a question.

12  Q    What type of -- was it a private house?

13  A    Yes.

14  Q    So when you got to that house, was your attention

15  directed to anywhere in particular inside?

16  A    Yes.

17  Q    Where was that?

18  A    The bathroom.

19  Q    When you got to the bathroom, can you describe for us

20  what you observed?

21  A    Can I refer to the photographs, please, or the second

22  page of this scene investigation form?

23            MR. REIN:  Can we turn to page 14 of the exhibit?

24  A    I observed the decedent lying face down on the

25  bathroom/hallway floor.

PEAKS - DIRECT - MR. REIN

1   Q    After observing that, can you describe for us how you

2   proceeded with your investigation?

3   A    I start first with photo documentation, followed by

4   written documentation.

5        MR. REIN:  Turning back to page 11 of the exhibit.

6   Q    Investigator, there is a heading on the page that says

7   Case Synopsis.  Can you describe for us what information is

8   included under that heading?

9   A    The demographics of the decedent and a summary of the

10  circumstances of death, a brief summary.

11  Q    So in this document, what was the case synopsis?  If you

12  could read it for us.

13  A    The decedent is a 43-year-old man with drug abuse.  The

14  decedent was found unresponsive in the bathroom by the father.

15  Q    There's also a heading called Subjective Findings.  Can

16  you describe for us what information is to be included under

17  that heading?

18  A    The social and medical history and the circumstances

19  surrounding the death.

20  Q    What is social history?

21  A    An example would be tobacco history, alcohol history,

22  drug history.

23  Q    And what is medical history?

24  A    An example would be hypertension, diabetes, asthma.

25  Q    Can you read for us what it says on this document under

PEAKS − DIRECT − MR. REIN

1  subjective findings?

2  A    The decedent is a 43-year-old man with drug abuse,

3  heroin, in parentheses.  Social drinker.  The decedent lived

4  with the parents.  The decedent was scheduled to work today.

5  The father noticed the bathroom door closed.  The father

6  opened the door and found the decedent sitting on the commode.

7  A belt was found tied around the decedent's right arm.

8  Several glassines were found in the commode.  An empty syringe

9  was on the bathroom floor.  EMT pronounced without

10  intervention.  The decedent was last seen alive at 9 a.m. by

11  the father.

12  Q    Investigator, what is a glassine?

13  A    It's a packaging that has kind of a waxy film paper for a

14  substance that's usually used.

15  Q    You mentioned a syringe.  Can you just describe for us

16  what's a syringe?

17  A    A syringe consists of a barrel with a needle and a

18  plunger.  It's used to administer a substance or extract

19  fluid.

20  Q    There's also a heading on this page that says Scene

21  Investigation Details.  Can you describe for us what

22  information is to be included under that heading?

23  A    The information is the information obtained at the scene

24  of the surroundings and the examination of the decedent.

25  Q    Can you read for us what's listed under that heading?

PEAKS – DIRECT – MR. REIN

1  A    Scene investigation revealed the decedent prone on the

2  bathroom/hallway floor.  Examination revealed no obvious

3  trauma.  Two bundles, glassine, in parenthesis, and brown

4  grass-like substance was found in the decedent's pocket.

5  Q    When the report says the examination revealed no obvious

6  trauma, can you just explain to us what that means?

7  A    Well, an example would be that there was no wounds or

8  bruising found on examination, on the external examination of

9  the body.

10  Q    After conducting your initial examination of the scene,

11  how do you document what you saw there?

12  A    Photo documentation and written documentation.

13  Q    Why do you take photos of a scene?

14  A    It's policy and procedure.

15  Q    Other than conferring with law enforcement at the scene,

16  who else did you confer with?

17  A    Family.  The father.

18  Q    Why did you speak with family members?

19  A    To obtain a history, social and medical history, and

20  circumstances surrounding his death, and his state of well

21  being around the time that he passed.

22  Q    Why are you interested in learning about past medical

23  history?

24  A    The information is important to draw a conclusion or help

25  to establish the cause of death.

PEAKS – DIRECT – MR. REIN

1   Q    Once you learn that information, how is it documented?

2   A    On the subjective findings, it would be listed, and in

3   the investigation scene report, there's a section there where

4   it would be listed.

5        MR. REIN:  Can we turn to page 14 of the exhibit?

6   Q    Investigator, in looking at this -- well, first, what is

7   this page?

8   A    This is page 2 of the scene investigation form.

9   Q    And in looking at this page of the exhibit, what can you

10  tell us about Vincent Price's prior medical history?

11  A    It indicates social drinker.

12       MR. SCHOER:  Objection.

13       Judge, this can only be --

14       THE COURT:  Overruled.

15  Q    You can proceed.

16  A    And drug abuse.

17  Q    I'd like to direct your attention now to page 8 of the

18  exhibit.  And, Investigator, what are we looking at on page 8

19  of this exhibit?

20  A    The identification of body form.

21  Q    Can you describe for us what this form is?

22  A    This form is used for a witness to confirm that he

23  recognized the decedent.

24  Q    In reviewing this form first, to whom does it pertain?

25  A    Vincent C. Price.

PEAKS – DIRECT – MR. REIN

1    Q    And in looking at the exhibit, who identified the body of

2    Vincent C. Price?

3    A    Vincent Price.

4    Q    What was that person's relationship to Vincent C. Price?

5    A    Father.

6    Q    In looking at the form about midway down, the word

7    "remains" is circled.  Do you see that?

8    A    Yes.

9    Q    Can you explain to what us what that means?

10   A    It means that the father visualized, he looked at the

11   decedent and confirmed that that was Vincent C. Price.

12   Q    And who was the body actually identified to?

13   A    Myself.

14   Q    I'd like to direct your attention now to page 9 of the

15   exhibit.  And, Investigator, can you explain to us what we're

16   looking at on page 9?

17   A    The form is the Statement of Opposition to Autopsy.

18   Q    Just describe for us, what is this form?

19   A    This form -- family members are asked their preference

20   regarding an autopsy.  And they'll express their preference,

21   and in part two, is the family will also give a preference if

22   they are okay with the taking of fluids for examination.

23   Q    In looking at this form, what is the name of the deceased

24   person to whom it pertains?

25   A    Vincent Price.

                      PEAKS – DIRECT – MR. REIN

1    Q      And what is the form, in your review of it, tell you

2    about the desires of Vincent Price's family regarding an

3    autopsy?

4    A      The family had an objection to autopsy.

5    Q      What is the reason given?

6    A      The reason was, I know why he died.

7    Q      Who is the person that made the -- made that objection?

8    A      Vincent Price, father.

9    Q      You mentioned that there is another portion of the form

10   regarding the taking of fluids.  Can you just explain to us a

11   little bit more about that?

12   A      In some cases, fluids are required or necessary to help

13   establish the cause of death.  Fluids may be sent for

14   toxicology or other analysis.

15   Q      And this form, who was it signed by at the bottom

16   indicating -- I'm sorry, withdrawn.  Who is this form

17   witnessed by?

18   A      Myself.

19   Q      You mentioned earlier that you documented the scene by

20   taking photographs; is that right?

21   A      Yes.

22            MR. REIN:  Can we show the witness only what have

23   been premarked for identification as Government Exhibits 632A

24   through 632N?

25   Q      Investigator, are you able to see the first exhibit in

PEAKS – DIRECT – MR. REIN

1   front of you, 632A?

2   A     Yes.

3               MS. TODD:  Your Honor, if I may.  This might be a

4   good time for the limiting instruction, your Honor.

5               THE COURT:  How about first we put this in evidence.

6               MS. TODD:  Certainly.

7               THE COURT:  Actually, can I see counsel at the side,

8   please.

9               (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1        (The following occurred at sidebar.)

2        MS. TODD:  I was trying to wait for the appropriate

3    time.

4        THE COURT:  First they have to put it in evidence,

5    there's nothing in evidence yet.

6        Did I hear you -- Mr. Rein, did I hear you, you said

7    Government Exhibit whatever the number was A through N.

8        MR. REIN:  We're not going to look at all of them

9    with her.

10        THE COURT:  Why are you even identifying everything,

11    I don't understand.  I thought there was an agreement that

12    there were only a few photographs that were going to be

13    admitted.

14        MR. REIN:  These are included, not all of them show

15    the body, they're just photos of the scene.

16        THE COURT:  Okay.

17        MR. REIN:  So that's why there's that many.  There

18    are only a few that show the actual body.

19        THE COURT:  Okay.

20        MR. REIN:  Yes.

21        THE COURT:  You have the views of what, the

22    building.

23        MR. REIN:  The bathroom, there is no body.  There

24    are things --

25        THE COURT:  How much more do you have.

SIDEBAR CONFERENCE

1    MR. REIN:  After I get through the pictures, look at

2    them I'm going to be done.

3    THE COURT:  It's probably going to take us to

4    5 o'clock and it is Wednesday, the Alternate 5 has the travel

5    issues.

6    I assume you're going to ask questions.

7    MS. TODD:  I have no questions --

8    MR. SCHOER:  I have questions --

9    MS. TODD:  He's not charged --

10   THE COURT:  One at a time.

11   MR. SCHOER:  I have questions.

12   MS. TODD:  -- with respect to the 4/18/2017

13   incident.

14   THE COURT:  Right, Mr. Allen.

15   MS. TODD:  Is not charged.

16   THE COURT:  You're going to have questions?

17   MR. SCHOER:  Yes, Judge.

18   THE COURT:  About how long.

19   MR. SCHOER:  Probably at least 20 minutes to half an

20   hour.

21   THE COURT:  Then she'll have to come back tomorrow.

22   Don't start.

23   MR. REIN:  Okay.

24   THE COURT:  Move.

25   (End of sidebar conference; Continued on next page.)

PEAKS – DIRECT – MR. REIN

1          (In open court.)

2          THE COURT:  Can we have the last question read back

3     please, madam reporter?

4          (Record read.)

5          MR. REIN:  May I proceed, Judge?

6          THE COURT:  Yes.

7          MR. REIN:  If we can just flip slowly through each

8     exhibit.

9          THE COURT:  Can you see the photographs, ma'am?

10         THE WITNESS:  Yes.

11         THE COURT:  Okay.

12         MR. REIN:  Going to 632B then C, D, E, F, G, H, I,

13    J, K, L, M, and N.

14    Q    Investigator, were you able to see all the exhibits?

15    A    Yes.

16    Q    And what are these?

17    A    Glassine envelopes.

18    Q    I'm sorry, what are the exhibits that you've just seen,

19    632A through N?

20    A    Photographs I took at the scene.

21    Q    When you say the scene, is that the scene at 69 Carlyle

22    Green?

23    A    Yes.

24    Q    And do these photographs fairly and accurately depict the

25    scene of your investigation at 63 Carlyle Green when you were

PEAKS – DIRECT – MR. REIN

1    there on April 18th, 2017?

2    A     Yes.

3          MR. REIN:  Your Honor, the government offers 632A

4    through 632N?

5          THE COURT:  Are there any objections to the photos?

6          MR. SCHOER:  No objection.

7          THE COURT:  Ms. Todd?

8          MR. SCHOER:  We would ask for a limiting

9    instruction.

10         THE COURT:  I can't hear you.

11         MR. SCHOER:  I'm sorry.  We would ask for a limiting

12   instruction with respect to the photos of Mr. Price.

13         THE COURT:  Nothing has been shown yet.

14         MR. SCHOER:  No, I understand.

15         THE COURT:  Relax.

16         MR. SCHOER:  But I have no objection.

17         THE COURT:  Answer the one question.

18         MR. SCHOER:  No objection.

19         THE COURT:  Do you have an objection, yes or no?

20         MR. SCHOER:  No, ma'am.

21         THE COURT:  Thank you.  Ms. Todd?

22         MS. TODD:  No, your Honor.

23         THE COURT:  They are admitted.

24         (Government Exhibits 632A through 632N, were

25   received in evidence.)

PEAKS – DIRECT – MR. REIN

1        MR. REIN:  Can we publish 632A, please?

2        (Exhibit published.)

3    Q    Investigator, can you describe for us what are we looking

4    at in 632A?

5    A    The decedent lying face down on the floor of the hallway

6    and bathroom.

7    Q    Can you describe for us what do you see in the top

8    portion of the exhibit on the floor next to the decedent?

9    A    A belt.

10        MR. REIN:  Can we turn now to 632B?

11   Q    Investigator, could you describe what we're seeing in

12   this exhibit?

13   A    The bathroom of the decedent's lower legs near the

14   toilet.

15        MR. REIN:  If we could just turn to 632C.

16   Q    Investigator, what was the purpose in taking this

17   picture?

18   A    To document the syringe cap.

19   Q    Can you just describe for us, where do you see the

20   syringe cap in this exhibit?

21   A    It's the orange item on the floor.

22        MR. REIN:  Turning now to 632F.

23   Q    And, Investigator, could you describe for us what you see

24   in this exhibit?

25   A    A syringe.

PEAKS – DIRECT – MR. REIN

1   Q    Can you describe for us the syringe, where is it located

2   in relation to the body of the decedent?

3   A    It appears that it is near an extremity, perhaps the leg.

4        MR. REIN:  Turning now to 632K.

5   Q    Can you describe for us what we're looking at in this

6   exhibit?

7   A    A syringe.

8        MR. REIN:  And turning to 632L.

9   Q    Investigator, describe for us what we're looking at in

10  this exhibit.

11  A    Glassine envelopes wrapped in a black band, a lighter,

12  and a plastic bag with green and brown substance.

13  Q    You mentioned glassine envelopes.  Could you actually

14  point out to us what you're referring to?  You're able to

15  touch the screen, and actually we'll see what you're drawing.

16  If you could draw a circle around what you're referring to?

17  A    A circle?

18  Q    Okay.

19  A    (Witness complies.)

20       MR. REIN:  If we can turn to 632M?

21       THE COURT:  Let the record reflect that the witness

22  has placed circles around two objects that are white in color,

23  wrapped with something black next to what appears to be a

24  green lighter around the middle of the photograph.

25  Q    I'm sorry, before we go to the next exhibit.

PEAKS – DIRECT – MR. REIN

1  Investigator, why was this photo taken?

2  A    Policy and procedure is to document any drug, illicit

3  drug or paraphernalia at a scene.

4       MR. REIN:  Turning now to 632M.

5  Q    Can you describe what we're seeing in 632M?

6  A    Currency.

7  Q    Why was this photograph taken?

8  A    Policy and procedure is to document personal property or

9  currency at the scene.

10  Q    And, lastly, looking at 632N, can you describe for us

11  what we're looking at in this exhibit?

12  A    Toilet with glassine envelopes.

13  Q    Could you again draw on the screen and just indicate

14  that's what you're referring to?

15  A    Glassine envelopes?

16  Q    Yes.

17  A    (Witness complies.)

18       MR. REIN:  We'll note for the record that you've

19  drawn circles around white objects which are located toward

20  the bottom of the toilet bowl as it is framed in this exhibit.

21       We can take the exhibit down.

22  Q    Investigator, after you completed your examination and

23  took these photographs, did you play any other role in this

24  investigation?

25  A    Yes.

PEAKS – DIRECT – MR. REIN

1   Q    What was that?

2   A    Speak to witnesses and family.

3   Q    And after you spoke with witnesses and family and left

4   the location, did you play any other role in the

5   investigation?

6   A    Prior to departing the scene, I would notify

7   transportation to –– for pickup, to transport back to our

8   office.

9   Q    You're saying pick up of the body?

10  A    Yes.

11  Q    Where was the body of Vincent Price taken?

12  A    To the medical examiner's office in Brooklyn.

13          MR. REIN:  No further questions, Judge.

14          THE COURT:  Any questions for the witness?

15          MR. SCHOER:  Yes, Judge.

16          THE COURT:  Mr. Schoer?

17          MR. SCHOER:  You want me to start?

18          THE COURT:  Yes, go ahead and start.

19          MR. SCHOER:  Okay.

20          (Continued on the next page.)

21

22

23

24

25

PEAKS – CROSS – MR. SCHOER

1    (Continuing.)

2    CROSS-EXAMINATION

3    BY MR. SCHOER:

4    Q    Good afternoon, Ms. Peaks.

5    A    Good afternoon.

6    Q    My name is Gary Schoer.  I represent Mr. Wyche.

7         Do you have any independent recollection of what you

8    did on April 18th, 2017?

9    A    No, I do not.

10   Q    So all of your testimony is based on reviewing your

11   reports and photographs, correct?

12   A    Yes.

13   Q    Anything else that you reviewed?

14   A    No.

15   Q    With respect to the photographs that you reviewed,

16   Exhibit 632, A through N, were there -- other than, perhaps,

17   other photographs of the deceased, did you take any other

18   photographs of the apartment, the home?

19   A    Yes.

20   Q    Now, before you took those photographs -- you arrived

21   there at approximately 3:00 p.m., correct?

22   A    Yes.

23   Q    And at that time, when you arrived there, there were --

24   were there EMT -- Fire Department EMT gentlemen there?

25   A    Usually, they are not at the scene when I arrive.

PEAKS – CROSS – MR. SCHOER

1   Q    Well, do you remember whether they were there on that

2   day?

3   A    I do not recall.

4   Q    Were there police detectives there?

5   A    I do not recall.

6   Q    Were there police officers there?

7   A    Yes.

8   Q    Do you know how many police officers were there?

9   A    I do not recall.

10  Q    When -- were there -- other than -- well, were there

11  family members there?

12  A    Yes.

13  Q    How many family members do you remember seeing there at

14  that time when you first arrived?

15  A    I do not recall.

16  Q    When you arrived -- withdrawn.

17       You looked at a notice of death and that was part of

18  the Government Exhibit that was introduced, correct?

19  A    Yes.

20  Q    And you spoke about the reporter.  You mentioned that

21  word, the reporter, there were certain information from that

22  reporter in that notice of death, correct?

23  A    Yes.

24  Q    Do you know who the reporter was?

25  A    I have to refer to the document, please.

PEAKS – CROSS – MR. SCHOER

```
 1            MR. SCHOER:  Can we show the witness, the notice of
 2    death.  Yes.  Thank you very much.
 3    Q    Do you know who the reporter was?
 4    A    Caller named appears Ritchie PO.
 5    Q    And do you know -- PO means police officer?
 6    A    It can.
 7    Q    Okay.  Well, looking it the report, do you have a feel
 8    for whether or not that's a police officer named Ritchie?
 9    A    I would go with the last name, Ritchie.
10    Q    Yes.  But it's a police -- it's somebody from the police.
11            It says from police and it has a shield number,
12    collect?
13    A    Yes.
14    Q    Okay.  And that was the reporter that called your office
15    and your office took down this information and provided it to
16    you, correct?
17    A    Yes.
18    Q    Now, looking at the investigative report that you
19    prepared which I believe is Page 13.  The page before, I
20    guess, 12.  Next page, 11.  Sorry.
21            The information that's contained in this report --
22    this is your report, correct?
23    A    Yes.
24    Q    And the information that's contained in this report,
25    where did you get that information from?
```

PEAKS – CROSS – MR. SCHOER

1   A    The information obtained is from police and from family.

2   Q    Okay.  So when you put in this report that the decedent

3   is a 43-year-old man with drug abuse, I assume you meant drug

4   abuse history, correct?

5   A    Yes.

6   Q    And you received that information from the family,

7   correct?

8   A    Initially, it was reported by police, but then confirmed

9   by family.

10  Q    Okay.  And the other information that's here concerning

11  the father opening the door, this is information, again, that

12  you received from the police, and then confirmed by the

13  family?

14  A    Yes.

15  Q    The third paragraph down concerning scene investigation

16  details.

17         The substance that is alleged to have been found in

18  his pocket, did you find that substance in his pocket?

19  A    The report does not indicate.

20  Q    Would the report indicate if you were the one that found

21  it in his pocket?

22  A    Sometimes.

23  Q    Well, do you remember whether you were the one that found

24  it in his pocket or someone else?

25  A    I do not recall.

                    PEAKS – CROSS – MR. SCHOER

1   Q    Do you remember whether the body had been moved at the

2   time that you first arrived?

3   A    The report says the decedent was sitting on the commode,

4   and when I arrived, he's on the floor.

5   Q    He's on the floor and he's halfway between -- halfway

6   into the hallway; is that fair?

7   A    Yes.

8   Q    In the picture that you -- that was Exhibit 632A.

9          Is that fair, is that the location that you observed

10  him?

11  A    Yes.

12  Q    When you first observed him -- well -- withdrawn.

13         Is there anything in that picture that isn't the way

14  you first observed him?

15  A    Can I see the picture?

16         MR. SCHOER:  I'm sorry, make it's easier.  632A.

17  A    Please repeat your question.

18  Q    Is there anything in that photograph that's inconsistent

19  with the way you first observed the person?

20  A    Photo documentation, this is the first picture of the

21  scene.

22  Q    So when you observed him -- I guess really what I'm

23  getting to, when you observed him, there was a covering over

24  his rear end, correct?

25  A    Yes.

PEAKS - CROSS - MR. SCHOER

1   Q    And do you know whether or not that covering was there

2   when the first officer arrived on the scene?

3   A    Based on my report, no.

4   Q    Do you know whether the body had been moved in any way

5   from the place where the first officer who arrived on the

6   scene, where it was when the first officer arrived on the

7   scene?

8   A    Please repeat.

9   Q    I apologize.

10           Do you know whether or not the body was in the same

11  place as it was when the first officer arrived on the scene?

12  A    The report indicate that the decedent was found on the

13  commode.  When I arrived at the scene, he's lying on the

14  floor, facedown.  So there's a change in position from the

15  commode to the floor, based on the information gathered.

16  Q    Do you know whether or not he was rolled over and then

17  rolled back?

18  A    I know that the position is changed.  It's reported that

19  he's sitting on the toilet, and now he's on the floor.

20  Q    Okay.  Do you know whether or not the syringe that you

21  took photographs of, whether that had been moved at any time

22  before you took the photograph?

23  A    Prior to my arrival to the scene?

24  Q    Yes.

25  A    My documentations only reveal what I found at the scene.

                    PEAKS - CROSS - MR. SCHOER

1    I'm not aware if the syringe was in a different location.

2              THE COURT:  Do you know what happened in terms of

3    the position of any of those items prior to your arrival there

4    other than moving the body from the commode to the floor?

5              THE WITNESS:  Usually, in cases, the items remain in

6    place until we arrive on scene.

7    Q    But you don't know whether that's true in this case?

8    A    No.

9    Q    Now, looking back at your scene investigation form which

10   was Exhibit 404.

11             MR. REIN:  Page 13.

12             MR. SCHOER:  Page 13, correct.  I'm sorry.

13   Q    On that Page 13, down at the bottom, there's a place for

14   entry of information concerning objections as to an autopsy;

15   isn't that correct?

16   A    Yes.

17   Q    And you didn't fill that out, correct?

18   A    No.

19   Q    And then on the next page, with respect to the deceased's

20   medical history, when you checked drug abuse, did you inquire

21   as to whether or not the decedent had previously overdosed?

22   A    The report does not indicate.

23   Q    Do you remember whether you inquired as to whether he

24   had?

25   A    Perhaps I have.

PEAKS - CROSS - MR. SCHOER

1    Q    Do you have any recollection of making that inquiry?

2    A    I don't have any recollection.

3    Q    If you had made that inquiry, would that information be

4    contained on the medical history?

5    A    It could appear if there is a history of drug overdose.

6    Q    And if there's a history of drug overdose, could that

7    impact on someone's heart condition?

8              MR. REIN:  Objection.

9              THE COURT:  Sustained.

10   Q    Well, based on your expertise as a medical legal

11   investigator --

12             MR. REIN:  Objection.

13             THE COURT:  Sustained.

14   Q    So the only thing that you put in the deceased medical

15   history is what you're told, correct?

16   A    Yes.

17   Q    Now, also, on that page, it indicates that you observed

18   an empty glassine, correct?

19   A    Yes.

20   Q    And where was the empty glassine?

21   A    Referring to the photographs?

22   Q    No.  I'm referring to your recollection.

23             Where was there an empty glassine?

24   A    I don't recall.  I would have to refer to photo

25   documentation.

PEAKS – CROSS – MR. SCHOER

1            MR. SCHOER:  Judge, can we have the witness look,

2    herself, only at the photographs to see if that refreshes her

3    recollection as to where the empty glassine was and point us

4    to us which photograph?

5            THE COURT:  There were, I think, two or three photos

6    that showed glassines.

7            MR. SCHOER:  Yes.  But the question is --

8            THE COURT:  So they can be shown only to the

9    witness.

10            MR. SCHOER:  Thank you.

11            THE COURT:  And the Government needs to put on the

12    record which photos it is you're showing.  Just the glassine

13    photos.

14            MR. REIN:  I'm sorry, this is -- the witness is

15    being shown what's in evidence as 632N, only to the witness.

16   Q    Is 632N the empty glassine that you referred to in your

17    investigative report?

18   A    When I observed here looking, there are empty glassines

19    in the toilet.

20   Q    In your report, you did not use the plural.

21            You used singular, glassine, correct?

22   A    I'd have to see the report.

23            MR. SCHOER:  Can we go back now to 404.

24            MR. REIN:  Page 14.  404, 14.

25   Q    Is it fair to say that you used the word, empty glassine?

PEAKS – CROSS – MR. SCHOER

1   A   Correct.

2   Q   And in 404 –– in 632N, there are numerous glassines in

3   the toilet, correct?

4   A   Yes.

5   Q   Were all of them empty?

6   A   Can you go back to the photograph, please.

7           MR. SCHOER:  632N.

8   A   I circled what appears to be empty.

9   Q   So those are the two ––

10  A   Well, I don't know if it's just the two, but that's what

11  I can see now.  It appears to be empty.

12  Q   Now, looking back again at Exhibit 404, Page 15 is the

13  page.

14          You did a physical examination of the deceased,

15  correct?

16  A   Yes.

17  Q   And during that physical examination, you found breakable

18  rigor, correct?

19  A   Yes.

20  Q   And what does that signify?

21  A   After death, initially, muscles become flaccid or flabby,

22  and perhaps 30 minutes or so, it's variable, that the muscles

23  start to stiffen.  I was able, with my force, to break the

24  rigor, the muscle stiffness.  That's what that means.

25  Q   And then you also have ––

PEAKS - CROSS - MR. SCHOER

1          THE COURT:  So what does that mean if you're able to

2     do that?

3          THE WITNESS:  It's still variable, but it means that

4     the person was not deceased very long.

5     Q    And then you have liver -- livor mortis.

6          Can you tell us what that means?

7     A    Lividity is when the body -- when the heart stops, the

8     blood is no longer circulating and the blood tends to pool in

9     a dependent position.  So if, for example, someone's laying on

10    their back, by gravitational forces, the blood will settle

11    there on their back.

12    Q    So in this case, the lividity was to the chest, so that

13    implies, or at least you could conclude, that the person was

14    lying on his chest, correct?

15    A    At some point.

16    Q    At some point.

17         Well, would that be lying on his chest before death

18    or only after -- or could it be after death?

19    A    Lividity patterns immediately after death, you can have

20    more than one pattern.  You can have the pattern of how they

21    were found, and if they're moved shortly after death into a

22    different position, you can also get a lividity pattern.

23    Q    Now, you then looked at some other things.

24         This says other post-mortem changes, correct?

25    A    Yes.

PROCEEDINGS

1   Q    And you didn't see any of those other post-mortem

2   changes, correct?

3   A    Yes.

4   Q    You didn't see any purge from the nose or the mouth,

5   correct?

6   A    Correct.

7            MR. SCHOER:  May I just have a second, Judge?

8            THE COURT:  I second, literally.  Clock is ticking.

9            MR. SCHOER:  I didn't go over what I told you.

10           THE COURT:  No discussion is necessary.

11           MR. SCHOER:  I have no further questions, Judge.

12           THE COURT:  Any redirect.

13           MR. REIN:  No.  Thank you, Judge.

14           THE COURT:  I'm sorry, Ms. Todd, I was relying on

15   what you had said before.  Any questions on behalf of

16   Mr. Allen?

17           MS. TODD:  No, Your Honor.

18           THE COURT:  I'm sorry, I didn't mean to go over.

19           Okay.  Thank you, ma'am.  You may step down.

20           (The witness steps down.)

21           THE COURT:  Okay.  Ladies and gentlemen, I know we

22   went a little over 5:00 o'clock, and as I'm sure, Magistrate

23   Judge Kuo said, if it looks like we can finish with a witness

24   completely, we might do that from time to time.  I'm also very

25   mindful, Mr. Li, our alternate, Number Five, that you've got a

PROCEEDINGS

1   class to teach in a little bit.  I understand that you can get

2   there fairly quickly, so we're going to let everybody go in a

3   minute.  But before we do, just a couple of things that I do

4   want to mention.

5          It should not be a problem, Mr. Li, on Wednesdays --

6   can you get there in 15 minutes or so.

7          THE JUROR:  Yes.

8          THE COURT:  All right.  I just want to make sure we

9   get you out of here on time.

10          And then as to Alternate Number 3, Ms. Pease, yes.

11   Okay.  I know that you've got a flight tomorrow and that you

12   need to leave here at 2:00 o'clock.  So we're going to have a

13   modified schedule tomorrow.  I'm going to ask everybody to

14   come back at 9:30.  Be mindful, please, like I said, there's a

15   problem coming in through the security.  That's not your

16   fault.  Everyone is trying to work very hard to try to get all

17   of this done, fixed as quickly as possible.  I'm just going to

18   ask you to adjust for that, because we need to have you in

19   your jury room at 9:30 and assembled so that we can get

20   started right away.  I know we're asking a lot, but the sooner

21   you arrive, the sooner we can get started.

22          So normally, I would give you a break in the morning

23   and in the afternoon, maybe 15 or 20 minutes.  You have a

24   break for lunch between 1:00 and 2:00 o'clock.  It makes

25   everybody comfortable.  You can take your nature break.  If

PROCEEDINGS

1   you have special dietary needs and you need to snack or

2   something like that, diabetics sometimes need to do that,

3   that's your opportunity to do that.

4           Tomorrow, we'll take a morning break, but we're

5   going to skip lunch, because we're going to end at 2:00.  So

6   we're going to start at 9:30, end at 2:00, and that means,

7   Ms. Vitale, that means you have some extra time in the

8   afternoon to work on your school reports.  Remember that we're

9   not meeting on Fridays.  Okay.  So you can go back to work on

10  Fridays.  Do whatever it is you have to do on Fridays.  That's

11  fine.  If we're already deliberating, that might change.  But

12  we kind of try to play things by ear a little bit as we go.

13          So keep in mind tomorrow we're going to stop at

14  2:00.  I'm going to ask you all to be here at 9:30.  I'm going

15  to encourage you, I think they have a refrigerator, right, in

16  their room.  If you're a person who does need to have snacks

17  or you have special dietary needs, maybe you eat kosher or

18  halal or whatever, it's not so easy to find that stuff in this

19  neighborhood, so you might want to -- and it gets a little

20  pricey, too, eating out every day, so I recognize that.  So if

21  you have special diets or anything like that, I encourage you

22  to bring your lunch in and keep it in the -- they have a

23  microwave too?

24          (Judge confers with the courtroom deputy.)

25          THE COURT:  Okay.  So we'll make sure that you have

PROCEEDINGS

1    access to coffee and tea and all of those sorts of things.  I

2    am just going to ask that if you want to bring some bottled

3    water into the courtroom, that's fine.  Just don't bring

4    anything else into the courtroom.

5           I recommend that you bring some sweaters or some

6    layers.  Everybody's body temperature is different.  Like I

7    said, we do our best to control the temperature so that it's

8    comfortable.  But I see some people looking like they're cold

9    and some people looking like they're warm.  So layers are the

10   way to go.  Okay.

11          So we're going to continue tomorrow at 9:30.

12          And one other thing.  You're going to hear me say

13   this to you every time before we break, as I previously

14   instructed you, remember not to have any contact or

15   conversations with any of the parties in this case, including

16   any witnesses, the Court, or any Court staff, whether you see

17   any of us on the streets or any hallways or any other

18   location.  And of course, if any attempt is made by any person

19   to converse with you about this case, or any incident occurs

20   within your knowledge involving an attempt by any person to

21   improperly influence any member of the jury, you must report

22   it promptly to the Court.  Please do not discuss either the

23   incident or the fact that you feel it necessary to report the

24   incident with any or juror or anyone other than my case

25   manager, Christy Carosella or either one of my law clerks, Rae

PROCEEDINGS

1    Berger or Brachah Goykadosh.

2            Remember that you may not discuss this case or any

3    aspect of this case, including jury selection, with anyone,

4    including family members, case workers, maybes neighbors or

5    friends, either in-person or any other medium such as cell

6    phones, laptops, tablets, social media or other tools of

7    technology.

8            You must keep an open mind and not form any opinion

9    about the guilty or non-guilty of either defendant on trial

10   until such time as all the evidence has been presented, you

11   have been instructed on the law by me, and you have had an

12   opportunity to deliberate with your fellow jurors.

13           You must not read, listen to or view anything at all

14   about this case or anything touching on this case over any

15   kind of media, newspaper, social media, internet, blogs,

16   radio, podcasts, television, just for example.

17           You must not conduct any research or investigation

18   about this case or any manner concerning this case on your own

19   or over any kind of media.  You must decide this case only on

20   the admissible evidence presented at trial and my instructions

21   on the law.

22           You may not visit or view any location that may be

23   involved in this case or mentioned during trial.

24           Again, please be here promptly at the time directed

25   by the Court.  Each of you is important and we cannot proceed

PROCEEDINGS

1  until all of you are present.  Get home safely, safe travels,

2  today and tomorrow.

3           THE COURTROOM DEPUTY:  All rise.

4           THE COURT:  Get plenty of sleep.  It's tiring

5  sitting there and watching.

6           (Jury exits the courtroom.)

7           THE COURT:  All right.  The jury is no longer

8  present.  Please have a seat, everyone.

9           Okay.  So whose next on the laundry list of

10 witnesses?

11          MR. REIN:  Yes, Judge.  Tomorrow we intend to call

12 Sergeant Raul Irizarry, detective Dominick Libretti, and if we

13 are able to get to him, Detective Philip Vaccarino.

14          THE COURT:  Sergeant Raul Irizarry, do you know

15 whether -- have you asked him whether he's related to me or

16 not?  I don't know of anybody in my family by that name.

17          MR. REIN:  I didn't specifically ask him, but I

18 mentioned that you share a last name and it was -- he didn't

19 remark that he knew you or was related in any way.

20          THE COURT:  Okay.  I don't recall of anybody being a

21 police officer of recent vintage in my family.  Not on the

22 Irizarry side, any way.  Okay.

23          Whose the other one?

24          MR. REIN:  I'm sorry --

25          THE COURT:  After Irizarry.

PROCEEDINGS

1          MR. REIN:  Irizarry, Libretti, and Vaccarino.

2          THE COURT:  That's it?  Well, tomorrow we end at

3     2:00.

4          MR. REIN:  Yes.  Right.

5          THE COURT:  Okay.  Please, this is for everyone, you

6     need to have your ducks lined up.  That includes whatever

7     documents you intend to use for cross-examination or

8     impeachment or introduction into evidence.  The defense has

9     all the same exhibits that the Government has been using.

10    You've had these -- the 3500 material now for two weeks.  We

11    can't have all these pauses waiting for things to be put up on

12    the screens.  There is the ELMO that can be used to put

13    documents on there.  You need to be prepared to go.  I can't

14    have these long gaps where you're just looking for documents.

15    That's going to delay us.  The minutes add up.  We have time

16    to make up.  I want to make sure that everybody has their

17    opportunity to do the examination that you want to make, but I

18    also expect a certain level of efficiency.  It is possible to

19    do.  So I don't want to see people hunting around for

20    documents or anything else.  Be prepared.

21          Is there anything --

22          (Judge confers with law clerk.)

23          THE COURT:  The same thing that I told to the jury

24    about being mindful of the security issues that we have

25    downstairs, you lawyers also need to be mindful of that.  And

PROCEEDINGS

1    I had a chat with the CSOs today.  They are doing their best

2    to get this thing fixed, but you know, it's the Government.

3    What can I say?  It's going to take a while to get done.  And

4    there's no way to separate out the attorneys to give you

5    priorities to get through.  So you need to make sure that you

6    get here early, as well, and set up, so that we're ready to

7    go.

8            Anything that you all want to raise with me today

9    before we end?

10           MS. CHEN:  Your Honor, I wanted to raise one

11   housekeeping issue.

12           Yesterday, the parties executed a stipulation and

13   waiver of jury trial on forfeiture.  I know different judges

14   have different procedures of when they want to handle that,

15   whether we wait until a verdict, whether a verdict was

16   reached, or if Your Honor wanted us to file the stipulation

17   and waivers now?

18           THE COURT:  Do the parties have any preference?

19           Does defense have any preference?

20           MR. SCHOER:  No.

21           MS. TODD:  No, Judge.

22           THE COURT:  I'll take a look at it.

23           Have you shown it to --

24           MS. CHEN:  They signed it.

25           MR. SCHOER:  We signed.

PROCEEDINGS

1          THE COURT:  All right.  I'll take a look at this

2   tonight.  And then I can go over it with you all tomorrow.

3          Anything else?

4          MS. CHEN:  No, Your Honor.

5          THE COURT:  Anything on behalf of the defense?

6          MS. TODD:  No, Your Honor.  Thank you.

7          THE COURT:  All right.  Okay.  Thank you all very

8   much.  I'm glad that we're finally underway, here.

9                  *     *     *     *     *

10          (Proceedings adjourned to resume on February 2, 2023

11   at 9:30 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2      WITNESS                              PAGE

3      OPENING STATEMENT     BY MR. REIN         21

4      OPENING STATEMENT     BY MR. SCHOER       28

5      OPENING STATEMENT     BY MS. TODD         33

6      VINCENT PRICE SENIOR

7      DIRECT EXAMINATION    BY MS. CHEN         36

8      CROSS-EXAMINATION     BY MR. SCHOER       57

9      REDIRECT EXAMINATION  BY MS. CHEN         63

10

**LEASHAWN PEAKS**

11     DIRECT EXAMINATION    BY MR. REIN         69

12     CROSS-EXAMINATION     BY MR. SCHOER       95

13

14                     E X H I B I T S

15     GOVERNMENT                           PAGE

16     601                                      42

17     10                                       68

18     401, 402, 403, 404, 405, and 406         68

19     632A through 632N                        90

20

21

22

23

24

25

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*