```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    --------------------------------x
                                           18-CR-561(DLI)
 3    UNITED STATES OF AMERICA,
                                           United States Courthouse
 4            Plaintiff,                   Brooklyn, New York

 5            -against-                    February 2, 2023
                                           9:30 a.m.
 6    KEITH WYCHE AND ONEIL ALLEN,
              Defendants.
 7    --------------------------------x
                  TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
 8              BEFORE THE HONORABLE DORA L. IRIZARRY
                 UNITED STATES SENIOR DISTRICT JUDGE
 9                        BEFORE A JURY

10    APPEARANCES
      For the Government:        UNITED STATES ATTORNEY'S OFFICE
11                               Eastern District of New York
                                 271 Cadman Plaza East
12                               Brooklyn, New York 11201
                                 BY:  GILBERT REIN, AUSA
13                                    IRISA CHEN, AUSA
                                      JAMES MCDONALD, AUSA
14
      For Defendant Wyche:       GARY SCHOER, ESQ.
15                               6800 Jericho Turnpike
                                 Syosset, New York 11791
16
                                 THE VITALIANO LAW FIRM, PLLC
17                               1492 Victory Boulevard
                                 Staten Island, New York 10301
18                               BY:  MICHAEL VITALIANO, ESQ.

19    For Defendant Allen:       LAW OFFICES OF NATALI J.H. TODD, P.C.
                                 26 Court Street, Suite 413
20                               Brooklyn, New York 11242
                                 BY:  NATALI J. H. TODD, ESQ.
21
                                 CODY WARNER, P.C.
22                               11 Broadway, Suite 615
                                 New York, New York 10004
23                               BY:  CODY WARNER, ESQ.

24    Court Reporter:            Georgette K. Betts, RPR, FCRR, CCR
      Proceedings recorded by mechanical stenography.  Transcript
25    produced by computer-aided transcription.
```

```
 1                    (In open court; Jury not present.)

 2              THE COURT:  Have a seat please.  Good morning.

 3                    Is it just me or does it feel a little warm in here?

 4       It feels a little warm in here.  I'm almost afraid to start

 5       even asking for adjustments to the temperature because we

 6       usually wind up regretting it.  I just don't want people to

 7       fall asleep.

 8                    We can call the case.

 9              THE COURTROOM DEPUTY:  Criminal cause on trial.

10       Docket number 18-CR-561.  United States versus Keith Wyche and

11       Oneil Allen.  Please state your appearances.

12              MR. REIN:  Good morning, your Honor, Gilbert Rein

13       for the United States.  Joined by Assistant United States

14       Attorneys, Irisa Chen, James McDonald, paralegal Teri Carby

15       Special Agent Traveis Guy, and paralegal Eileen Rosado.

16              THE COURT:  Good morning to all of you.  Please have

17       a seat.

18              MR. SCHOER:  Good morning, your Honor.  For

19       Mr. Wyche, Gary Schoer.

20              MR. VITALIANO:  And Michael Vitaliano.  Good

21       morning.

22              THE COURT:  Good morning.  Good morning to the three

23       of you.  Good morning, Mr. Wyche.

24              DEFENDANT WYCHE:  Good morning, your Honor.

25              MR. WARNER:  Good morning, your Honor.  Cody Warner
```

1    and Natali Todd for Mr. Oneil Allen.

2              THE COURT:  Good morning to all of you.  Good

3    morning to Mr. Allen.

4              DEFENDANT ALLEN:  Good morning, your Honor.

5              THE COURT:  I understand all the jurors are here.

6    Just two things that I quickly want to discuss with you before

7    we bring out the jury.  Again, a reminder that we're going to

8    end at two.  I will have a mid morning break maybe 20 minutes

9    or so, but we'll have to break at 2 o'clock, as you will

10   recall.

11             I was going to start out by reading to the jury the

12   limiting instruction with respect to the postmortem

13   photographs, since that was not done yesterday at the end of

14   the government's last witness.

15             And so my proposed instruction is as follows:

16             The government has introduced postmortem photographs

17   of the deceased victim Vincent Price.  I instruct you that

18   these photographs may be considered against Defendant Wyche

19   only.  You may not consider these photographs against

20   Defendant Allen in determining whether or not the government

21   has proven the charges against him.

22             Is that satisfactory to the government?

23             MR. REIN:  It is, Judge.

24             THE COURT:  For Mr. Wyche?

25             MR. SCHOER:  Yes, your Honor.

1          THE COURT:  For Mr. Allen.

2          MS. TODD:  Yes, your Honor.

3          THE COURT:  All right, great.  The other issue, I

4    think my deputy has already given you a heads up as to juror

5    number 12.  She apparently had some difficulty finding her way

6    to the jury room but got there, so I am going to instruct the

7    jury when we break today to make sure that they take a look at

8    their surroundings and make a note of the jury room number,

9    and since we're going to have a break until Monday and advise

10   them if they are a little lost or don't remember, instead of

11   just wandering around the courthouse they should just go to a

12   security officer downstairs in the lobby and ask for some

13   help.  I'm sure they'll be able to track somebody from

14   chambers down.

15          The bigger issue with respect to Juror Number 12 is

16   now apparently she remembers that she has an appointment on --

17   well, she said Wednesday, February 7th, but I believe that's

18   actually a Tuesday, and when pressed as to what kind of an

19   appointment it was she said it was for tax preparation.  She

20   claims that she can't reschedule it because her tax preparer

21   doesn't have appointments available until June.  I am not

22   buying it.  This is tax season, tax preparers make

23   accommodations.  I'm sure if she tells him she's on jury

24   duty -- I don't know even know what tax preparer requires

25   their client to come in to see them, most of it is done online

1    these days, but in any event, she's just going to have to

2    reschedule.  I'm not adjourning for her to come in whenever,

3    unless the parties have some different feeling about that.  On

4    behalf of the government?

5              MR. REIN:  We agree with your Honor, Judge.

6              THE COURT:  Defense for Mr. Wyche?

7              MR. SCHOER:  We agree as well, Judge.

8              THE COURT:  Ms. Todd?

9              MS. TODD:  We concur.

10             THE COURT:  All right.  I'm going to deal with that

11   at the end.  I'm just going to hold her back, I'm going to

12   dismiss the rest of the jury, then hold her back and discuss

13   this with her.  I'm not going to hold up the whole case to

14   deal with this.  All right.

15             So is everyone ready?

16             MR. REIN:  Judge, we had just two quick issues to

17   bring up with your Honor.  The first is we expect that today

18   there might be the first opportunity for an in court

19   identification and so our proposal is that at that time

20   everybody in the courtroom just briefly lower their masks and

21   the witness could be asked a question about recognizing

22   anyone.

23             THE COURT:  I'm sorry, say that again.  For who to

24   remove their masks?

25             MR. REIN:  Everyone in the courtroom could just

1    briefly lower their masks, or an alternative could be

2    everybody at counsel's table could lower their masks just so

3    that the witness has an opportunity to see the full face of

4    everybody.

5              THE COURT:  Okay.  Just let's address that first.

6              MR. REIN:  Yes.

7              THE COURT:  What is the feeling of -- what is the

8    position of the defense on that?

9              MR. SCHOER:  We have no objection.

10             MS. TODD:  We're fine with it, your Honor.

11             THE COURT:  I'm fine with it also.  We actually

12   don't have very many people in the courtroom today so that's

13   fine.  It's for a few minutes anyway.

14             What's your next issue.

15             MR. REIN:  The next issue is -- yes, I'm sorry.  We

16   also expect that there will be physical evidence introduced.

17   We wanted to consult with your Honor about your preference for

18   how we do that physically allowing our agent to physically

19   bring the evidence up to the witness to show it to them.

20   Would that be acceptable?  I know obviously you're concerned

21   about --

22             THE COURT:  That's the role of counsel.

23             MR. REIN:  Counsel could obviously do it too.

24             THE COURT:  Counsel can bring the physical evidence

25   to the witness.

```
 1              MR. REIN:  Okay.

 2              THE COURT:  Okay.  So you can just have it ready to

 3    be presented to the witness.

 4              MR. REIN:  The other --

 5              THE COURT:  Keep in mind, please, that with respect

 6    to any contraband evidence, whether it's firearms, drugs,

 7    whatever contraband it might be, remember that the U.S.

 8    Attorney's Office is responsible for it.  Please don't leave

 9    it here.  Don't leave it lying around.  I'm telling you

10    because people have messed up in the past and it's caused

11    problems.

12              MR. REIN:  I understand, Judge.  The other I guess

13    portion of our inquiry is whether your Honor would permit us

14    to publish it to the jury by passing it among the jurors.

15              THE COURT:  I have no problem with that.  Any

16    problem with that by the defense?

17              MR. SCHOER:  The actual drug package?  I'm not --

18    I'm trying to understand exactly what --

19              THE COURT:  Well, they are not going -- you're

20    talking about drugs?

21              MR. REIN:  We are, Judge.  They're packaged

22    obviously in a plastic security envelope, which I'm sure --

23              THE COURT:  They are in a secure envelope.

24              MR. SCHOER:  I'm okay with that.

25              THE COURT:  Ms. Todd, any objection?
```

1            MS. TODD:  No, your Honor.

2            THE COURT:  Okay.  All right.

3            MR. REIN:  That was it, Judge.  Thank you.

4            THE COURT:  Okay.  And of course I will remind the

5    jury that at the end when they are deliberating if they want

6    to see any physical evidence, documents, will be sent into

7    them, but any other physical evidence they may have to come to

8    the courtroom to view it.  All right.

9            Aside from that, defense have anything else to

10   address at this moment?

11           MR. SCHOER:  No, your Honor, thank you.

12           THE COURT:  All right.  So we can bring them in.

13           MS. CHEN:  Your Honor, is there a time this morning

14   that your Honor anticipates would be a good time for that

15   morning break?  We'll just try to be mindful of it.

16           THE COURT:  Since we're going to break around two,

17   I'm thinking around somewhere around 12-ish, 12:30, something

18   like that.

19           MS. CHEN:  Okay.

20           THE COURT:  I try to pick a time when we have a

21   break in witness testimony so it's not disruptive.

22           MS. CHEN:  Okay, Judge, thank you.

23           THE COURT:  Jury entering all rise.

24           (Jury enters courtroom.)

25           THE COURT:  Everyone may have a seat.  Thank you.

```
1    Do the parties agree that all of our jurors are present and

2    properly seated, government?

3              MR. REIN:  Yes, Judge.

4              THE COURT:  Defense for Mr. Wyche?

5              MR. SCHOER:  Yes, your Honor.

6              THE COURT:  For Mr. Allen?

7              MS. TODD:  Yes, your Honor.

8              THE COURT:  Before we get started with the

9    continuation of the government's case, ladies and gentlemen,

10   yesterday the government introduced postmortem photographs of

11   the deceased victim Vincent Price.  I instruct you that these

12   photographs may be considered against Defendant Wyche only.

13   You may not consider these photographs against Defendant Allen

14   in determining whether or not the government has proven the

15   charges against him.

16             And I know we have an abbreviated day today, I will

17   give you a break at some point mid morning so you can stretch

18   your feet and take care of nature calls and whatever else.

19   Okay?

20             All right, the government may call its next witness.

21             MR. REIN:  Your Honor, the government calls Sergeant

22   Raul Irizarry.

23             (Witness takes the witness stand.)

24             THE COURTROOM DEPUTY:  Please raise your right hand,

25   sir.
```

IRIZARRY - DIRECT - MR. REIN

1        (Witness sworn.)

2        THE WITNESS:  Yes.

3   **RAUL IRIZARRY,** called as a witness, having been first duly

4   sworn/affirmed, was examined and testified as follows:

5        THE COURTROOM DEPUTY:  Thank you.  Please be seated.

6   Please state and spell your name.

7        THE WITNESS:  My name is Raul Irizarry.  First name

8   R-A-U-L.  Last name I-R-I-Z-A-R-R-Y.

9        THE COURTROOM DEPUTY:  Thank you.

10        THE COURT:  Good morning, Sergeant.  You may remove

11   your mask if you would like to, if you feel more comfortable

12   doing that --

13        THE WITNESS:  Yes, thank you.

14        THE COURT:  -- while you testify.  I'm going to take

15   off my mask.

16        I know we share a same last name, but I don't think

17   we are related.

18        THE WITNESS:  No, we are not.

19        THE COURT:  Okay.  I just wanted to make that clear

20   for the record, there's no conflict of interest here.  All

21   right.  Thank you.

22        I'm just going to ask you to keep your voice up nice

23   and loud.  You can adjust the microphone so that you have a

24   comfort level with it and whenever you're ready, Mr. Rein, you

25   may proceed.

IRIZARRY – DIRECT – MR. REIN

1          MR. REIN:  Thank you, Judge, good morning, sergeant.

2          THE WITNESS:  Good morning.

3    DIRECT EXAMINATION

4    BY MR. REIN:

5    Q     Sergeant, are you currently employed?

6    A     Yes, I am.

7    Q     Where do you work?

8    A     New York City Police Department.

9    Q     How long have you been a member of the New York City

10   Police Department?

11   A     A little over 25 years.

12   Q     What is your current assignment?

13   A     I am one of the three supervisors for Evidence Collection

14   Team Staten Island.

15   Q     And can you just describe for us prior to being a

16   supervisor for the Evidence Collection Team in Staten Island,

17   what have some of your other assignments been within the NYPD?

18   A     I started my career in Transit District Four in lower

19   Manhattan.  I left there and I went to Internal Affairs Bureau

20   and after I left Internal Affairs Bureau I was promoted and I

21   went to the 120th Precinct as a sergeant.  Once I left the

22   120th Precinct, I went to the Patrol Borough Staten Island.

23   After I left the Patrol Borough Staten Island, I went to PBSI,

24   Patrol Borough Staten Island, Evidence Collection Team.

25   Q     And Evidence Collection Team, is it abbreviated ECT?

IRIZARRY – DIRECT – MR. REIN

1   A    Yes, it is.

2   Q    So how long have you been assigned to the Staten Island

3   Evidence Collection Team?

4   A    Approximately nine years.

5   Q    How long have you been a sergeant?

6   A    Seventeen years as a sergeant.

7   Q    Can you describe for us what are your responsibilities as

8   a sergeant with the Evidence Collection Team in Staten Island?

9   A    I supervise a team of police officers that respond to

10  crime scenes.

11  Q    Can you describe for us what is ECT?

12  A    ECT, we respond to crime scenes to try and collect

13  forensic evidence.

14  Q    When you first joined ECT, what type of training did you

15  receive?

16  A    I received a five-day training from the lab in Queens.

17  Q    What did that training consist of?

18  A    It consisted of learning how to take DNA, using swabs,

19  how to get latent prints, and the processing of that evidence.

20  Q    When you say the lab in Queens, is that at the New York

21  City Police Department's lab?

22  A    Correct, it is.

23  Q    How does the Evidence Collection Team ECT get involved in

24  an investigation?

25  A    We have to be requested either by patrol or the detective

IRIZARRY - DIRECT - MR. REIN

1    bureau.

2    Q    When you say patrol, what is that?

3    A    It's -- it could be from the precinct -- patrol is the

4    members of the precinct.

5    Q    Why does ECT get involved in an investigation?

6    A    We get involved when we have to collect any type of

7    forensic evidence to try and ascertain perpetrators.

8    Q    Once your unit is notified and gets involved, where will

9    the officers with it actually go?

10   A    It depends on the case.  Usually, most likely we respond

11   directly to the crime scene.

12   Q    And if you weren't responding to the crime scene, where

13   would on officer with ECT be going?

14   A    To the precinct.

15   Q    When an ECT officer responds to a scene, who will they

16   confer with when they are at the scene?

17   A    They will usually confer with either a member of the

18   detective bureau or the officers on scene.

19   Q    I'm sorry, I thought you were continuing your answer.

20   A    No.

21   Q    What is the purpose of conferring with an officer on

22   scene?

23   A    Well, usually what we do is, we do what's called a walk

24   through.  So the member -- the ECT officer will respond to the

25   location and that member, whether it be the detective bureau

IRIZARRY – DIRECT – MR. REIN

1   detective or police officer, or the police officer from the

2   precinct they will walk through -- they will walk us through

3   the crime scene to show us what transpired and what was left

4   or what kind of evidence that we possibly have.

5   Q    Do the ECT officers with your unit respond to narcotics

6   overdose case?

7   A    Yes, we do.

8   Q    What is the purpose of doing that?

9   A    To document -- to collect and document narcotic evidence

10  that was left at the scene.

11  Q    Once that narcotic evidence is collected by the members

12  of your unit, how do they safeguard it?

13  A    It depends on the evidence.  Let's say hypodermic

14  needles, they get packaged in what's called a hypodermic

15  container.  Pills or powder usually go in to -- they do go

16  into an envelope or a paper bag.

17  Q    Are you familiar with the vouchering process?

18  A    Yes, I am.

19  Q    Can you explain for us what is the vouchering process?

20  A    Once the evidence is collected, we take that evidence and

21  we break it down into what's called the voucher.  So the

22  quantity, the description of the evidence will be on that

23  voucher.

24  Q    When you say on that voucher, is that a physical piece of

25  paper?

IRIZARRY – DIRECT – MR. REIN

1    A    Correct.

2    Q    Are you familiar with what's called an invoice number?

3    A    Yes.

4    Q    What's an invoice number?

5    A    An invoice number is a group of numbers that's assigned

6    to that property that's going to be vouchered.

7    Q    Is that number unique?

8    A    Yes, it is.

9    Q    The paperwork that you just mentioned a moment ago, can

10   you describe for us what the approval process is for that?

11   A    Once the officer is done with his voucher, he will

12   sign -- he will sign off, he or she will sign off on that

13   voucher and then they would send it to a supervisor for

14   approval.

15   Q    When you say they would send it to a supervisor for

16   approval, would that include yourself?

17   A    Yes, correct.

18   Q    And when the paper work is sent to you as a supervisor,

19   what steps do you then take as part of the approval process?

20   A    Well, prior to me signing the voucher for approval, I

21   make sure that the count is correct.  Once the count is

22   correct, I authorize the officer to seal and package.  Once

23   that is done, he brings it to my attention, I view it, and

24   then I sign the voucher via the intranet.

25   Q    When you say that you make sure the count is correct, can

IRIZARRY - DIRECT - MR. REIN

1  you just explain for us what you're talking about?

2  A    Prior to him packaging it I must make sure that the count

3  is correct.  So let's say, for example, if there's five pills,

4  I will have that officer count those five pills in front of

5  me, and then I will direct him to package it.

6  Q    How is the invoice number that we were talking about a

7  moment ago used as part of the vouchering process?

8  A    The invoice number will be put on -- I'm sorry, say that

9  again.

10  Q    How is the invoice number that you mentioned a moment

11  ago, how is that used as part of this vouchering process?

12  A    That invoice number is going to be assigned to that

13  evidence that's going to be vouchered.  That invoice number

14  can only be used for that property, for that evidence, I

15  should say, and it cannot be used again.

16  Q    Are you familiar with what's called a package number?

17  A    Yes.

18  Q    What's a package number?

19  A    A package number it could be either a paper bag, it could

20  be a plastic security envelope, but each bag has a number

21  assigned to it.

22  Q    When you say each bag, are these evidence bags?

23  A    Yes, it is.

24  Q    I want to direct your attention now to April 18th, 2017,

25  were you working on that day?

IRIZARRY - DIRECT - MR. REIN

1    A    Yes.

2    Q    And what was your assignment?

3    A    I was Evidence Collection Team supervisor.

4    Q    I want to direct your attention now to approximately

5    6:20 p.m., what were you doing around that time?

6    A    I was working.

7    Q    Do you remember specifically what you were doing at that

8    moment?

9    A    I'm sorry, but I do not.

10   Q    Is there anything that would refresh your memory?

11   A    The voucher itself.

12        MR. REIN:  Can we show only for the witness what's

13   been marked for identification, 3500-RI-2, and the second

14   page.

15   Q    Sergeant, are you able to view the exhibit?

16   A    Yes.

17   Q    Does this -- in viewing this exhibit, does this -- I'll

18   ask you first to look down at it and look up at me if your

19   memory is refreshed about that time on that day?

20   A    Yes.

21   Q    So what were you doing at approximately 6:20 p.m. on

22   April 18th of 2017?

23   A    At 1823 hours I was signing this voucher approving it.

24        THE COURT:  Is that military time?

25        THE WITNESS:  Yes, your Honor.

IRIZARRY – DIRECT – MR. REIN

1      THE COURT:  What would that be in civilian time?

2      THE WITNESS:  I'm sorry it's 6:23.

3  BY MR. REIN:

4  Q    And the invoice that you are approving at that time --

5  the voucher, I'm sorry, that you are approving at that time,

6  what was the invoice number?

7  A    5000116143.

8  Q    As you sit here today do you remember what the contents

9  were of the voucher that you were approving?

10  A    I would have to look at the first page.  I don't remember

11  off the top of my head, no.

12      MR. REIN:  If we could look at the first page of

13  this exhibit.

14      And in looking at --

15      THE COURT:  Just one second.  So do vouchers have

16  multiple pages?  Does a property voucher have multiple pages

17  to it?

18      THE WITNESS:  Yes, it could, yes.

19      THE COURT:  Okay.

20  BY MR. REIN:

21  Q    I'm sorry, Sergeant, looking at the first page -- we're

22  looking at the first page or you're looking at the first page

23  of what's marked for identification as Government

24  Exhibit 3500-RI-2, does this refresh your recollection as to

25  what the contents were of the voucher you were reviewing?

IRIZARRY – DIRECT – MR. REIN

1           You can just take your time and take a look at it

2    and let us know if that refreshes your recollection.

3    A    Okay.  I do not remember the day of April 17,

4    unfortunately it was quite a few years ago, but I recognize

5    this evidence as being on this voucher.

6    Q    At the time that the voucher was generated and you

7    reviewed its contents, did you have personal knowledge of

8    what's reflected in the voucher?

9    A    At the time of that day, yes, I did.

10   Q    Does viewing the invoice right now refresh your

11   recollection as to what was contained in the voucher that you

12   were reviewing?

13   A    I do not remember that day, but I recognize the type of

14   narcotics that's on this voucher, yes.

15   Q    The record that you're reviewing, did you approve it?

16   A    I did.

17   Q    So are you able to tell us in reviewing it now, what the

18   contents were of the voucher that you approved at around that

19   time?

20   A    Yes.

21   Q    Just so we're clear, what was the invoice number of this

22   particular voucher?

23   A    The invoice number is 5000116143.

24   Q    What were the contents of that voucher?

25   A    The contents, item one:  Quantity seven.

IRIZARRY – DIRECT – MR. REIN

1          THE COURT:  He can't read the document, it is not in

2    evidence.

3          MR. REIN:  Your Honor, I would ask at this time that

4    the witness be permitted to read from it as past recollection

5    recorded.

6          THE COURT:  Any objection by the defense?

7          MR. SCHOER:  Yes, your Honor.

8          THE COURT:  Excuse me?

9          MR. SCHOER:  Yes.

10          THE COURT:  Can I just see counsel at the side,

11    please.

12          (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1          (The following occurred at sidebar.)

2          THE COURT:  Please state your objection,

3     Mr. Vitaliano.

4          MR. VITALIANO:  This witness didn't actually record

5     this item.  It is recorded by the invoicing officer, Officer

6     Lynch, he's only approved it.  So it's not really something

7     that he recorded rather than Officer Lynch.

8          MR. REIN:  Your Honor, this witness has testified

9     that he approved it and adopted its contents, so under the

10    rule it is his past recollection recorded.  He's also

11    testified that prior to approving it, he counts the evidence

12    and makes sure that the contents are correct.

13         THE COURT:  He has testified at least as to the

14    procedure, the general procedure that he does make the

15    vouchering officer count out the items in front of him, but

16    you have not asked him whether that was done on this

17    particular day.

18         MR. REIN:  We can ask additional questions, Judge,

19    to lay the foundation.

20         THE COURT:  Okay.  But you can't just go willy-nilly

21    and start asking a witness to read from a document that's not

22    in evidence.

23         MR. REIN:  I understand.

24         THE COURT:  And as to the Defendant Allen, any -- it

25    doesn't affect --

SIDEBAR CONFERENCE

1          MS. TODD:  It doesn't affect us.

2          THE COURT:  I understand.  I want to make sure I

3    didn't ignore you.

4          MS. TODD:  I understand, your Honor, I appreciate

5    it.

6          THE COURT:  I'm going to allow him to do it subject

7    to some additional foundation, okay.

8          MR. VITALIANO:  Yes.

9          THE COURT:  Thank you.

10          (End of sidebar conference.)

11          (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IRIZARRY – DIRECT – REIN

1              (In open court.)

2    BY MR. REIN:

3    Q    Sergeant prior to approving the invoice, can you describe

4    for us the procedure that you took to ensure the accuracy of

5    what was listed on the vouchering paperwork?

6    A    Okay.

7              THE COURT:  On this particular day, with respect to

8    this particular invoice.

9              THE WITNESS:  Yes, your Honor.

10             With this particular invoice, I would —— again, I

11   don't remember that day, but common practice is to have the

12   officer count the evidence in front of my presence so I can

13   make sure that count is correct.

14   Q    Would you have approved the invoice if the count was

15   incorrect?

16   A    No, I would not.

17   Q    And at the time that you approved the invoice, was the

18   contents of the invoice accurate?

19   A    Yes.

20   Q    Would you have approved the invoice if any portion of it

21   was inaccurate?

22   A    No, I would not.

23   Q    Why wouldn't you approve it if it was inaccurate?

24   A    Because it wouldn't be accurate.  It would —— it wouldn't

25   be proper.

IRIZARRY – DIRECT – REIN

1  Q    If an invoice is submitted and contains inaccurate

2  information, what would happen?

3  A    If -- I'm sorry say that again one more time.

4  Q    If an invoice is submitted and it contains inaccurate

5  information, what would -- what would be the result of there

6  being an inaccurate invoice that had been generated?

7  A    Oh, I see, okay.  Once that property goes to the lab for

8  analysis, they would do their own count.  If the count was

9  wrong, an Internal affairs notification would be made and

10 there would be an investigation with them.

11 Q    Would the lab test that evidence?

12      THE COURT:  If the count is wrong you mean?

13 Q    Yes.  If the invoice reflects an improper count?

14 A    I don't have that answer.

15 Q    In this case, judging by the fact that you approved the

16 invoice, what can you tell us about the contents of the

17 invoice?

18 A    By looking at this invoice I could tell you exactly what

19 was vouchered and the quantity number.

20 Q    And was that accurate at the time that you approved the

21 invoice?

22 A    Yes.

23      MR. REIN:  Your Honor, at this time I ask that the

24 witness be permitted to read from the exhibit as his past

25 recollection recorded.

IRIZARRY – DIRECT – REIN

1    THE COURT:  Defense wish to be heard?

2    MR. SCHOER:  Judge --

3    THE COURT:  Any objection.

4    MR. VITALIANO:  We maintain our objection.

5    THE COURT:  Okay, overruled.

6  Q    Sergeant, can you tell us, in viewing the exhibit in

7  front of you, what was contained in this invoice under invoice

8  number 5000116143?

9    THE COURT:  You mean the physical items that were

10  contained?

11  Q    Yes, the physical items, yes.

12  A    The physical items contained in this voucher would be a

13  plastic bag with -- can I give a description as well --

14  Q    Yes.

15  A    -- or can I read this?  A plastic bag with alleged

16  marijuana.  Glassine envelope.  Paper bag with black rubber

17  band.  White paper bag with black rubber band, and another

18  paper bag with black rubber band.

19  Q    How many white paper bags with black rubber bands were

20  contained within the voucher?

21  A    The first line was seven, and the second line was six.

22  Q    And how many, what's referred to as glassine envelopes,

23  were contained?

24    THE COURT:  Were contained where?

25  Q    In the voucher envelope.

IRIZARRY - DIRECT - REIN

1   A    Glassine envelope, there's one.

2   Q    How many plastic bags with alleged marijuana were

3   contained in the voucher envelope?

4   A    One.

5   Q    What was the package number assigned to the voucher

6   envelope?

7   A    These were packaged under envelope number 1202910614.

8             THE COURT:  That related to what item?

9             THE WITNESS:  To all the items.  They were all in

10  one envelope and packaged and that envelope was packaged in

11  what's called a plastic security envelope.

12  Q    What was -- if we could turn to page -- I'm sorry, before

13  we do that.  I'm sorry.

14            Looking still at first page of the exhibit, what was

15  the name of the ECT officer who was responsible for vouchering

16  these items?

17  A    His name is Robert Lynch.

18  Q    Turning now to second page of the exhibit --

19            MR. SCHOER:  Excuse me, has this been offered as an

20  exhibit?

21            MR. REIN:  We've --

22            THE COURT:  Let me talk to counsel at the side,

23  please.

24            (Continued on the next page.)

25

142

SIDEBAR CONFERENCE

1          (The following occurred at sidebar.)

2          THE COURT:  I'm just going ask if you have a

3     question like that, that you address it to the Court in the

4     future.

5          MR. SCHOER:  I apologize.

6          THE COURT:  It's a very good question.  You're going

7     off into other questions here that -- the problem is that

8     there is, obviously, besides the mere listing of items on the

9     voucher, there's hearsay on the document.

10         MR. REIN:  The question we intend to offer the

11    physical exhibit.

12         MR. SCHOER:  You haven't offered it yet, you called

13    it an exhibit.

14         MR. REIN:  The document --

15         MR. SCHOER:  It's really not an exhibit yet.

16         MR. REIN:  The document.

17         MR. SCHOER:  I understand it's a document and it was

18    3500 material but you --

19         THE COURT:  It is an exhibit, it's just not in

20    evidence.

21         MR. REIN:  Right.

22         MR. SCHOER:  Okay, fair enough.

23         THE COURT:  The document itself is not in evidence,

24    it is still an exhibit.

25         MR. REIN:  We have -- yes, the physical exhibit will

SIDEBAR CONFERENCE

1    be.

2              THE COURT:  Let me ask you this, to the defense,

3    would you have an objection, it is past recollection recorded,

4    he has basically certified the document, if the government

5    were to redact the hearsay portions of the document, would you

6    have any objection then to introducing the document as an

7    exhibit, that might simplify matters actually.

8              MR. REIN:  I have a redacted copy.

9              MR. McDONALD:  We were thinking in advance, we

10   already prepared a redacted version we believe --

11             MR. REIN:  Actually that's --

12             THE COURT:  You have to keep your voice down.

13             This is the entire voucher?  It's two pages.

14             MR. REIN:  It's front and back.  One is another --

15   one is another voucher.

16             MR. SCHOER:  This is the syringe he --

17             THE COURT:  Okay.  Are you going to be asking him

18   about that other document --

19             MR. REIN:  I will.

20             THE COURT:  -- too.

21             MR. REIN:  I can show it to, your Honor.

22             THE COURT:  Well, let's kill two birds with one

23   stone.  So 3500-RI-1 relates to the hypodermic needle and

24   aside from containing the names of various police officers,

25   and the reverse side has the signature of this witness

SIDEBAR CONFERENCE

1   apparently.  And then there is 3500-RI-2 which is being

2   discussed now.

3           Has the defense been provided with redacted

4   versions?

5           MR. REIN:  Not a redacted version, they have a full

6   unredacted version.

7           THE COURT:  All right.

8           It does appear to have the contents section where

9   the hearsay is redacted, otherwise it has the name of police

10  officers, the listing of the items vouchered, it has other

11  identifying numbers on the reverse side, the name of the

12  decedent, the address and then signatures of Officer Lynch and

13  the witness.

14          So do you have any objection to either of these as

15  redacted?

16          MR. VITALIANO:  No, Judge.

17          THE COURT:  Okay.  And this one too, I want to make

18  sure you have a chance to look at it.

19          You'll have to provide both the Court and the

20  defense with a redacted version --

21          MR. REIN:  Yes, Judge.

22          THE COURT:  -- with a redacted copy.

23          MR. REIN:  We will promptly.

24          MR. SCHOER:  Just as a --

25          THE COURT:  You have to give that an exhibit number,

SIDEBAR CONFERENCE

1    not a 3500 number.

2                MR. REIN:  Okay.

3                THE COURT:  I imagine you have some spare numbers --

4                MR. REIN:  We do.

5                THE COURT:  -- to assign to it.  And put a proper

6    sticker on it.

7                MR. REIN:  Okay.

8                MR. SCHOER:  Just as a clarification, I assume that,

9    and if I'm wrong, tell me, in the bags themselves these

10   documents are either in the bag or attached to the bags, am I

11   right?

12               MR. REIN:  The documents are not but the original

13   bag that the items were packaged in are in there and they

14   contain the same package number that's on the invoice.

15               MR. SCHOER:  But they don't contain the hearsay,

16   that's being redacted.

17               MR. REIN:  No, they do not.

18               MR. SCHOER:  That was my question.

19               THE COURT:  Before any of that is shown to the jury

20   you're going to be shown it.

21               MR. SCHOER:  I understand.

22               MR. REIN:  One thing in terms of full transparency,

23   the initial envelope is in the bag.  It does contain writing

24   on it that was put there at the time, that contains some of

25   the information that's on here, including the name, Vincent

SIDEBAR CONFERENCE

1   Price and the address, but these remarks section that contain

2   the hearsay is not on there and what I will do before we --

3   taking a chance it gets shown to the jury, you'll obviously

4   see it.

5           THE COURT:  I'll make sure that anything that's

6   shown to the jury is shown to you first.

7           MR. SCHOER:  Thank you, Judge.

8           THE COURTROOM DEPUTY:  Pardon the interruption, one

9   of the paralegals from the U.S. Attorney's Office let me know

10  that you can kind of be heard over at counsel table.  I can't

11  make the white noise any louder.  Richard Norville is actually

12  coming up right now on a separate matter so I'll ask him if he

13  can raise the volume of the white noise.

14          THE COURT:  Okay, so we're good.

15          MR. SCHOER:  Yes?

16          MR. REIN:  Okay.

17          (End of sidebar conference.)

18          (Continued on the next page.)

19

20

21

22

23

24

25

IRIZARRY – DIRECT – MR. REIN

1            (In open court.)

2            THE COURT:  So a couple of things, ladies and

3    gentlemen, I understand the sun is coming in, we're trying to

4    see if we can find some way to get that out of your face.  I

5    apologize about that.  I'm not in my regular courtroom and my

6    regular courtroom doesn't have windows so we don't usually

7    have that issue.  We're going to do our best to see what we

8    can do.  There you go.  The wonders of technology.  No more

9    sunshine.

10           Also, I just wanted to let you know from time to

11   time I may have sidebars with it lawyers we're discussing

12   legal issues that are not of any concern for the jury, please

13   don't try to read anything into it.  The attorneys have a

14   right to have these discussions with the Court, we're going to

15   try not to have too many of them, but issues do come up from

16   time to time during the course of the trial.

17           So whenever you're ready, Mr. Rein, you can proceed.

18           MR. REIN:  Thank you.

19           Can we show only to the witness what's being placed

20   on the ELMO.

21           THE COURT:  Yes, only to the witness.

22   Q    Sergeant, I'm going show you what's been premarked for

23   identification as Government Exhibit 421.

24           Are you able to see it?

25   A    No.

IRIZARRY – DIRECT – MR. REIN

1    Q    No.

2              THE COURT:  Can you see it?

3    A    No, your Honor.

4              THE COURT:  Still can't see it.  The witness is

5    having trouble seeing.  The attorneys should be able to see it

6    also.

7    A    I can see it now.

8    Q    And Sergeant, this document which you're being shown,

9    which is Government Exhibit 421 for identification, what is

10   this?

11   A    This is an NYPD Property Clerk Invoice.

12   Q    Is this the same invoice you were just looking at

13   previously which was marked as Government Exhibit 3500-RI-2

14   for identification?

15   A    Yes, it appears to be.

16   Q    And the notations on it, are they accurate?

17   A    Yes.

18   Q    It's a two-page document, I'm going to show you the

19   second page.  Are you able to see that?

20   A    Yes.

21   Q    And do you recognize this signature at the bottom of the

22   document?

23   A    Yes.

24   Q    Whose signature is that?

25   A    That's my signature.

IRIZARRY - DIRECT - MR. REIN

1   Q    What does it indicate?

2   A    It indicates that I approved this voucher.

3   Q    And the information on the -- you see a portion where it

4   says Complainant?

5   A    Yes.

6   Q    Where does that information come from?

7   A    That comes from either the officer on scene, the

8   detective or the police officer.

9   Q    And would you approve any of this contents of this

10  document if it was inaccurate?

11  A    On occasion the names are switched and -- but besides

12  that, if the evidence was not accurate I would not approve it.

13          MR. REIN:  Your Honor, at this time I offer

14  Government Exhibit 421.

15          THE COURT:  Any objection?

16          MR. VITALIANO:  No, Judge.

17          THE COURT:  Any objection by Defendant Allen?

18          MS. TODD:  No, your Honor.

19          THE COURT:  It's admitted.

20          MR. REIN:  If we could just publish it for the jury.

21          THE COURT:  Yes.

22          (Government Exhibit 421, was received in evidence.)

23          (Exhibit published.)

24          MR. REIN:  Sergeant -- let me wait a moment.

25          THE COURTROOM DEPUTY:  It's on the smaller screen.

IRIZARRY – DIRECT – MR. REIN

1           THE COURT:  It takes a while for the big screen.

2   All of you can see it on your screens, on your monitors?

3           THE JURY:  Yes.

4           A JUROR:  No.

5           THE COURT:  It's not coming up.  It might be off.

6           THE COURTROOM DEPUTY:  Yes, it might be off.

7           THE COURT:  Do you have it now?

8           A JUROR:  Yes.

9   BY MR. REIN:

10  Q    Sergeant, you were discussing a moment ago the contents

11  of the voucher.  Can you actually just point out for us, use

12  your finger and touch the screen and draw for us the

13  section -- draw on the screen the section you were referring

14  to.

15  A    (Witness complies.)

16  Q    That portion that you've circled, although you've drawn a

17  box under where it says Articles and about one-third down the

18  page that we're looking at, when you testified a moment ago

19  did you recite what's contained in that section?

20  A    Yes, I did.

21  Q    And you were asked a moment ago about the package number

22  that these items were contained in.  Could you please just

23  point that out for us as well.

24  A    (Witness complies.)

25  Q    I'll note you've drawn a box around the section to the

                    IRIZARRY - DIRECT - MR. REIN

1   right of the box you circled under where it says, Package

2   Number?

3   A    Correct.

4   Q    I'm going to move the document up so you see a different

5   portion of it.  Can you point out for us the name of the

6   officer who completed the voucher?

7   A    Would you like me to circle it?

8   Q    Yes.  Thank you.

9   A    (Witness complies.)

10        MR. REIN:  I'll note that you've circled the name

11   Robert Lynch which is to the right of the word finder at the

12   bottom of the page.

13        I'm going to turn the document over to the second

14   page.

15   Q    Sergeant, can you circle the name of the complainant

16   that's associated with the property under this voucher?

17   A    Yes.  (Witness complies.)

18   Q    What was the date that this voucher was completed on?

19   A    Would you like me to circle or state it?

20   Q    You can state it.

21   A    April 18th, 2017.

22   Q    What's the address associated with the property?

23   A    69 Carlyle Green, Staten Island, New York 10309.

24        MR. REIN:  I'm going to take the exhibit down.

25   Q    At the time that you approved the paperwork that we just

IRIZARRY – DIRECT – MR. REIN

1  looked at as Government Exhibit 421, what was the condition of

2  the voucher envelope that contained the property?

3  A    If I approved this, which I did, I approved this voucher

4  that means that that property was in good condition for it to

5  be transported to the lab for analysis.

6  Q    After you approve it, what happens to the actual envelope

7  that it's contained in?

8         THE COURT:  What do you mean by good condition to be

9  transported?  What makes it good condition to transport?

10        THE WITNESS:  Meaning that the evidence was

11  appropriately packaged wrapped and placed in the plastic

12  security envelope with the flap signed by the officer

13  vouchering it and ready to go to the lab.

14        THE COURT:  So that outer envelope would have to be

15  sealed?

16        THE WITNESS:  Yes, your Honor.

17        MR. REIN:  Thank you, Judge.

18        I'd like to show you now what's been premarked for

19  identification as Government Exhibit 332.

20        Your Honor, may I approach the witness?

21        THE COURT:  Yes.

22        MR. REIN:  First, I'm going to show it to defense.

23        THE COURT:  Yes.

24        MR. REIN:  I'm sorry, your Honor, may I approach

25  now?

153

IRIZARRY – DIRECT – MR. REIN

1          THE COURT:  Yes, you may.

2     Q     Sergeant, I've handed you what's been premarked for

3     identification as Government Exhibit 332.  Do you recognize

4     that exhibit?

5     A     I recognize the number on the plastic security envelope,

6     it's the same number that's on the voucher.

7     Q     And looking at that number and observing it's the same

8     number on the voucher, what does that indicate to you?

9     A     That indicates that the property that's on that voucher

10    was packaged inside that bag.

11    Q     Is the property that's contained within Government

12    Exhibit 332 for identification, other than the fact that the

13    envelope appears to have been opened for testing at the lab,

14    is it in the same or substantially the same condition as when

15    you approved the voucher on April 18th, 2017?

16    A     With the exception of these vials that I have no idea

17    what they are, but the property does look to be what is

18    described on the voucher.

19          MR. REIN:  Your Honor, at this time I offer the

20    exhibit subject to connection.

21          THE COURT:  Do you wish to voir dire?

22          MR. VITALIANO:  No, Judge.

23          THE COURT:  Any objection?

24          MR. VITALIANO:  No, Judge.

25          THE COURT:  Any objection by Defendant Allen?

IRIZARRY – DIRECT – MR. REIN

1          MS. TODD:  No, your Honor.

2          THE COURT:  It's admitted.

3          (Government Exhibit 332, was received in evidence.)

4          MR. REIN:  I'm going to just come and take the

5    exhibit if I may, Judge?

6          THE COURT:  Yes.

7    Q    Sergeant, did you approve a voucher for additional

8    property from 69 Carlyle Green on April 18th, 2017?

9    A    Yes, I did.

10   Q    What was the invoice number associated with that

11   property?

12   A    I don't know it off the top of my head.  I would need to

13   see it.

14         MR. REIN:  Can we show only to the witness what's

15   been premarked for identification as Government Exhibit 422.

16         THE COURT:  It can be shown to counsel as well.

17         MR. REIN:  From the ELMO, I'm sorry.

18   Q    Sergeant, can you see the exhibit?

19   A    Yes.

20   Q    And in looking -- I'll ask you to look down at it and

21   look up at me if your recollection is refreshed regarding that

22   invoice number.

23   A    Yes.

24   Q    What was the invoice number for that additional property?

25   A    5000116141.

IRIZARRY – DIRECT – MR. REIN

1   Q    And this document that you're looking at, Government

2   Exhibit 422 for identification, what is this document?

3   A    This is a voucher for a hypodermic needle.

4   Q    This document -- I'm going to turn to the second page of

5   it, who is it approved by?

6   A    Myself.

7   Q    At the time that -- turning back to the first page, at

8   the time that you approved of this document, can you describe

9   for us what steps you took to ensure its accuracy?

10  A    Just like the other voucher, I would have to observe it

11  and make sure that it was contained in the hypodermic

12  container.

13  Q    Would you have approved this invoice if the contents were

14  incorrect?

15  A    No, I would not.

16  Q    Are the notations made on this document, do they

17  accurately reflect the contents of the invoice?

18  A    I would have to see the package to make sure the package

19  number is correct, but yes, it looks -- it looks like, yes.

20          MR. REIN:  Your Honor, at this time I offer

21  Government Exhibit 422.

22          THE COURT:  Any voir dire?

23          MR. VITALIANO:  No, Judge.

24          THE COURT:  Any objection?

25          MR. VITALIANO:  No.

IRIZARRY – DIRECT – MR. REIN

1          MS. TODD:  No, your Honor.  Thanks.

2          THE COURT:  It's admitted.

3          (Government Exhibit 422, was received in evidence.)

4          MR. REIN:  If we could publish it now to the jury

5     please, Judge.

6          THE COURT:  Yes.

7          (Exhibit published.)

8     Q     Sergeant, can you tell us, in looking at Government

9     Exhibit 422, what was the name of the ECT officer responsible

10    for invoicing the property that's reflected in this document?

11    A     Robert Lynch.

12    Q     And what was the property that was contained within the

13    voucher that this document pertains to?

14    A     One hypodermic needle.

15    Q     What was the package number -- what is the package number

16    associated with the voucher package?

17    A     This would be the plastic security envelope that would be

18    number 1202910615.

19          (Continued on the next page.)

20

21

22

23

24

25

IRIZARRY – DIRECT – MR. REIN

1    BY MR. REIN (continuing):

2    Q    Could you just draw on the screen and circle for us where

3    that is.

4            And I'll just note that you've circled an area about

5    a third down the page under where it says, "package number."

6            Could you also tell us the name of the complainant

7    that is associated with this property?

8    A    Vincent Price.

9    Q    And what is the address associated with it?

10   A    69 Carlyle Green, Staten Island, New York 10309.

11   Q    I'm going to turn to the second page of the document.

12           Do you recognize the signature at the bottom of the

13   page?

14   A    Yes.

15   Q    Whose signature is that?

16   A    It's my signature.

17   Q    I'll take the exhibit down.

18           I'm going to show you now what's been premarked for

19   identification as Government Exhibit 333.

20           MR. REIN:  I'll first show it to defense counsel.

21           THE COURT:  I'm sorry.  May I have that number

22   again?

23           MR. REIN:  333, Judge.

24           THE COURT:  Thank you.

25           MR. REIN:  May I approach the witness, Judge?

IRIZARRY – DIRECT – MR. REIN

1    THE COURT:  Yes, you may.

2    Q    Sergeant, I've just handed you what's been premarked for

3    identification as Government Exhibit 333.

4         Do you recognize that exhibit?

5    A    Can you put the voucher back on, please?

6    Q    Sure.

7         MR. REIN:  If we could show, on the ELMO, what's in

8    evidence as Government Exhibit 422.

9    A    Okay.  The plastic security envelope is the same as the

10   voucher, so I recognize the number on the voucher.

11   Q    And what does that recognition indicate to you?

12   A    That that -- this hypodermic needle was packaged in this

13   plastic security envelope.

14   Q    And under which invoice number?

15   A    5000116141.

16   Q    And prior to approving the invoice, which is in evidence

17   as Government Exhibit 422, can you describe for us the steps

18   that you took to ensure the accuracy of it?

19   A    I made sure that the hypodermic needle was in its

20   appropriate container, hypodermic container, and packaged in

21   the property security envelope.

22   Q    Other than the fact that the security envelope had been

23   opened for additional testing, does the property contained in

24   Government Exhibit 333 for identification appear to be in the

25   same or substantially the same condition as when you approved

IRIZARRY – CROSS – MR. VITALIANO

1    the invoice on April 18, 2017?

2    A    Yes, it does.

3    Q    Okay.

4          MR. REIN:  Your Honor, at this time, I offer

5    Government Exhibit 333 into evidence.

6          THE COURT:  Do you have any voir dire?

7          MR. SCHOER:  No, Judge.  No objection.

8          THE COURT:  And as to Allen?

9          MS. TODD:  No objection, Judge.

10          THE COURT:  Thank you.  It's in evidence.

11          (Government Exhibit 333, was received in evidence.)

12          MR. REIN:  One moment, Judge.

13          THE COURT:  Yes.

14          MR. REIN:  Nothing further, Judge.  Thank you.

15          THE COURT:  Does counsel for Mr. Wyche wish to

16    inquire?

17          MR. VITALIANO:  Yes, Judge.  Just a minute.

18          MR. REIN:  I'm sorry, Judge.  May I approach the

19    witness and retrieve the exhibit?

20          THE COURT:  Yes, you may.

21    CROSS-EXAMINATION

22    BY MR. VITALIANO:

23    Q    Good morning, Sergeant.

24    A    Good morning.

25    Q    My name is Michael Vitaliano.  I'm the attorney for

IRIZARRY – CROSS – MR. VITALIANO

1   Mr. Wyche.

2           So Sergeant, where were you when you first received

3   the narcotics from Officer Lynch?

4   A    I was in my office.

5   Q    So you were never on the scene on that day?

6   A    No, sir.

7   Q    So you did not have any personal knowledge of where

8   Officer Lynch recovered the drugs from?

9   A    No, sir.

10  Q    And when you say that -- you testified that you count the

11  items to make sure that they're accurate.

12  A    Well, I have the officer count in my presence.

13  Q    And the officer just counts and you consider what is

14  accurate, the drugs that are in front of you at that point?

15  A    Yes, sir.

16  Q    So it's possible that an officer would recover drugs and

17  a different amount would be presented in front of you and you

18  would still consider that accurate?

19          MR. REIN:  Objection.

20          THE COURT:  I'm going to sustain as to form.

21  Q    So the drugs that Officer Lynch brought to you, they were

22  seven glassine envelopes, correct?

23  A    I don't have the voucher in front of me, so I can't tell

24  you that.

25          MR. VITALIANO:  Can you guys pull the voucher up?

IRIZARRY – CROSS – MR. VITALIANO

1          (Exhibit published.)

2     Q     Can you see that, Sergeant?

3     A     Yes.

4     Q     So the officer counted it in front of you, seven glassine

5     envelopes, correct?

6     A     No.  I only see one glassine envelope.

7     Q     One -- seven white paper bags, correct?

8     A     In item one, there is seven white paper bags, yes.

9     Q     And then item two, there were six paper bags?

10    A     Yes, sir.

11    Q     And then in item three, was it another glassine envelope?

12    A     There was one glassine envelope.

13    Q     And then item four was another bag with residue?

14    A     Item four would be one bag of alleged marijuana.

15    Q     And you approved that voucher, correct?

16    A     Yes, sir.

17    Q     And in addition to these vouchers, you also approved

18    other vouchers, correct?

19    A     With this case?

20    Q     With this case.

21    A     Yes, sir.

22    Q     And those vouchers, you also approved a request for

23    laboratory examination?

24    A     Yes, I did.

25    Q     And you requested the laboratory examination for DNA,

IRIZARRY – CROSS – MR. VITALIANO

1    correct?

2    A    I didn't request it.  The officer requested it, and I

3    approved it.

4    Q    So you approved a request for DNA, correct?

5    A    Correct.

6    Q    And you also approved a request for fingerprints,

7    correct?

8    A    I don't have the -- I don't have the request for lab in

9    front of me.  I would have to see that.

10   Q    Would that refresh your recollection?

11   A    Yes.

12            MR. VITALIANO:  May the witness be shown Government

13   Exhibit 3500RI3?

14            THE COURT:  Okay.  And just to the witness, only.

15            MR. VITALIANO:  And also Government Exhibit 3500RI4,

16   just to the witness.

17            MR. REIN:  You're asking that we show --

18            MR. VITALIANO:  Just the witness, 3500RI4.

19            MS. CHEN:  It's not on the ELMO.

20            THE COURTROOM DEPUTY:  It's on your laptop.  That's

21   what I wanted to know.  Thank you.

22            MR. VITALIANO:  And then –RI4, Page 2.

23   Q    Sergeant, does that reflect your recollection?

24   A    Yes.

25   Q    So Sergeant, you approved a request for laboratory

IRIZARRY – CROSS – MR. VITALIANO

1    examination for fingerprinting, as well, correct?

2    A    Not on all items.  The hypodermic needle, I believe was

3    only for chemical analysis.

4    Q    What items did you request to be tested for

5    fingerprinting?

6    A    I also requested for item one, DNA and latent print and

7    chemical analysis.  For item two, the same, DNA, latent print,

8    and chemical analysis.  I can't see item three.

9                MR. VITALIANO:  Can you --

10   A    Now I can.  Item three, chemical analysis, DNA, latent

11   print; and item four, chemical analysis, DNA, and latent

12   print.

13               THE COURT:  The document is not in evidence.  So the

14   witness is not supposed to be reading from a document not in

15   evidence.

16

17               MR. VITALIANO:  I apologize.

18               THE COURT:  We had this discussion.

19   Q    So I'm now going to show you what has previously been in

20   evidence as Government Exhibit 332.

21               MR. VITALIANO:  Your Honor, may I show the witness?

22               THE COURT:  Yes.  You can take down the document.

23   Thank you.

24   Q    Sergeant, in that exhibit, there are vials in there,

25   correct?

IRIZARRY – CROSS – MR. VITALIANO

1    A    Correct.

2    Q    And those vials contain the DNA that was sent for

3    testing, correct?

4                MR. REIN:  Objection.

5                THE COURT:  Can I have the question read back,

6    please.

7                (Whereupon, a portion of the testimony was read

8    back.)

9                THE COURT:  Sustained as to form.

10   Q    If you know, were those items ever sent for testing?

11   A    I do not know.

12   Q    Looking at that exhibit, Sergeant, can you tell us where

13   the drugs were recovered from?

14   A    Not by looking at this, no.

15   Q    Is there anything that would indicate?

16   A    Turning it over, I could see on the envelope, it does

17   indicate where it was recovered.

18   Q    And can you tell us what that says?

19   A    It says:  On dining room table in 69 Carlyle Green.

20   Q    And again, you weren't at that location, correct?

21   A    No, I was not.

22   Q    And you do not know what time those drugs were recovered,

23   correct?

24   A    No, I don't know.

25               MR. VITALIANO:  Judge, may I have a moment to confer

IRIZARRY – CROSS – MR. VITALIANO

1    with counsel?

2              THE COURT:  Of course.

3              (Pause in the proceedings.)

4              MR. VITALIANO:  Nothing further, Your Honor.

5              THE COURT:  Any redirect?

6              MR. REIN:  No, Your Honor.

7              THE COURT:  Thank you, sir.  You may step down.  I'm

8    sorry.  Again, I did not mean to overstep.

9              Ms. Todd, anything from Defendant Allen?

10             MS. TODD:  No, Your Honor.  Thank you.

11             (The witness steps down.)

12             THE COURT:  The Government can call its next

13   witness.

14             MS. CHEN:  Your Honor, in advance of that, may the

15   Government read into the record a stipulation?

16             THE COURT:  Yes, you may.  And what is the exhibit

17   number?

18             MS. CHEN:  It's been marked for identification as

19   Government Exhibit 102.

20             THE COURT:  102?

21             MS. CHEN:  That's right, Your Honor.

22             THE COURT:  Thank you.

23             MS. CHEN:  May I proceed, Your Honor?

24             THE COURT:  Yes.

25             MS. CHEN:  I'm reading into the record a

IRIZARRY – CROSS – MR. VITALIANO

1    stipulation.  The caption is United States of America against

2    Keith Wyche and Oneil Allen.  Case caption is 18-CR-561.  And

3    the stipulation reads:

4            It is hereby stipulated and agreed by and between

5    the United States of America and the defendant, Keith Wyche

6    through his attorneys, Gary Schoer and Michael Vitaliano, and

7    the defendant, Oneil Allen, through his attorneys, Natali Todd

8    and Cody Warner, that:

9            One, following their seizure and recovery, the

10   contents of Government Exhibits 301 through 320 were submitted

11   to the New York City Police laboratories controlled substance

12   analysis section, otherwise known as the NYPD lab.  The

13   contents of each exhibit were analyzed by forensic chemists,

14   trained for such matters and in compliance with the standards

15   and best practices normally acceptable by experts in the

16   testing and analysis of controlled substances.  Each exhibit

17   had an unbroken seal when received at the NYPD lab.

18           Based on the testing conducted at the NYPD lab, the

19   parties agree that the substances in each Government Exhibit

20   are as follows:  Government Exhibit 301 contains a hypodermic

21   needle with residue in it recovered from the passenger seat of

22   a car in the vicinity of Smyrna Avenue and Shotwell Avenue on

23   February 18, 2017.  Testing of the residue in the hypodermic

24   needle revealed that it contained heroin and Fentanyl.

25           Government Exhibit 302 contains 10 glassine

IRIZARRY – CROSS – MR. VITALIANO

1    envelopes with solid material in them which were recovered

2    from John Kane on –– I'll spell John Kane for the record,

3    J-O-H-N, K-A-N-E –– on July 12th, 2017.  Testing of the

4    material in one of the glassine envelopes revealed that it

5    contained heroin and Fentanyl.

6                Government Exhibit 303 contains 10 glassine

7    envelopes with solid material in them which were recovered

8    from a confidential informant on November 3rd, 2017.  Testing

9    of the material in all 10 glassine envelopes revealed that

10   they contained heroin and Fentanyl.

11               Government Exhibit 304 contains 10 glassine

12   envelopes with solid material in them which were recovered

13   from a confidential informant on November 14th, 2017.  Testing

14   of the material in one of the glassine envelopes revealed that

15   it contained Fentanyl and acetylfentanyl.

16               Government Exhibit 305 contains 10 glassine

17   envelopes with solid material in them recovered from a

18   confidential informant on November 22nd, 2017.  Testing of the

19   material in one of the glassine envelopes revealed that it

20   contained Fentanyl and heroin.

21               Government 306 contains 10 glassine envelopes with

22   solid material in them recovered from a confidential informant

23   on November 27th, 2017.  Testing of the material in one of the

24   glassine envelopes revealed that it contained Fentanyl and

25   acetylfentanyl.

IRIZARRY – CROSS – MR. VITALIANO

1    Government 307 contains 10 glassine envelopes with

2    solid material in them recovered from a confidential informant

3    on December 6th, 2017.  Testing of the material in one of

4    those glassine envelopes revealed that it contained Fentanyl

5    and acetylfentanyl.

6    Government Exhibit 308 contains 10 glassine

7    envelopes with solid material in them recovered from a

8    confidential informant on January 10th, 2018.  Testing of the

9    material in one of the glassine envelopes revealed that it

10   contained heroin, Fentanyl, and acetylfentanyl.

11   Testing of the additional nine glassine envelopes

12   revealed that they contained heroin, Fentanyl -- and what I'll

13   read into the record is a chemical substance.  And that

14   chemical substance is 4- -- I'm going to spell it for the

15   record -- anilino-N-phenethyl-4-piperidine (ANPP).

16   Government Exhibit 309 contains 11 glassine

17   envelopes with the solid material in them recovered from a

18   confidential informant on February 8th, 2018.  Testing of the

19   material in one of the glassine envelopes revealed that it

20   contained heroin and Fentanyl.

21   Government Exhibit 310 contains 10 glassine

22   envelopes with solid material in them recovered from a

23   confidential informant on April 19th, 2018.  Testing of the

24   material in one of the glassine envelopes revealed that it

25   contained Fentanyl, tramadol, and the chemical substance that

IRIZARRY — CROSS — MR. VITALIANO

1    I'll read into the record.  4-anilino-N-phenethyl-4-piperidine

2    (ANPP).  In addition, testing of the material in all 10 of the

3    glassines revealed that they contained heroin.

4            Government Exhibit 311 contains 10 glassine

5    envelopes with solid material in them recovered from a

6    confidential informant on May 29th, 2018.  Testing of the

7    material in one of the glassine envelopes revealed that it

8    contained heroin and Fentanyl.

9            Government Exhibit 312 contains 10 glassine

10   envelopes with solid material in them recovered from a

11   confidential informant on June 6th, 2018.  Testing of the

12   material in one of the glassine envelopes revealed that it

13   contained Fentanyl.

14           Government Exhibit 313 contains 15 glassine

15   envelopes with solid material in them recovered from a

16   confidential informant on June 13th, 2018.  Testing of the

17   material in one of the glassine envelopes revealed that it

18   contained heroin and Fentanyl.

19           Government Exhibit 314 contains 15 glassine

20   envelopes with solid material in them recovered from a

21   confidential informant on June 12 –– I'm sorry, June 24, 2018.

22   Testing of the material in one of the glassine envelopes

23   revealed that it contained heroin and Fentanyl.

24           Government Exhibit 315 contains 15 glassine

25   envelopes with solid material in them recovered from a

IRIZARRY – CROSS – MR. VITALIANO

1    confidential informant on July 15th, 2018.  Testing of the

2    material in one of the glassine envelopes revealed that it

3    contained heroin.

4            Government Exhibit 316 contains 10 glassine

5    envelopes with solid material in them and one Ziplock bag

6    containing solid material recovered from a confidential

7    informant on July 31st, 2018.  Testing of the material in one

8    of the glassine envelopes revealed that it contained heroin

9    and Fentanyl.  Testing of the material in the Ziplock bag

10   revealed that it contained cocaine.

11           Government Exhibit 317 contains 10 glassine

12   envelopes with solid material in them recovered from a

13   confidential informant on August 9th, 2018.  Testing of the

14   material in one of the glassine envelopes revealed that it

15   contained heroin.

16           Government Exhibit 318 contains 10 glassine

17   envelopes with solid material in them recovered from a

18   confidential informant on August 21st, 2018.  Testing of the

19   material in one of the glassine envelopes revealed that it

20   contained heroin and Fentanyl.

21           Government Exhibit 319 contains 10 glassine

22   envelopes with solid material in them recovered from a

23   confidential informant on August 26th, 2018.  Testing of the

24   material in all 10 glassine envelopes revealed that they

25   contained Fentanyl.  Testing of the material in two of the

IRIZARRY – CROSS – MR. VITALIANO

1    glassines revealed that they contained cocaine.  Testing of

2    the material in nine of the glassines revealed that they

3    contained heroin.

4            Government Exhibit 320 contains nine glassine

5    envelopes with solid material in them in four Ziplock bags

6    with solid material in them.  All of which were recovered from

7    a Lexus GS 350 with New York State license plate number

8    JAG1606 on January 7th, 2019.  Testing of the material in one

9    of the glassine envelopes revealed that it contained heroin

10   and Fentanyl.  Testing of the material in all four Ziplock

11   bags revealed that they contained cocaine.

12           It is further stipulated that Government

13   Exhibits 301 through 320 have been in the continual custody of

14   law enforcement and are in substantially the same condition

15   today as when they were recovered by law enforcement agents.

16   It is further stipulated and agreed that Government

17   Exhibits 301 through 320 and this stipulation, which is

18   Government Exhibit 102, may be received in evidence as a

19   government exhibit at trial.  This stipulation is signed by

20   the parties on January 25th, 2023.

21           Your Honor, on the basis of the stipulation, the

22   Government offers into evidence, Government Exhibits 101

23   through -- I'm sorry, 301 through 320, as well as Government

24   Exhibit 102.

25           THE COURT:  As it's been stipulated by all of the

IRIZARRY – CROSS – MR. VITALIANO

1    parties, the stipulation and the exhibits that are enumerated

2    in that stipulation are in evidence.  I gave you instructions

3    yesterday as to what a stipulation is.  I will repeat those

4    instructions at the end of the case.  Those instructions still

5    apply here.

6              (Government Exhibits 301 through 320 and 102, were

7    received in evidence.)

8              THE COURT:  You may call your next witness.

9              MS. CHEN:  Your Honor, the Government calls

10   Detective Dominick Libretti.

11             THE COURT:  How's the jury doing?  You can hold on

12   for maybe another hour and then maybe we'll take a break?

13   Yes?  Everybody's nodding yes.  All right.

14             (The witness takes the stand.)

15             THE COURTROOM DEPUTY:  Please raise your right hand,

16   sir.

17             (The witness was sworn and/or affirmed in by the

18   courtroom deputy.)

19             THE WITNESS:  Yes.

20             THE COURTROOM DEPUTY:  Thank you.  Please be seated.

21             Please state and spell your name.

22             THE WITNESS:  Yes.  Detective Dominick Libretti,

23   D-O-M-I-N-I-C-K, L-I-B-R-E-T-T-I.

24             THE COURTROOM DEPUTY:  Thank you.

25             THE COURT:  And good morning, sir.  If you would

LIBRETTI - DIRECT - MS. CHEN

1   like and you feel comfortable, you can take the mask off

2   during your testimony.  If you would rather keep it on, that's

3   fine, as well.  I'm just going to ask you to keep your voice

4   up nice and loud and speak slowly, and you can adjust the

5   microphone so that you're comfortable with it.

6                THE WITNESS:  Okay.  Thank you.

7                THE COURT:  You're welcome.  You may inquire

8   whenever you're ready.

9                MS. CHEN:  Thank you, Your Honor.

10  **DOMINICK LIBRETTI**, called as a witness, having been first duly

11  sworn/affirmed, was examined and testified as follows:

12  DIRECT EXAMINATION

13  BY MS. CHEN:

14  Q     Good morning.

15  A     Good morning.

16  Q     Where do you work?

17  A     Staten Island Detective Bureau, NYPD.

18  Q     And does the NYPD stand for New York City Police

19  Department?

20  A     Yes.

21  Q     How long have you been with NYPD?

22  A     Twelve years.

23  Q     When did you become a detective?

24  A     In May of 2017.

25  Q     Before you became a detective, what was your role at the

LIBRETTI – DIRECT – MS. CHEN

1    NYPD?

2    A    Police officer.

3    Q    And I think you said you were currently assigned to

4    Staten Island Detective Bureau; is that right?

5    A    Yes, ma'am.

6    Q    Prior to your current assignment, can you walk the jury

7    through some of your prior assignments?

8    A    Absolutely.  So I became a police officer in 2012.  I was

9    stationed in the East Flatbush area of Brooklyn, 6-7 Precinct.

10   I then transferred to Sunset Park which is the 7-2 Precinct.

11   I then transferred to strategic response group.  And in May of

12   '17, I then went to the detective bureau and became a

13   detective.

14   Q    In May of 2017, were you assigned to a specific

15   assignment?

16   A    Yes.  Narcotics.

17   Q    Oh.  And where?

18   A    Staten Island narcotics.

19   Q    Okay.  Can you tell the jury what's the difference

20   between a bureau and a precinct?

21   A    So a precinct will pretty much cover a specific area in a

22   borough.  When they -- a bureau can cover the whole borough

23   you work in.

24   Q    And how long were you at Staten Island narcotics?

25   A    Approximately seven years.

LIBRETTI - DIRECT - MS. CHEN

1    Q    And when did you start your current assignment?

2    A    In August of 2022.

3    Q    And what's your role, or what are some of your

4    responsibilities in your current assignment?

5    A    Currently, I review all overdose cases that occur on

6    Staten Island.

7    Q    I want to talk about your work in Staten Island

8    narcotics, okay?

9    A    Yes.

10   Q    While you were there, were you assigned to any particular

11   group?

12   A    Yes.  The Overdose Task Force.

13   Q    And how long were you a member of the Overdose Task

14   Force?

15   A    Approximately four years.

16   Q    And what is the Overdose Task Force tasked with doing?

17   A    Respond to any overdose-related cases on Staten Island

18   and do the investigation on the save or passing of a overdose

19   victim.

20   Q    And do you know why the Overdose Task Force was created?

21   A    Yes.  Staten Island was having such high numbers of

22   overdose fatalities and saves.

23   Q    When you were assigned to the Overdose Task Force, what

24   were some of your responsibilities?

25   A    Responding to overdoses and doing phone subpoenas, trying

LIBRETTI – DIRECT – MS. CHEN

1    to figure out where these drugs were coming from.

2    Q     When you joined the NYPD, did you receive any training?

3    A     Yes.

4    Q     What training was that?

5    A     Community –– dealing with the community, with –– did drug

6    identification, and summonses and stuff like that.

7    Q     And how long were you trained before, I guess, in your ––

8    in joining the NYPD?

9    A     Six months.

10   Q     Were there any tests you had to take in connection with

11   that training?

12   A     Yes.  There was three trimesters that you had to pass to

13   get through the academy.

14   Q     And did you pass them?

15   A     Yes.

16   Q     Did you receive any training when you became a detective?

17   A     Yes.

18   Q     What training was that?

19   A     Search warrant training and the extended version of the

20   drug identification and packaging.

21   Q     And how long was that training?

22   A     Three weeks.

23   Q     Did you receive a specialized narcotics training?

24   A     Yes.

25   Q     What was that?

LIBRETTI – DIRECT – MS. CHEN

1   A    That was the testing of drugs to see if it was positive

2   for narcotics, and the packaging it comes in and

3   identification.

4   Q    During your time with the NYPD, how many investigations

5   have you been involved in?

6   A    Over 100.

7   Q    And how many of those have been narcotics-related?

8   A    About 80.

9   Q    About 80.

10        How many arrests have you been involved in?

11  A    Over 200.

12  Q    And how many of those have been narcotics related?

13  A    Approximately 70.

14  Q    And have you been involved in any search-warrant

15  executions?

16  A    Yes.

17  Q    How many?

18  A    Over 100.

19  Q    And how many of those were narcotics-related?

20  A    All of them.

21  Q    Okay.  Detective Libretti, I want to direct your

22  attention to October 27th, 2017.

23        What was your assignment at that time?

24  A    I was on the Overdose Task Force catch for the day.

25  Q    When you say "catch for the day," what does that mean?

LIBRETTI – DIRECT – MS. CHEN

1    A    If any overdoses came over on the phone, then I would

2    respond to it.

3    Q    And how would an overdose be reported to you or the

4    Overdose Task Force?

5    A    In the precinct of concern, the patrol sector of that

6    area would respond to the scene, and if there was any

7    paraphernalia or signs of a drug overdose, they would then

8    call my office which would make us head over there.

9    Q    So you would receive a call from another NYPD member?

10   A    Yes.

11   Q    Were any overdoses reported to you on October 27th, 2017?

12   A    Yes.

13   Q    Do you remember what was reported to you?

14   A    Yes.  There was a drug overdose in the vicinity of

15   3755 Victory Boulevard.

16   Q    And what did you do in response to receiving that

17   reported overdose call?

18   A    I headed over to that location.

19   Q    Do you recall around what time that was?

20   A    Approximately noon.

21   Q    Okay.  Can you explain to the jury what type of area

22   3755 Victory Boulevard is?

23   A    It's a commercial strip mall area with two lanes of

24   traffic going the opposite direction.

25   Q    When you say, two lanes of traffic, is that one lane

LIBRETTI - DIRECT - MS. CHEN

1  going one way and one lane going the other, or is it two lanes

2  each?

3  A     One lane in each direction.

4  Q     And what's the speed limit on that Victory Boulevard?

5  A     Twenty-five.

6  Q     Twenty-five.

7         Are you familiar with 3755 Victory Boulevard?

8  A     Yes.

9  Q     Are you familiar with how it looked on October 27th,

10  2017?

11  A     Yes.

12        MS. CHEN:  Can we show just the witness what's been

13  premarked as Government Exhibit 516, please.

14        THE COURT:  Marked for identification?

15        MS. CHEN:  Yes, Judge.

16  Q     Detective Libretti, do you recognize this?

17  A     Yes.

18  Q     What is it?

19  A     A map.

20  Q     What is it a map of?

21  A     The location 3755 Victory Boulevard.

22  Q     Is this map a reasonably accurate representation of

23  3755 Victory Boulevard and the surrounding area as it existed

24  on October 27th, 2017?

25  A     Yes.

LIBRETTI – DIRECT – MS. CHEN

1        MS. CHEN:  Your Honor, at this time, we move into

2    evidence, Government Exhibit 516.

3        THE COURT:  Do you wish to voir dire?

4        MR. VITALIANO:  No, Judge.

5        MS. TODD:  No, Your Honor.

6        THE COURT:  Any objection?

7        MS. TODD:  No, Your Honor.

8        MR. VITALIANO:  No.

9        THE COURT:  It's admitted.

10       (Government Exhibit 516, was received in evidence.)

11   Q    Detective Libretti, can you explain again what this map

12   shows?

13   A    It's the location, 3755 Victory Boulevard.

14   Q    And I'm going to circle on the map in blue --

15       THE COURT:  When you say that it's a map, this is an

16   overhead view, correct?

17       THE WITNESS:  Yes, Your Honor.

18       MS. CHEN:  I just want to let the record reflect

19   that I've circled four rectangular white boxes that appear in

20   the middle-to-bottom section of the map.

21   Q    Detective Libretti, can you explain what those four

22   rectangular items are that I just circled on the map?

23   A    Yes.  That's the strip mall, the stores, and parking lot.

24   Q    Do you see a pin that's dropped on this map?

25   A    Yes.

LIBRETTI - DIRECT - MS. CHEN

1   Q    What does that pin denote?

2   A    That's the address, 3755 Victory Boulevard.

3   Q    And Detective Libretti, you said you responded that day

4   to 3755 Victory Boulevard; is that right?

5   A    Yes.

6   Q    When you arrived there, did you see any vehicles?

7   A    I don't recall.

8   Q    Detective Libretti, in responding to overdoses or

9   reported overdoses, do you keep documentation of what you do?

10  A    Yes.

11  Q    Do you make that documentation close in time to when

12  those events occurred?

13  A    Yes.

14  Q    And would reviewing that documentation help refresh your

15  recollection today?

16  A    Yes.

17         MS. CHEN:  Can we publish, just for the witness,

18  what's been marked as Government Exhibit 3500DL1, Page 14,

19  please.

20  Q    Detective Libretti, take a look at this and let me

21  know --

22         THE COURT:  Well, first of all, what is it?

23         MS. CHEN:  I apologize, Your Honor.

24  Q    Detective Libretti, what is this document that we're

25  looking at?

LIBRETTI – DIRECT – MS. CHEN

1   A    This is a police report that I had typed up that day.

2   It's considered a DD5 which is labeled as its own -- every

3   report has its own label, and this was my general

4   investigation of the response to the scene.

5   Q    Can you explain what you mean by DD5, Detective Libretti?

6   A    The DD5 is a term for the police department as, like, a

7   report in the case.

8   Q    And when you say, that day, was that day, October 27th,

9   2017?

10  A    Yes.

11  Q    Detective Libretti, can you review this report and let me

12  know when you are finished.

13  A    Okay.

14  Q    In reviewing this report, Detective Libretti, does this

15  help refresh your recollection as to whether there were

16  vehicles that day?

17  A    Yes.

18  Q    Was there a vehicle that day when you responded to the

19  scene?

20  A    Yes, there was.

21  Q    What was the vehicle?

22  A    A red Audi 4-door sedan.

23  Q    When you responded to the scene, was that red Audi sedan

24  on, was it running?

25  A    I don't recall.

LIBRETTI - DIRECT - MS. CHEN

1  Q   Do you recall if the doors were opened or closed?

2  A   I don't recall.

3  Q   Did you look inside the car?

4  A   I don't recall.

5  Q   Okay.  Detective Libretti, are you familiar with how

6  3755 Victory Boulevard looks today?

7  A   Yes.

8  Q   Is it a strip mall, still?

9  A   Yes.

10 Q   And are there any differences to how it looked back in

11 October 27th, 2017?

12 A   I'm not sure about if they changed the store name.

13 Q   So the store name might be different at the strip mall?

14 A   Yes.

15 Q   Okay.

16         MS. CHEN:  Can we show just to the witness, what's

17 been marked for identification as Government Exhibits 638A

18 through F.

19 Q   And I'm going to scroll slowly through these so you can

20 see them, Detective Libretti.

21         Detective Libretti, do you recognize what has just

22 been shown to you?

23 A   Yes.

24 Q   And what has just been shown to you?

25 A   That's the parking lot of 3755 Victory Boulevard.

LIBRETTI – VOIR DIRE – MS. TODD

1    Q    Are these true and accurate depictions of the area

2    surrounding 3755 Victory Boulevard as it exists today?

3    A    Yes.

4              MS. CHEN:  Your Honor, at this point, the Government

5    moves into evidence Government Exhibits 638A through F.

6              THE COURT:  Do you wish to voir dire?

7              MR. VITALIANO:  No, Judge.  No objection.

8              THE COURT:  Do you wish to voir dire, on behalf of

9    Defendant Allen?

10              MS. TODD:  Yes, Your Honor.  Briefly.

11              THE COURT:  You may.

12    VOIR DIRE EXAMINATION

13    BY MS. TODD:

14    Q    Good morning, Detective Libretti.

15    A    Good morning.

16    Q    Government's Exhibit 63A through F [sic}, were those

17    photos taken in 2017?

18    A    I'm not sure.

19    Q    So you don't know when they were taken?

20    A    No.

21    Q    Who took those photographs?

22    A    I have no idea.

23    Q    Do these photographs reflect what the area looked like in

24    2017 in October?

25    A    Yes.

LIBRETTI – DIRECT – MS. CHEN

1      MS. TODD:  Nothing further, Your Honor.

2      THE COURT:  Any objection?

3      MS. TODD:  No objection.

4      THE COURT:  They are admitted.

5      (Government Exhibits 638A through F, were received

6  in evidence.)

7      MS. CHEN:  Can we please publish for the jury,

8  Government Exhibit 638A.

9      THE COURT:  Yes, you may.

10  DIRECT EXAMINATION (Continued)

11  BY MS. CHEN:

12  Q    Detective Libretti, can you explain what this picture

13  shows?

14  A    Yes.  The front of 3755 Victory Boulevard.

15  Q    And can you explain, I guess, the lower portion of that

16  picture where you see the pavement?  I guess I'll mark it on

17  this page.

18      MS. CHEN:  I've just circled, for the record, under

19  this strip of pavement that's in the middle-lower portion of

20  the page.

21  Q    Can you explain what that is, Detective Libretti?

22  A    Yes.  That's where I responded to on October 27th, 2017.

23      MS. CHEN:  Can we please publish for the jury,

24  what's been admitted as Government Exhibit 638E as in Eric?

25  Q    Detective Libretti, what does this picture show?

LIBRETTI – DIRECT – MS. CHEN

1  A    The same parking lot of 3755 Victory Boulevard.

2  Q    And can you mark –– you can touch the screen –– on this

3  photo where you saw that red Audi on October 27th, 2017.

4  A    Yes (indicating).

5       MS. CHEN:  And let the record reflect that

6  Detective Libretti just circled towards the middle-left

7  portion of the page, the first about three or four parking

8  spaces in front of the depicted store front.

9       You can take down the exhibit.  Thank you.

10 Q    Detective Libretti, I want to take a step back and talk

11 about how you and the Overdose Task Force generally respond to

12 overdoses.  First of all, how many overdoses have you

13 responded to in your time at the NYPD?

14 A    Over 100.

15 Q    And have you been investigated –– I'm sorry, have you

16 been involved in investigations stemming from those responses

17 to overdoses?

18 A    Yes.

19 Q    When you respond to the scene of an overdose, what

20 investigative steps do you take?

21 A    You will secure the scene, speak with anybody on scene,

22 and then conduct a search for any paraphernalia as well as

23 video cameras.

24 Q    When you say, video cams, what does that mean?

25 A    Check the store fronts or residents so see if they have

LIBRETTI - DIRECT - MS. CHEN

1   any working cameras to see if we can review any videos for

2   evidence.

3   Q    If you do find drug paraphernalia, what do you do?

4   A    It is taken -- it's vouchered.

5   Q    And who vouchers it?

6   A    It'll be me vouchering that drug paraphernalia or the

7   precinct of concern that responded, first response.

8              THE COURT:  What do you mean by drug paraphernalia?

9              THE WITNESS:  Anything pertaining around the

10  overdose or something that could be involved in the case.

11  Q    And why do you take these steps, Detective Libretti?

12  A    To find out where these drugs came from that caused the

13  overdose.

14  Q    I'm going to go back to October 27th, 2017, now.

15             When you arrived at 3755 Victory Boulevard, do you

16  recall who was there?

17  A    Yes.  I believe I spoke with Mark Corrao.

18  Q    And who was Mark Corrao?

19  A    The friend of the overdose victim.

20  Q    Do you know who the overdose victim was?

21  A    Yes.  It was Sarah Wieboldt.

22  Q    And without telling us what anyone told you, did you

23  learn anything about the location where Sarah Wieboldt had

24  obtained the drugs that she allegedly overdosed on?

25  A    Yes.

LIBRETTI – DIRECT – MS. CHEN

1   Q    And what was that location?

2   A    It was Melba Street and Queen Street.

3   Q    And without telling us what anyone told you again, did

4   you learn anything about the persons -- or the persons who

5   Ms. Wieboldt had obtained drugs from that allegedly caused her

6   overdose?

7   A    Yes.

8   Q    And what was that information?

9           MR. SCHOER:  Objection.

10          THE COURT:  Yes.  May I speak to counsel, please, at

11  the side.

12          (Continued on the next page.)

13          (Sidebar conference.)

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE

1          (The following occurred at sidebar.)

2          THE COURT:  Can you read back the last question for

3     me, please.

4          (Whereupon, a portion of the testimony was read

5     back.)

6          THE COURT:  I assume you're objecting on the basis

7     of hearsay?

8          MS. TODD:  Yes, Your Honor.

9          MS. CHEN:  Your Honor, we're not offering this

10    evidence for its truth.  What Detective Libretti will testify

11    to is that it was reported to him that the individual was

12    driving a white Jeep with black rims, and because of that

13    information, he took additional investigative steps.  So

14    perhaps a limiting instruction will be appropriate as to how

15    this evidence may be used.

16         THE COURT:  Well, let me hear from defense counsel

17    first.

18         MS. TODD:  We disagree with that.  It's clearly

19    being offered for the truth.  And based on that information,

20    he relied on it to further his investigation in identifying

21    perpetrators.

22         MS. CHEN:  Your Honor, I don't think defense counsel

23    has raised any issue that cannot be cured by limiting

24    instruction.

25         THE COURT:  Well, the problem is in how you ask the

SIDEBAR CONFERENCE

1    question, because the Court, based on its decisions on the

2    motion in limine, was allowing this investigative evidence to

3    come in.  The problem is that you lead by telling the witness,

4    don't say what anybody told you.

5            MS. TODD:  And the other concern is --

6            THE COURT:  So I think that the -- perhaps a way to

7    cure this would be to ask him whether or not during the course

8    of his investigation, he became aware of any other vehicles

9    that were involved.

10           MS. CHEN:  I'm happy to do that, Your Honor.

11           THE COURT:  Would that satisfy the hearsay concern?

12           The next question would be, what was the vehicle.

13           MR. SCHOER:  That's the hearsay.  That's still

14   hearsay, Judge.

15           THE COURT:  But he has to be able to talk about what

16   he did in connection with the investigation, and I admitted

17   that evidence.  That was the subject of the motion in limine.

18           MR. SCHOER:  Well, I don't think that this

19   transaction had anything to do with the motions in limine,

20   Judge.  The motions in limine had to do with two other

21   overdoses, not with respect to Ms. Wieboldt.  This is a

22   charged crime.

23           MS. TODD:  The Government made clear during all of

24   their submissions that witness herself would be testifying and

25   that we would be able to cross-examine the witness.  This

SIDEBAR CONFERENCE

1    officer was not present at the scene.  He came after the fact.

2            MS. CHEN:  Your Honor, this is not something --

3    well, at this point in the examination, this is not something

4    that the detective learned from Ms. Wieboldt herself.  He

5    spoke, as I explained, to Mark Corrao at the scene when he

6    arrived.  Again, it's not being offered for its truth.  It's

7    being offered to explain why he took next steps which I expect

8    Detective Libretti will testify he reached out to

9    Detective Vaccarino because he was aware of an ongoing

10   investigation concerning individuals suspected to use a white

11   Jeep and black rims, and that information stood out to him.

12   So again, it's not being offered for its truth, Your Honor.

13           THE COURT:  I'm going to allow the Government to ask

14   the question, pursuant to the investigation of the scene, did

15   you become aware of any other vehicles in the area?

16           MS. CHEN:  Your Honor, I'm not sure -- I don't think

17   if the area would actually --

18           THE COURT:  Well, you know, give me some more

19   information here.  I'm pulling teeth.

20           MS. CHEN:  So Mark Corrao told Detective Libretti

21   that he and Sarah Wieboldt had gone to purchase drugs earlier

22   that day and that he observed the white Jeep with black rims.

23           THE COURT:  So why can't Sarah Wieboldt testify to

24   that?

25           MS. CHEN:  She will testify to that.  But this is

SIDEBAR CONFERENCE

1    talking about the next investigative steps that

2    Detective Libretti took.

3            THE COURT:  So really, the danger of the hearsay

4    issue is that there might not be some other way of the

5    evidence coming in, but for the hearsay, or that it would be

6    admitted for the truth of the matter.  The point is that in

7    any event, Sarah Wieboldt would testify as to the vehicle.  So

8    I think that it's appropriate for the witness to testify that,

9    based on the investigation that he conducted, he became aware

10   of a vehicle that might possibly be involved in the

11   investigation which was blah, blah, blah.

12           MS. CHEN:  That's right, Your Honor.

13           THE COURT:  Right.  So the question is, pursuant to

14   your investigation, did you become aware of any other vehicle

15   that might have been involved?

16           MS. CHEN:  Okay.

17           THE COURT:  Okay.

18           MS. CHEN:  I'll ask that question, Judge.

19           THE COURT:  All right.

20           (End of sidebar conference.)

21           (Continued on the next page.)

22

23

24

25

LIBRETTI – DIRECT – CHEN

1    (Continuing)

2              (In open court.)

3              MS. CHEN:  Your Honor, may I proceed.

4              THE COURT:  Yes.  Please.

5    Q    Detective Libretti --

6              THE COURT:  Just for the record, the objection is

7    sustained as to form.

8    Q    Detective Libretti, during the course of your

9    investigation that day at 3755 Victory Boulevard, did you

10   become aware of any vehicles that became of interest?

11   A    Yes.

12   Q    And what was the description of that vehicle?

13   A    It was a white Jeep with black wheels.

14   Q    Did that piece of information stand out to you?

15   A    Yes.

16   Q    Why?

17   A    I was aware of an ongoing investigation in my office by

18   Detective Vaccarino of a case involving a white Jeep with

19   black wheels.

20   Q    When you say wheels, what part of the wheel are you

21   talking about?

22   A    The rim.

23   Q    What did you do with this piece of information?

24   A    I had called Detective Vaccarino to the scene.

25   Q    Did Detective Vaccarino come to the scene?

LIBRETTI - DIRECT - CHEN

1    A    I don't recall if he came to the scene or met me at the

2    hospital.

3    Q    At some point you left 3755 Victory Boulevard that day?

4    A    Yes.

5    Q    Where did you go?

6    A    Melba Street and Queen Street.

7    Q    Before you went to Melba Street and Queen Street, did you

8    go anywhere else?

9    A    Yes.

10   Q    Where was that?

11   A    Richmond County University Hospital.

12   Q    Why did you go there?

13   A    To interview the overdose victim.

14   Q    That overdose victim was Sarah Wieboldt?

15   A    Yes.

16   Q    Was anyone with you when you went?

17   A    I don't recall.

18   Q    When you arrived at the hospital that day, were you able

19   to see the victim?

20   A    Yes.

21   Q    Can you describe -- I'm sorry, the victim was

22   Ms. Wieboldt; is that right?

23   A    Yes.

24   Q    Can you describe what Ms. Wieboldt looked like when you

25   arrived at the hospital?

LIBRETTI – DIRECT – CHEN

1  A    Yes.  In a hospital bed, pale and being treated for an

2  overdose.

3  Q    Do you remember what part of the hospital she was in?

4  A    Yes, the emergency room.

5  Q    Was she awake when you saw her?

6  A    Yes.

7  Q    Was she able to speak?

8  A    Yes.

9  Q    And did you, in fact, speak with her?

10  A    Yes, I did.

11  Q    Do you remember if anyone was with you when you spoke

12  with Ms. Wieboldt?

13  A    I believe Detective Vaccarino.

14  Q    Do you remember seeing if she had any belongings on her

15  when you saw her at the hospital?

16  A    Yes.

17  Q    What belongings were those?

18  A    A cell phone.

19  Q    Was that of interest to you?

20  A    Yes.

21  Q    Why?

22  A    Just to see if there was any conversation or phone calls

23  leading up to the overdose.

24  Q    Were you able to view her phone that day?

25  A    Yes.

LIBRETTI – DIRECT – CHEN

1    Q    Did she provide you that phone?

2    A    Yes.

3    Q    Did you or Detective Vaccarino do anything with that cell

4    phone?

5    A    I believe Detective Vaccarino took over from that point

6    with the phone.

7    Q    Say that again, Detective.

8    A    Detective Vaccarino took over with the phone at that

9    point.  He had it and spoke to her about it.

10   Q    Okay.  Did you speak with any family members of the

11   victim Ms. Wieboldt that day?

12   A    Yes.

13   Q    Who was that?

14   A    The victim's father.

15   Q    I think you said, Detective Libretti, after you left the

16   hospital you went to Queen and Melba Street; is that right?

17   A    Yes.

18   Q    What was the purpose of you going there?

19   A    To conduct a video canvass.

20   Q    When you say video canvass, what does that mean?

21   A    I went house to house to check the cameras to see if

22   there were any recordings of the incident.

23   Q    Were there any recordings that you were able to recover?

24   A    No.

25   Q    Can you describe for the jury what that area or

LIBRETTI – DIRECT – CHEN

1  neighborhood around the intersection of Queen and Melba Street

2  is like?

3  A    Yes, it's residential.

4  Q    And is Queen Street and Melba Street, that intersection,

5  is in Staten Island?

6  A    Yes.

7           MS. CHEN:  Can I show, just for the witness, what's

8  been premarked for identification as Government Exhibit 509.

9           THE COURT:  Yes.

10 Q    Detective Libretti, do you recognize this?

11 A    Yes.

12 Q    What is this?

13 A    A map.

14 Q    A map of what?

15 A    The overview of Queen Street and Melba Street.

16 Q    When you say overview, do you mean it's an overhead view?

17 A    Yes.

18 Q    Is this map a reasonably accurate representation of Queen

19 Street and Melba Street and the surrounding area as it existed

20 in on October 27th, 2017?

21 A    Yes.

22           MS. CHEN:  Your Honor, at this time we move into

23 evidence Government Exhibit 509.

24           THE COURT:  Any objection?

25           MR. VITALIANO:  No objection.

LIBRETTI – DIRECT – CHEN

1          MS. TODD:  No, your Honor.

2          THE COURT:  It's admitted.

3          (Government Exhibit 509, was received in evidence.)

4   Q    Detective Libretti, can you explain again for the jury

5   what this exhibit shows?

6   A    This shows the overview of Queen Street and Melba Street.

7   Q    Is this a map?

8   A    Yes.

9   Q    Is this an overhead map?

10  A    Yes.

11  Q    Do you see a pin dropped on this map, Detective Libretti?

12  A    Yes.

13  Q    What does that pin denote?

14  A    That's showing the corner that was stated for interaction

15  on Queen Street and Melba Street.

16  Q    Can you just mark, generally, the area on this map where

17  you conduct your video canvass?

18  A    I don't recall the addresses at this time.  Can I look

19  back at my notes?

20  Q    Yes.

21          MS. CHEN:  Can I publish just for the witness

22  3500-DL-1, page 6 please.

23          THE COURT:  Yes.

24  Q    Detective Libretti, what is this document?

25  A    This is another DD5 report conducted by me.

LIBRETTI – DIRECT – CHEN

1   Q    Please take a moment to review this and let me know when

2   you're finished please.

3   A    Okay.

4   Q    Detective Libretti, does this refresh your recollection

5   as to the homes where you conducted the video canvass that

6   day?

7   A    Yes.

8   Q    And what were those homes?

9   A    378 Melba Street, 374 Melba Street.

10        THE COURT:  You can't read from the document itself.

11  You can certainly take a look at it for as long as you need to

12  refresh your recollection.

13        THE WITNESS:  Yes, your Honor.  Okay.

14  Q    Go ahead, Detective, if your recollection is refreshed?

15  A    It was just residences on Melba Street.

16        MS. CHEN:  If we could go back and publish

17  Government Exhibit 509.

18        (Exhibit published.)

19  Q    Detective Libretti, can you mark on Government

20  Exhibit 509 which street is Melba Street.

21        Let the record reflect that Detective Libretti --

22        THE COURT:  It's marked on the map.

23        MS. CHEN:  I understand, your Honor.  You mean the

24  Melba Street?

25        THE COURT:  Melba Street is marked on the map very

LIBRETTI - DIRECT - CHEN

1   clearly.

2               MS. CHEN:  Okay.

3               THE COURT:  Can you mark the general area where you

4   did your canvass.

5               THE WITNESS:  I'm not sure exactly which houses it

6   was 'cause I skipped some that didn't answer, so I'm not

7   exactly sure which ones.

8               THE COURT:  Just the general area what, more or

9   less, what area you checked.

10              THE WITNESS:  I don't recall off the top of my head

11  which direction I went in, so...

12  BY MS. CHEN:

13  Q    Detective Libretti, did you conduct video canvass on

14  Queen Street?

15  A    I don't recall the addresses on Queen Street.

16              THE COURT:  So your canvass was on Melba Street, is

17  that what you're saying?

18              THE WITNESS:  From what I read, yes, your Honor.

19              THE COURT:  Okay.

20              MS. CHEN:  We can take down Government Exhibit 509.

21  Thank you.

22  Q    Detective Libretti, I'm want to talk a little bit about

23  your work with confidential informants.

24              THE COURT:  Since you're going into a different area

25  at this point, why don't we take our break now.  It's about a

PROCEEDINGS

1   quarter to 12.  So why doesn't everybody come back at five

2   after one.  So be back in the jury room at five after one

3   assuming that you --

4           MS. CHEN:  Five after 12, your Honor.

5           THE COURT:  I'm sorry.  My eyes just did something

6   funky there.  I meant five after 12.  Thank you.  Five after

7   12.  Thank you.

8           And remember what I told you, you can't talk about

9   the case, you can't do any research or investigation on your

10  own about the case over any kind of media, and you have to

11  keep an open mind about the case.  You haven't heard all the

12  evidence yet, you haven't heard my instructions on the law,

13  okay.  And we'll see you five after 12.

14          THE COURTROOM DEPUTY:  All rise.

15          (Jury exits courtroom.)

16          THE COURT:  The jury is no longer present so the

17  break is for everyone including you, Detective.  You're still

18  on direct so you're free to talk to the government about your

19  testimony if necessary.  I'll see everybody back here five

20  after 12.

21          Yes, ma'am.

22          MS. TODD:  There is one issue I'd like to raise,

23  your Honor.

24          THE COURT:  Why don't we let the witness step out.

25  Thank you, sir.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

1          THE WITNESS:  Thank you.

2          (Witness steps down.)

3          THE COURT:  Yes, ma'am.

4          MS. TODD:  Yes, Judge.

5          THE COURT:  The witness is outside.

6          MS. TODD:  I have one objection to the continuing

7    reference to Ms. Wieboldt as a victim.  So defense

8    collectively object to that reference and that she should be

9    referred to by her name.  It is prejudicial.

10          THE COURT:  I'll hear from the government.

11          MS. CHEN:  Your Honor, Ms. Wieboldt was the victim

12    of the reported overdose that day so we believe that reference

13    is appropriate.

14          THE COURT:  You will refer to her by her name.

15          MS. CHEN:  Okay, your Honor.

16          THE COURT:  I'll see everybody at five after 12.

17          One other thing, if the government has prepared

18    redacted reports from these police officers, because you have

19    some intention of referring to them, whether it's past

20    recollection recorded or whatever other theory you have,

21    please produce those to defense counsel with those redactions.

22    That should have been done already.  For the sake of

23    expediency and because it shouldn't -- they shouldn't have to

24    be asking you for those exhibits.  If they have their own

25    reports, they could take it up with them when they start

PROCEEDINGS

1    questioning.  Okay, I'll see everybody at five after 12.

2              (Recess.)

3              THE COURT:  Please have a seat.

4              Our jurors appear to be ready on this case on trial.

5    All the parties are present and accounted for.

6              Why don't you bring your witness and put him in the

7    witness stand and unless there is anything you want to bring

8    up now, the jurors are ready to come in.  Anything?

9              MS. CHEN:  Not from the government, your Honor.

10             THE COURT:  So you can assume your position at the

11   lectern and we'll go out and get the jurors.

12             MR. SCHOER:  Judge, one quick thing, do you have any

13   problem with certain witnesses Ms. Todd going first?

14             THE COURT:  No, I guess not.  I mean, it's just been

15   the order of things, but I suppose that's not a problem.

16             MR. SCHOER:  Okay, thank you.

17             (Witness resumes stand.)

18             MR. SCHOER:  Or Mr. Warner.

19             THE COURT:  All rise.  Jury entering.

20             (Jury enters courtroom.)

21             THE COURT:  Everyone may be seated.  Do the parties

22   agree that all of our jurors are present and properly seated,

23   government?

24             MS. CHEN:  Yes, your Honor.

25             THE COURT:  Defense?

PROCEEDINGS

1          MR. SCHOER:  Yes, your Honor.

2          MS. TODD:  Yes, your Honor, thank you.

3          THE COURT:  Thank you.  So we have with us Detective

4   Dominick Libretti.  Welcome back, sir.

5          THE WITNESS:  Thank you.

6          THE COURT:  I'm going to remind you that you are

7   still under oath.  This is still direct examination by the

8   government by Ms. Chen and you may resume as soon as you're

9   ready.

10          MS. CHEN:  Thank you, your Honor.

11   Q    Detective Libretti, are you familiar with the term

12   confidential informant?

13   A    Yes.

14   Q    What does that mean?

15   A    A confidential informant is not a police officer that

16   does conduct narcotics in the phone calls and buys in to drug

17   deals.

18   Q    Sir, you said not a police officer, so it's a layperson?

19   A    Yes, just a regular people.

20   Q    Different from an undercover officer?

21   A    Yes.

22   Q    Why are they called confidential informants, what makes

23   them confidential?

24   A    We don't go by their names, they go by numbers or code

25   names.

PROCEEDINGS

1   Q   Why is that?

2   A   Just for the safety of them.

3   Q   What do you mean by that, why does that make them safe?

4   A   Just because if the subject that we're dealing with in a

5   case knows the name, then it could be a problem.

6   Q   Why is it a problem, Detective?

7   A   They may, you know, seek revenge after everything going

8   on, so.

9   Q   How are confidential informants used by law enforcement?

10  A   They are used in the purchase of narcotics.

11  Q   Do they also provide information?

12  A   Yes.

13  Q   Are confidential informants paid for their work?

14  A   Yes.

15  Q   Are they compensated in other ways as well?

16  A   Yes.

17  Q   How so?

18  A   They could work off their -- they could be proffered for

19  their court cases.

20  Q   And when they're paid, they're paid money, cash?

21  A   Yes.

22  Q   How do confidential informants maintain contact with the

23  NYPD or law enforcement?

24  A   With cell phones, calling, texting.

25  Q   So regular communications?

PROCEEDINGS

1   A   Yes.

2   Q   And who is the person at the NYPD who would that do?  I'm

3   sorry, who is the person at NYPD who would be in communication

4   with a confidential informant?

5         THE COURT:  Well, what do you mean who would be the

6   person in NYPD.

7         MS. CHEN:  Let me clarify, judge.

8         THE COURT:  That's an overly broad.

9         MS. CHEN:  I understand.

10   Q   Detective Libretti, is there a person at the NYPD

11   specifically assigned to communicate with a particular

12   confidential informant?

13         THE COURT:  The entire police department?  Are

14   informants used in areas other narcotics enforcement?

15         THE WITNESS:  Yes, your Honor.

16         MS. CHEN:  Should I ask the question again, your

17   Honor?

18         THE COURT:  In your unit, in your particular unit

19   who is the contact person for an informant?

20         THE WITNESS:  It would be the handler of the

21   confidential informant.

22   BY MS. CHEN:

23   Q   How is that handler assigned?

24   A   They would be the ones that sign up this confidential

25   informant at One Police Plaza.

PROCEEDINGS

1    Q    Can you explain for the jury what is the process of

2    signing up a confidential informant?

3    A    The confidential informant will be checked for any open

4    warrants or court cases and if they are cleared, then they

5    could work.

6    Q    How would the Overdose Task Force in particular go about

7    identifying an individual who would be a potential

8    confidential informant?

9    A    A lot of times they are overdose victims or people who

10   have been arrested that want to work off their court case.

11   Q    Why are those people identified in particular?

12   A    They're the ones that are around the people dealing drugs

13   and stuff like that, so they could help us get into these

14   cases.

15   Q    I want to go back to -- you said the person who's

16   involved in contacting a particular CI would be a handler; is

17   that right?

18   A    Yes.

19   Q    What are some of the roles and responsibilities of a

20   handler of a CI?

21   A    They will remain contact, also keep conversation with

22   them daily or weekly just to see if everything's all right.

23   Also check them during the buys for contraband or currency

24   before they go out in step for a buy.

25   Q    If a handler is not available for some reason or not

PROCEEDINGS

1    working that day, who would a CI contact?

2    A    It would be the secondary assistant.

3    Q    What do you mean by secondary assistant?

4    A    It'll be a second detective assigned to a confidential

5    informant in case of sick leave or vacation.

6    Q    What are the responsibilities of that secondary person?

7    A    It would be the same as the primary if they are in

8    charge.

9    Q    Detective Libretti, have you been a handler for a

10   confidential informant before?

11   A    Yes.

12   Q    About how many confidential informants?

13   A    Over a dozen.

14   Q    Have you been a secondary handler for any confidential

15   informant?

16   A    Yes.

17   Q    About how many?

18   A    About the same, over a dozen.

19   Q    You mentioned that confidential informants are used to

20   make buys; is that right?

21   A    Yes.

22   Q    Can you just walk the jury through the process of how one

23   of those buys would occur?  I guess more specifically, how a

24   handler would be involved in that process?

25   A    Yes, they would pretty much reach out to the confidential

PROCEEDINGS

1    informant to meet to a disclosed location and then they would

2    go over the buy for the day of the phone call that would

3    proceed to the next step.

4    Q    When you say go over, what specifically would that

5    entail?

6    A    A phone call be placed to a specific subject at the time

7    to see if it's, you know, it's a go for the day for the buy.

8    Q    And would the handler be providing that phone number?

9    A    Yes.

10   Q    Are there times where the confidential informant would be

11   providing that phone number?

12   A    Yes.

13   Q    What's the next step that happens after that initial

14   contact is made?

15   A    The confidential informant will be checked for any cash

16   or contraband.

17   Q    So there is a meeting between the handler and the

18   confidential informant?

19   A    Yes.

20   Q    And what's the purpose of that, why is that confidential

21   informant checked for, I believe you said contraband and cash?

22   A    So there is no confusion of the purchase and amount of

23   money used for the purchase of the buy.

24   Q    When you say contraband, can you explain specifically

25   what the handler would be looking for?

PROCEEDINGS

1   A   Any narcotic or narcotic-related contraband as far as

2   like pipes, stuff like that.

3   Q   So tools that could be used in connection with the use of

4   narcotics?

5   A   Yes.

6   Q   At that meeting, does the handler provide the

7   confidential informant anything?

8   A   Yes.

9   Q   What?

10  A   It would be the money to make the purchase of the

11  narcotics.

12  Q   And does the handler, at that meeting, have an

13  understanding as to what's to be purchased?

14  A   Yes.

15  Q   How do they learn that?

16  A   Through the confidential informant after conversating

17  with the dealer to let them know what they're going to

18  purchase.

19  Q   Okay.  At that meeting, does the handler see the

20  confidential informant calling in to the potential subject?

21  A   Yes.

22  Q   All the time?

23  A   Yes.

24  Q   So after this meeting what happens next in the process of

25  a controlled purchase?

211

PROCEEDINGS

1  A    The confidential informant will then start their way to

2  wherever they agree to meet on for the drug purchase.

3  Q    Where is the handler at that time?

4  A    Trying to get as best view as they can of them

5  approaching the drug dealer.

6  Q    So to be clear, are the handler and the confidential

7  informant going together to the agreed location?

8  A    No.  The confidential informant will go by themselves.

9  Q    And the handler would go separately, but be there or be

10 in the vicinity I suppose?

11 A    Yes.

12 Q    Would the handler be able to see the confidential

13 informant?

14 A    Depending on the location.

15 Q    What do you mean by that?

16 A    If it's a residential block or a busy corner and it's not

17 easy to get, you'll be in the vicinity not directly in front

18 of.

19 Q    So at times it sounds like the handler would be able to

20 maintain a visual, a line of sight --

21            MS. TODD:  Objection.

22            THE COURT:  Sustained as to form.  Leading.

23 Q    Does a handler have a line of sight to the confidential

24 informant?

25 A    Not at all times.

PROCEEDINGS

1    Q    What's the purpose of the handler being in the vicinity

2    of the purchase?

3    A    The safety of the confidential informant as long as

4    possible, identification of the drug dealer.

5    Q    After the planned controlled purchase occurs, what is the

6    next -- withdrawn.  After the transaction occurs, does the

7    handler meet with the confidential informant again?

8    A    Yes.

9    Q    What occurs at that meeting?

10   A    It will be the information provided from the buy, along

11   with the narcotics purchased.

12         MS. CHEN:  I'm sorry could I have that answer read

13   back.

14         (Record read.)

15   Q    Is the confidential informant searched at that meeting?

16   A    Yes.

17   Q    What are they searched for?

18   A    Once again, the cash and the narcotics, contraband or

19   tools used.

20   Q    What's the purpose of that?

21   A    Just to make sure nothing actually was purchased.

22   Q    Does the handler provide the confidential informant

23   anything at that meeting?

24   A    Yes.

25   Q    What would that be?

213
PROCEEDINGS

1  A    The payment for the purchase.

2  Q    Is there a standard amount of money that a confidential

3  informant is paid --

4  A    No, it fluctuates.

5  Q    -- for?

6        Does the handler make the decision about how much

7  money is paid to the confidential informant?

8  A    Yes.

9  Q    When you say it fluctuates, why are there different

10  amounts paid to a confidential informant?

11  A    Certain drugs, amounts of drugs or possibly weapons pay a

12  little bit more for the purchase of them.

13  Q    Does the time I guess that the confidential informant has

14  been working with the NYPD, does that factor into it at all?

15  A    Yes.

16  Q    How so?

17  A    If they've been around for a while and they have good

18  cases, then they will be paid extra for that.

19  Q    Detective Libretti, are you aware if Sarah Wieboldt ever

20  became a confidential informant?

21  A    Yes.

22  Q    Were you involved in the process of signing her up as a

23  confidential informant?

24  A    Yes.

25  Q    Do you know if this was before or after October 27th,

214

PROCEEDINGS

1    2017?

2    A     It'll be after.

3    Q     After.

4          Can you walk the jury through what that process was

5    signing up Sarah Wieboldt as a confidential informant?

6    A     Yes.  The forms are filled out, then taken to One Police

7    Plaza and verified there was no open cases or warrants.

8    Q     What forms are you talking about, Detective Libretti?

9    A     There are confidential informant forms for the police

10   department.

11   Q     What information is on that form?

12   A     Basic pedigree and residential.

13   Q     What does pedigree information mean?

14   A     Name, date of birth, address and ethnicity, and stuff

15   like that.

16   Q     What's the purpose of having that information?

17   A     It's just on file that the police department has this

18   confidential informant's information.

19   Q     And when that information is sent to One Police Plaza,

20   are you aware of what's done there?

21   A     Yes.

22   Q     What is done there?

23   A     The confidential informant is then given a specific

24   number assigned to them.

25   Q     Is every confidential informant whose paperwork is sent

PROCEEDINGS

1  to One Police Plaza approved as a confidential informant?

2  A    No.

3  Q    Why not?

4  A    Sometimes they've open cases or warrants in other states.

5  Q    Why is a confidential informant number and code name

6  provided for an approved confidential informant?

7  A    Just for the safety.  The only form of paperwork that

8  that confidential informant name and date of birth will be on

9  is that form and for the safety of them and court purposes

10  they'll be used for a number or a code name.

11  Q    Detective Libretti, were you involved in handling Sarah

12  Wieboldt as a confidential informant?

13  A    Yes.

14  Q    What was your involvement?

15  A    I was the secondary handler for Sarah Wieboldt.

16  Q    Who was the primary handler?

17  A    Detective Napolitano.

18  Q    What's the Detective Napolitano's first name?

19  A    Steven.

20  Q    Do you recall around when you signed -- you participated

21  in signing up Sarah Wieboldt as a confidential informant?

22  A    I don't recall.

23  Q    Do you recall if it was in 2017?

24  A    Yes.

25  Q    And it was after October 27th, 2017?

PROCEEDINGS

1   A    Yes.

2   Q    Are you aware of Sarah Wieboldt's involvement as a

3   confidential informant in a narcotics -- I'm sorry, in several

4   narcotics investigations with the Overdose Task Force?

5   A    Yes.

6   Q    Did she conduct controlled purchases as a confidential

7   informant in connection with those investigations?

8   A    Yes.

9   Q    Did she provide information in connection with those

10  investigations?

11  A    Yes.

12  Q    Was she paid for that work?

13  A    Yes.

14  Q    Are you aware if Sarah Wieboldt was involved in an

15  investigation concerning the individuals who allegedly sold

16  her drugs the day she overdosed, October 27th, 2017?

17  A    Yes.

18  Q    In connection with that specific investigation, did she

19  conduct controlled purchases?

20  A    Yes.

21  Q    Did she provide information?

22  A    Yes.

23  Q    She testified before a Grand Jury in connection with that

24  investigation?

25  A    Yes.

217

PROCEEDINGS

1   Q    Was she paid for all of that work?

2   A    Yes.

3   Q    Detective Libretti, were you involved in any of the

4   controlled purchases that Sarah Wieboldt worked as a

5   confidential informant in connection with this specific

6   investigation we were just speaking about?

7   A    Yes.

8   Q    I'm going to direct your attention to February 8th, 2018.

9   Were you working that day, Detective Libretti?

10  A    Yes.

11  Q    What were you doing?

12  A    Working in the Overdose Task Force.

13  Q    Do you recall if you were involved in an undercover --

14  I'm sorry, in a controlled purchase that day?

15  A    Yes.

16  Q    Do you know who the confidential informant was involved

17  in that controlled purchase?

18  A    Yes.

19  Q    Who was that?

20  A    Sarah Wieboldt.

21  Q    Were there other law enforcement officers present at that

22  controlled purchase?

23  A    Yes.

24  Q    Who were they?

25  A    Detective Steven Napolitano, and Sergeant Danny Quinn.

PROCEEDINGS

1    Q    In connection with that controlled purchase on

2    February 8th, 2018, what was your role?

3    A    I was the witness to the handler and purchase of the

4    controlled buy.

5    Q    Can you explain more what you mean by witness to.

6    A    When there's a controlled buy there's always a witness

7    that needs to be in the car with them to just -- when they're

8    doing check, the search for narcotics or currency, I'm the

9    witness for that.

10   Q    But you weren't the person who actually conducted the

11   search for contraband or handed the money?

12   A    No.

13   Q    Do you recall specifically where that controlled purchase

14   occurred?

15   A    I have to check my notes, I don't recall.

16   Q    Do you recall whether that controlled purchase was

17   actually successful and narcotics were purchased?

18   A    I don't recall.

19            MS. CHEN:  Can I show just to the witness what's

20   been marked as 3500-DL-2.  Page 1.

21            THE COURT:  Yes, and to counsel of course.

22   Q    Detective Libretti, what is this document -- well, first,

23   do you recognize this document?

24   A    Yes.

25   Q    What is this document?

PROCEEDINGS

1   A    This is a voucher receipt when a narcotics is vouchered

2   in the police department system.

3        MS. CHEN:  Can we go to the second page please.

4   Q    Detective Libretti, do you recognize who prepared this?

5   A    Yes.

6   Q    Who is that?

7   A    I did.

8        MS. CHEN:  Can we go back to the first page.  Thank

9   you.

10  Q    Can you take a look at this and see if it refreshes your

11  recollection?

12       THE COURT:  Take your time to review it and let us

13  know if it refreshes your recollection.

14  A    Okay.

15  Q    Detective Libretti, are you aware whether narcotics were

16  actually recovered in connection with the controlled purchase

17  that Sarah Wieboldt participated in as a confidential

18  informant on February 8th, 2018?

19  A    Yes.

20  Q    Were they recovered?

21  A    Yes.

22  Q    Taking a step back for a moment, Detective Libretti, are

23  you familiar with the term vouchering?

24  A    Yes.

25  Q    What does that mean?

220

PROCEEDINGS

1   A    Vouchered is when a narcotics is vouchered under or taken

2   into sealed bag given a special number and presented to the

3   lab for testing.

4   Q    When you say special number, what do you mean by that?

5   A    Each voucher put in this plastic bag is given its own

6   specific number that it goes by its identification number.

7   Q    Is that number unique?

8   A    Yes.

9   Q    You said it's placed in an envelope, is that what you

10  said?

11  A    Yes.

12  Q    What's the purpose of that?

13  A    Just for the safety of the product, chain of command.

14  Q    Is that envelope sealed?

15  A    Yes.

16  Q    By whom?

17  A    By me and signed.

18  Q    Detective Libretti, were you involved in vouchering the

19  narcotics that were seized that day in connection with the

20  controlled purchase on February 8th, 2018?

21  A    Yes.

22  Q    Do you recall the unique number that that voucher for

23  those narcotics was assigned?

24  A    Can I look back at my notes for that?

25       MS. CHEN:  Can we publish for the witness only

221

PROCEEDINGS

1  3500-DL-2 page 1.

2  A    Yes.

3  Q    What was that number, Detective Libretti?

4  A    5000133582.

5  Q    And after you placed the narcotics -- I'm sorry, did you

6  place the narcotics in that envelope?

7  A    Yes.

8  Q    Are you aware of what happened to those narcotics after

9  you placed them in the envelope?

10  A    Yes.

11  Q    What happened?

12  A    They were sent to the lab.

13  Q    Detective Libretti, I'm going to show you what's been

14  admitted as Government Exhibit 309.

15        MS. CHEN:  And, Judge, I can -- even though it's

16  admitted I'll show defense counsel first.

17        THE COURT:  Yes.

18        MS. CHEN:  May I approach, your Honor?

19        THE COURT:  Yes.

20  Q    Detective Libretti, I just handed you what has been

21  admitted as Government Exhibit 309.  Do you recognize this?

22  A    Yes.

23  Q    What is it?

24  A    This is the vouchered envelope from the day of

25  February 8th.

PROCEEDINGS

1   Q   How do you know that?  I'm sorry, what year was that?

2   A   2017.

3   Q   February 8th, 2017?

4   A   I'm sorry, '18, I'm sorry.

5   Q   Okay.  How do you know that, Detective Libretti?

6   A   By the number that it was given.

7   Q   Can you look at the envelope, do you see any markings on

8   that envelope?

9   A   Yes.

10  Q   Can you describe those markings?

11  A   Yes.  It is the signature -- it's my initials and my

12  shield number.

13          MS. CHEN:  Your Honor, at this time I would ask that

14  the exhibit be handed to the jury so that they can examine it

15  more closely.

16          THE COURT:  Any objection?

17          MS. TODD:  No, your Honor.

18          MR. SCHOER:  No objection.

19          THE COURT:  It may be handed to the jury.

20          MS. CHEN:  Thank you.

21          THE COURT:  We'll start with our first juror, then

22  you can hand it up backwards and come around that way or snake

23  it around.

24          (Pause in proceedings.)

25          MS. CHEN:  Your Honor, let the record reflect that

PROCEEDINGS

1   the jurors have had an opportunity to examine Government

2   Exhibit 309.  I'm now going to hand it back to the witness.

3            THE COURT:  So noted.

4   Q    Detective Libretti, can you describe what you see in

5   Exhibit 309?

6   A    Yes.  It's going to be glassine envelopes that are

7   usually used for heroin wrapped in black rubber bands.

8   Q    Do you have an understanding as to what the confidential

9   informant that day believed -- or believed she was purchasing?

10            MS. TODD:  Objection.

11            THE COURT:  Sustained.

12            MS. CHEN:  May I have a moment, your Honor?

13            THE COURT:  Yes.

14            (Pause in proceedings.)

15            MS. CHEN:  No further questions, your Honor.

16            THE COURT:  Defense wish to inquire?

17            MS. TODD:  Yes, your Honor, may I?

18            THE COURT:  Yes, you may proceed.

19            MS. CHEN:  I apologize, your Honor, may I collect

20   the exhibits that the witness has.

21            THE COURT:  Yes.

22            (Continued on the next page.)

23

24

25

LIBRETTI - CROSS - MS. TODD

1    (Continuing.)

2    CROSS-EXAMINATION

3    BY MS. TODD:

4    Q    Good afternoon, Detective Libretti.

5    A    Good afternoon.

6    Q    Now, you testified on direct that you were a member of

7    the Overdose Task Force, correct?

8    A    Yes.

9    Q    And you indicated that your duty involved determining

10   where drugs were coming from?

11   A    Yes.

12   Q    And to locate evidence as best as you can; is that fair?

13   A    Yes.

14   Q    And that would involve speaking with witnesses?

15   A    Yes.

16   Q    Checking cameras?

17   A    Yes.

18   Q    And looking for any other evidence that might be

19   available to you in the immediate vicinity, correct?

20   A    Yes.

21   Q    You were not the first officer on the scene, correct?

22   A    Correct.

23           MS. CHEN:  Objection, Your Honor.

24           Just a clarification as to what scene and when and

25   where.

                      LIBRETTI – CROSS – MS. TODD

1    Q     Directing your attention --

2                THE COURT:  Sustained.

3                Yes, if you could clarify, please.

4    Q     Directing your attention to October 27th, 2017.

5                You were not the first officer on the scene,

6    correct?

7    A     Correct.

8    Q     It was, if you recall, it was detective or Police Officer

9    Rutigliano, correct?

10   A     I don't recall.

11   Q     You learned the information from the officers who arrived

12   at the scene prior to your arrival, correct?

13               MS. CHEN:  Objection, Your Honor.

14               What information?

15               THE COURT:  Sustained.

16   Q     All my questions will be related to the October 27th --

17               THE COURT:  No.  Sustained as to form.

18               What information?

19   Q     On October 27th, 2017, you learned of an overdose,

20   correct?

21   A     Yes.

22   Q     And the overdose related to an individual by the name of

23   Sarah Wieboldt, correct?

24   A     Yes.

25   Q     And you learned the information about the overdose

LIBRETTI - CROSS - MS. TODD

1  related to Sarah Wieboldt from Officer Rutigliano?

2  A    That, I don't recall.  I spoke to a lot of people that

3  day.

4  Q    Did you speak to officers on that day related to the

5  overdose?

6  A    I'd have to look back at my notes.

7        MS. TODD:  Your Honor, just for the witness' --

8  refreshing of the witness' memory, I'd ask that Government

9  Exhibit 3500DL1 at Page 29.

10       THE COURT:  Okay.  Only show to the witness and,

11  obviously, counsel.

12 Q    Detective Libretti, is Exhibit 29 in front of you, Page

13 29?

14 A    I can't see the whole page to see if it's actually 29.

15 Q    Detective Libretti, do you recognize the report?

16 A    Yes.

17 Q    It is your report, correct?

18 A    Yes.

19 Q    Could you take a look at Government Exhibit DL1 at 29 and

20 see if it refreshes your recollection as to who was the first

21 officer at the scene on October 27th, 2017.

22       THE COURT:  Just take a look at it and let us know

23 if it refreshes your recollection.

24 Q    Have you had a chance to look at the exhibit, detective?

25 A    Yes.  I just don't recall if he was first on the scene.

LIBRETTI – CROSS – MS. TODD

1   Q   But it wasn't you, correct?

2   A   No.

3   Q   Now, you indicated that you learned from your

4   investigation that there was a white Jeep as it relates to the

5   October 27th, 2017, overdose, correct?

6   A   Yes.

7   Q   And you then went to review video cameras, correct?

8   A   Correct.

9   Q   And part of your need to review the video cameras was to

10  see if you could find objective evidence, correct?

11  A   Correct.

12  Q   Did you find anything?

13  A   No.

14  Q   When you got to the scene, was the red car that you

15  testified to, was that still at the location?

16  A   Which location?

17  Q   The location of Melba and Queen Street?

18  A   I'm sorry, repeat that.

19  Q   Was there a red vehicle when you arrived at the scene

20  where Ms. Wieboldt overdosed on October 27th, 2017?

21  A   That was a different location that you mentioned.

22  Q   Was there a red car at the location?

23  A   Which location?

24  Q   Melba and Queens?

25  A   No.

LIBRETTI - CROSS - MS. TODD

1    Q    Was there a red car at Victory Boulevard?

2    A    Yes.

3    Q    Did you observe any paraphernalia in that red car?

4    A    I don't recall.

5    Q    Did you look in the red car?

6    A    I don't recall.

7    Q    And outside of learning that the white Jeep was they at

8    the location, you have no firsthand knowledge of that,

9    correct?

10            MS. CHEN:  Objection, Your Honor.

11            Which location?

12            THE COURT:  You need to be -- stop.  Stop.  There's

13   an objection.  Let me rule on it.

14            Sustained as to form.

15            There are multiple locations here.  You need to be

16   specific about the location and the time, so sustained as to

17   form.

18   Q    Detective Libretti, you have no firsthand information

19   with respect to a white Jeep located at Melba and Queen Street

20   on October 27th, 2017, correct?

21   A    Correct.

22   Q    And you have no firsthand information of a white Jeep

23   located at Victory Boulevard on October 27th, 2017, correct?

24   A    Correct.

25   Q    Are you aware, Detective Libretti, if any narcotics was

LIBRETTI – CROSS – MS. TODD

1   recovered from Ms. Wieboldt on October 27th, 2017?

2   A    I don't recall.

3   Q    Are you aware of any narcotics was recovered from the

4   vehicle, the red vehicle on October 27th, 2017?

5   A    I don't recall.

6   Q    Are you aware of any narcotics recovered from an

7   individual by the name of Mark Corrao on October 27th, 2017?

8   A    I don't recall.

9   Q    You have no evidence of any DNA related to -- withdrawn.

10        The New York Police Department has a lab, correct?

11   A    Yes.

12   Q    And that lab is capable -- there are individuals who work

13   in the lab who are capable --

14        THE COURT:  Are you testifying or asking a question?

15   Ask a question, please.

16   Q    On the day of the overdose, October 27th, 2017, if

17   controlled substances were recovered from that scene, they

18   would have been sent to the New York Police Department lab for

19   testing, correct?

20        MS. CHEN:  Objection, Your Honor.

21        THE COURT:  I will allow it.

22        You may answer the question.

23   A    Can you just repeat that one more time?

24        THE COURT:  Let's have the question request read

25   back to the witness, please.

LIBRETTI - CROSS - MS. TODD

1          (Whereupon, a portion of the testimony was read

2    back.)

3    A    Correct.

4    Q    After -- once you got to the scene at Victory Boulevard

5    on October 27th, 2017, you then went to the hospital, correct?

6    A    Correct.

7    Q    And you met with Ms. Wieboldt at the hospital, correct?

8    A    Correct.

9    Q    You asked her -- you asked to look in her phone, correct?

10   A    I don't recall.

11        MS. TODD:  I ask just for the witness, Your Honor,

12   to take a look at DL1 at 4, and see if that refreshes his

13   recollection.

14        THE COURT:  Well, the first question is, is there

15   anything that would refresh your recollection.

16   Q    Detective, is there anything that would refresh your

17   recollection?

18   A    Yes.  My notes.

19        THE COURT:  I'm sorry, Ms. Todd, what was the number

20   of that document, again?

21        MS. TODD:  3500DL1 at 4.

22        THE COURT:  Thank you.

23        MS. TODD:  You're welcome.

24   Q    Detective Libretti, I'd ask you to take a look at the

25   exhibit in front of you, specifically, the last paragraph and

LIBRETTI – CROSS – MS. TODD

1  let us know if looking at it refreshes your recollection.

2          Having looked at that report, detective, does it

3  refresh your recollection as to whether or not the witness,

4  Ms. Wieboldt, permitted you to search her phone?

5  A     The report wasn't prepared by me.

6  Q     Does it refresh your recollection?

7  A     Yes.

8  Q     And the question I asked earlier is, you requested

9  permission to search her phone at the hospital, and she denied

10 you, correct?

11 A     No.  I was also with Detective Vaccarino who was able to

12 conduct the photographs of the text messages.

13 Q     Were you able to search her phone, go inside the phone

14 and look in it?

15 A     I don't recall.

16 Q     Now, you indicated that you work with confidential

17 informants, correct?

18 A     Correct.

19 Q     And that these confidential informants work off their

20 court cases, as you described it, correct?

21 A     Correct.

22 Q     It is correct that these court cases that you're talking

23 about, these people have committed crimes, correct?

24 A     Correct.

25 Q     And that they're charged with those crimes, correct?

LIBRETTI - CROSS - MS. TODD

1   A    Correct.

2   Q    Some have been found guilty, correct?

3   A    Correct.

4   Q    And some are facing prison time, correct?

5   A    That, I'm not sure.

6   Q    But they're working off their court cases.  Meaning, that

7   they expect to get some leniency by cooperating with the

8   police, correct?

9   A    It's a deal they work with the courts, not with us.

10  Q    So the confidential informants that you are working with,

11  are not -- promises are not made by the NYPD?

12  A    I'm not sure.

13  Q    You also indicated that the witnesses are

14  checked -- withdrawn.

15        You also indicated that the confidential informants

16  are checked for contraband before they go out to purchase

17  narcotics?

18  A    That's currency and contraband.

19  Q    And specifically, with Ms. Wieboldt, you testified about

20  a controlled purchase on October -- I'm sorry, on

21  February 8th, 2018, correct?

22  A    Correct.

23  Q    And you indicated that you were present for that,

24  correct?

25  A    Correct.

LIBRETTI - CROSS - MS. TODD

1    Q    And who conducted the search?

2    A    The handler of Sarah Wieboldt, Detective Stephen

3    Napolitano.

4    Q    So not a female who conducted a search, correct?

5    A    Correct.

6    Q    Now, you also indicated that in advance of a controlled

7    purchase, you meet with the confidential informant, correct?

8    A    Correct.

9    Q    And there's a discussion as to where the location of the

10   purchase is going to take place, correct?

11   A    Correct.

12   Q    And so you know in advance, the location of where the

13   purchase will occur, correct?

14   A    Not necessarily.

15   Q    When you meet with a confidential informant, you discuss

16   where the purchase will take place, correct?

17   A    Things change sometimes, so not necessarily.

18   Q    But you're in close proximity to where the purchase takes

19   place, correct?

20   A    Not necessarily.

21   Q    But you do know the date in advance of when a controlled

22   buy is going to take place, correct?

23   A    Not necessarily.

24   Q    On February 8th, 2018, did you know in advance that this

25   purchase was going to take place?

LIBRETTI – CROSS – MS. TODD

1   A    I don't recall.

2   Q    Let me ask you this, detective:  Informants are wired --

3   when I say wired, they're provided recording devices when they

4   make purchases, correct?

5   A    No.

6   Q    Never?

7   A    No.

8   Q    And in terms of photographing an actual sale, that

9   doesn't occur?

10  A    No.

11  Q    And so do you sometimes sit in a car and observe a

12  purchase occurring between a confidential informant and a

13  buyer -- and a seller?

14  A    If the buyer is accessible to be viewed.

15  Q    And why is that?

16  A    Due to traffic conditions or residence is not as easy to

17  watch the whole buy go down.

18  Q    But you do have the ability to do surveillance, correct?

19  A    Correct.

20  Q    And you can do so with a camera sitting in a car,

21  correct?

22  A    No.  For the safety of the confidential informant, you're

23  not going to take photos.

24  Q    And so how do you observe?

25  A    If you're able to see the front of the location that they

LIBRETTI – CROSS – MR. VITALIANO

1   agreed on, then you could observe it, and then you would write

2   down a note in one of your reports.

3   Q    And on February 8th, 2018, did you observe?

4   A    I don't recall.

5         MS. CHEN:  Just a moment, Your Honor.

6         THE COURT:  Yes.

7         MS. TODD:  Nothing further, Your Honor.

8         THE COURT:  Does counsel for Mr. Wyche wish to

9   inquire?

10        MR. VITALIANO:  Yes, Judge.

11        THE COURT:  You may proceed when you're ready.

12  CROSS-EXAMINATION

13  BY MR. VITALIANO:

14  Q    Good afternoon, detective.

15  A    Good afternoon.

16  Q    You indicated on direct that as part of the -- as part of

17  the Overdose Task Force, one of your duties and

18  responsibilities is to secure a scene, collect evidence, speak

19  to witnesses; is that correct?

20  A    Yes.

21        MS. CHEN:  Objection, Your Honor.

22        That is mischaracterizing the testimony.  I do not

23  believe that Detective Libretti said he collects evidence.

24        THE COURT:  Overruled.

25  Q    Is that correct, detective?

LIBRETTI – CROSS – MR. VITALIANO

1   A    It depends on the situation.

2   Q    And on October 27th, of 2017, you were assigned an

3   overdose case, correct?

4   A    Correct.

5   Q    And you responded to the scene on Victory Boulevard,

6   correct?

7   A    Correct.

8   Q    And on that scene, at Victory Boulevard, you spoke to

9   witnesses, correct?

10  A    Correct.

11  Q    Did you canvas for any video at that scene?

12  A    I don't recall.

13  Q    Did you collect any evidence from that scene?

14  A    I don't recall.

15        THE COURT:  You mean at Victory Boulevard?

16        MR. VITALIANO:  At Victory Boulevard.

17  Q    Had you collected any evidence at the Victory Boulevard

18  scene, would it have been vouchered?

19  A    Yes.  Under my name.

20  Q    And in this case, were there any vouchers from the

21  Victory Boulevard scene?

22  A    I don't recall.

23  Q    Detective, you testified on direct that you went to area

24  of Melba and Queen Street; is that correct?

25  A    Correct.

LIBRETTI - CROSS - MR. VITALIANO

1  Q    And around Melba and Queen Street, you canvassed for

2  video, correct?

3  A    Correct.

4  Q    At any of those locations, were there any videos?

5  A    No.

6         THE COURT:  Were those mostly single residences,

7  single-family homes on Melba and Queen?

8         THE WITNESS:  Your Honor, it is residential.  I just

9  don't remember if it was, like, semi-attached or single homes.

10  I'm just not sure how --

11        THE COURT:  They weren't like highrise apartments

12  like you'd have in Manhattan?

13        THE WITNESS:  It was all residential, yes.

14        THE COURT:  Okay.

15  Q    Detective, you indicated on direct that confidential

16  informants get paid money for their information; is that

17  correct?

18  A    Correct.

19  Q    And in this case, did you pay Sarah Wieboldt $100 for her

20  information connected to this case?

21  A    I don't recall.

22        MS. CHEN:  Objection, Your Honor.

23        What information in particular?

24        THE COURT:  Overruled.

25  Q    Would there be anything that would refresh your

LIBRETTI - CROSS - MR. VITALIANO

1   recollection?

2   A    Detective Napolitano was the handler that day, so the

3   information would have been provided to him.

4   Q    So have you yourself never paid Ms. Wieboldt any money?

5   A    I don't recall offhand on what other cases I had.

6   Q    As a secondary handler, you were in contact with

7   Ms. Wieboldt, correct?

8   A    On which day?

9   Q    Throughout her time as a confidential informant.

10  A    Pertaining this case or other cases?

11  Q    Any case.

12  A    Yes.

13  Q    And you would text her hoping that she would give you

14  information, correct?

15  A    Hoping or asking?

16  Q    Asking.

17  A    Yes.

18  Q    And when you were texting with Ms. Wieboldt, you wanted

19  her to give you informations because you wanted to pay her,

20  correct?

21  A    Correct.

22        MR. VITALIANO:  Just a moment, Your Honor.

23  Q    Detective, how many times did you meet with the

24  prosecution in regards to your testimony in this case?

25  A    I'm not exactly sure how many days it was.

PROCEEDINGS

1    Q     More than one?

2    A     Yes.

3    Q     More than two?

4    A     Yes.

5    Q     More than three?

6    A     I don't recall the days, how many it was.

7    Q     And do you recall the last time you reviewed your notes

8    in this case?

9    A     Yes.

10   Q     And when was that?

11   A     Yesterday.

12            MR. VITALIANO:  Thank you.  Nothing further.

13            THE COURT:  Any redirect?

14            MS. CHEN:  No, Your Honor.

15            THE COURT:  Thank you, sir.  You may step down.

16            THE WITNESS:  Thank you.  Have a good day.

17            THE COURT:  Have a good day.

18            (The witness steps down.)

19            THE COURT:  All right.  You can call your next

20   witness.

21            MR. REIN:  Your Honor, before that, the Government

22   has a stipulation to read into the record.

23            THE COURT:  Okay.

24            MR. REIN:  May I proceed, Your Honor?

25            THE COURT:  Yes, you may.

PROCEEDINGS

1          MR. REIN:  The stipulation is marked as Government

2    Exhibit 105 for identification contains a caption which

3    states, United States District Court Eastern District of New

4    York, United States of America against Keith Wyche and

5    Oneil Allen, and it states as follows:

6          It is hereby stipulated and agreed, by and between,

7    the United States of America and the defendant, Keith Wyche,

8    through his attorneys, Gary Schoer and Michael Vitaliano, and

9    the defendant, Oneil Allen, through his attorneys, Natali Todd

10   and Cody Warner, that, one, Government Exhibit 407 is a

11   compact disc containing true and accurate copies of records

12   obtained from T-mobile US Inc. which records reflect toll

13   records relating to a cellular telephone assigned number

14   (347)500-5837.

15         Two, Government Exhibit 408 is a compact disc

16   containing true and accurate copies of records obtained from

17   AT&T Wireless which records reflect toll records and cell

18   tower location information relating to a cellular telephone

19   assigned number (646)256-8211, a cellular telephone assigned

20   number (718)730-5862, and a cellular telephone assigned number

21   (917)860-4465.

22         Three, Government Exhibits 407 and 408 and this

23   stipulation, marked as Government Exhibit 105 are admissible

24   as evidence, and the stipulation is signed, dated

25   January 25th, 2023, signed by counsel for the Government and

PROCEEDINGS

1   counsel for Defendant Allen and Defendant Wyche.

2            And so Your Honor, at this time, on the basis of the

3   stipulation, the Government offers Government Exhibits 407 and

4   408 and the stipulation which is Government Exhibit 105.

5            THE COURT:  As it is stipulated by and between the

6   parties, the stipulation and the two exhibits described

7   therein 407 and 408 are admitted.

8            (Government Exhibits 407, 408, and 105, were

9   received in evidence.)

10           THE COURT:  All right.  You may call your next

11  witness.

12           MR. REIN:  Your Honor, the Government calls

13  Detective Philip Vaccarino.

14           (The witness takes the stand.)

15           THE COURTROOM DEPUTY:  Please raise your right hand,

16  sir.

17           (The witness was sworn and/or affirmed in by the

18  courtroom deputy.)

19           THE WITNESS:  Yes, ma'am.

20           THE COURTROOM DEPUTY:  Thank you.  Please be seated.

21           Please state and spell your name.

22           THE WITNESS:  Philip Vaccarino, P-H-I-L-I-P, last

23  name, V-A-C-C-A-R-I-N-O.

24           THE COURTROOM DEPUTY:  Thank you.

25           THE COURT:  Good afternoon, sir.  If you feel

VACCARINO – DIRECT – MR. REIN

1  comfortable, you can take off your mask during your testimony

2  if you think it would be easier for you to speak that way.

3         I'm going to ask you to keep your voice up nice and

4  loud, and you can adjust the microphone so that you're

5  comfortable with, okay.

6         THE WITNESS:  Yes, ma'am.

7         THE COURT:  Thank you.  You may inquire when you are

8  ready.

9  **PHILIP VACCARINO**, called as a witness, having been first duly

10  sworn/affirmed, was examined and testified as follows:

11  DIRECT EXAMINATION

12  BY MR. REIN:

13  Q    Good afternoon, detective.

14         How long have you been a member of the NYPD?

15  A    Since January 2007.

16  Q    How many arrests have you made in your career?

17  A    Under my name or also including participating?

18  Q    Where you were the arresting officer.

19  A    I think 700 and change, almost 800.

20  Q    And how many have you assisted in where you weren't the

21  arresting officer?

22  A    I have well over a thousand including those.

23  Q    How many of your arrests have been -- where you were the

24  arresting officers were narcotics-related?

25  A    A good majority off them.

VACCARINO - DIRECT - MR. REIN

1   Q    Could you give us a specific number?

2   A    Most likely 80 to 90 percent.

3   Q    And how many arrests have you assisted in that were

4   narcotics-related, but where you weren't the arresting

5   officer?

6   A    Same thing, at least 80 to 90 percent.

7   Q    When we use the term, arresting officer, can you just

8   explain for us what that actually means?

9   A    When the arrest is under my actual name, versus where it

10  might have been something I observed, but my partner or

11  somebody else I was working with took the arrest under their

12  name.

13  Q    How long have you been a detective?

14  A    Since December of 2013.

15  Q    And what's your current assignment?

16  A    Narcotics Borough of Staten Island, the Major Case Team.

17  Q    Can you describe for us what are the responsibilities of

18  that particular unit?

19  A    To conduct case investigations, mainly narcotics or gun

20  investigations, and we aim more at long-term cases in this

21  unit, and we try to aim for more violence or narcotics-prone

22  locations to conduct the investigations in.

23  Q    How long have you been assigned to that unit?

24  A    Approximately the past two or three years.

25  Q    Where were you assigned before that?

VACCARINO – DIRECT – MR. REIN

1    A    Still in Staten Island narcotics, but I was part of the

2    Overdose Task Force.

3    Q    I want to come back to the Overdose Task Force in a

4    second.

5         But prior to your assignment with the Overdose Task

6    Force, can you just describe for us what some of your other

7    assignments have been within the NYPD.

8    A    So from the academy, I went to 1-2-0 Precinct.  After the

9    1-2-0 Precinct, I started off armed patrol, from patrol, I

10   went to housing, from housing, I went to the conditions team,

11   and then from the conditions team, I went to what was

12   abbreviated as the SNEU team which was the Street Narcotics

13   Enforcement Unit, and then I went to Staten Island narcotics

14   when I left the 1-2-0.

15   Q    When you say the 1-2-0, is that the 120th Precinct?

16   A    Yes, sir.

17   Q    Is that in Staten Island?

18   A    Yes, sir.

19   Q    Have all of your assignments throughout your career been

20   in Staten Island?

21   A    Yes, sir.

22   Q    You mentioned that you, at one point, were a member of

23   what you called SNEU, Street Narcotics Enforcement.

24        Can you just describe for us what that is?

25   A    That was a precinct-level narcotics team where we went

VACCARINO – DIRECT – MR. REIN

1    out and, at the precinct level, you're not doing narcotics

2    investigations, but you're going out and trying to observe

3    hand-to-hand transactions between a dealer and purchaser, and

4    you'll lock them up for it.

5    Q    When you say, lock them up, you arrest them?

6    A    Yes, sir.

7    Q    What's a hand-to-hand purchase?

8    A    When somebody exchanges money for an item.  Being that I

9    was on a narcotics team, we were looking for narcotics.  And

10   back then, it's when marijuana was still illegal, so it was

11   marijuana, as well as other narcotics.

12   Q    When you first became a member of SNEU, what type of

13   training did you receive?

14   A    It was a 3-day training in regards to observing and

15   identifying narcotics activity, as well as, field testing of

16   marijuana.

17   Q    And what did the training consist of?

18   A    They taught us and went further into what to look for to

19   pick out what would be most likely a narcotics transaction.

20   Meaning, in the hand-to-hand transactions, the habits and

21   tendencies that are sometimes shown by somebody waiting to

22   purchase or certain areas where it might look like people are

23   set up and selling from a location.  So they would go over

24   spots where you could -- and describe areas where you could

25   observe from, and then based off what you see, if there's a

VACCARINO - DIRECT - MR. REIN

1    arrest to make, you make the arrest.

2    Q    Are you familiar with the term, a SNEU set?

3    A    Yes, sir.

4    Q    What's a SNEU set?

5    A    So that would be similar to what I was just saying.  So

6    if I see a location where I believe there's people selling

7    from, you will have one car which you would describe as, on

8    set, and they will be observing the location and calling out

9    to the team what they're observing, and if they believe

10   somebody just purchased from what was observed, you'll wait

11   until they're far enough away from the location to stop them,

12   and based off what you find, if it didn't disrupt who was

13   dealing, maybe it would wait to see if you have one or two

14   other purchasers to arrest before you move in for the dealer,

15   or sometimes they would just move in straight for the dealer

16   after you made that arrest.

17   Q    You mentioned before that your previous assignment was

18   with the Overdose Task Force.

19        Can you just describe for us who the

20   responsibilities of that particular unit are?

21   A    When I was on the Overdose Task Force, we responded to

22   overdoses, whether it was an overdose death.  Meaning, where

23   the person died from the overdose, or if they were saved,

24   meaning, they survived the overdose, and you would conduct an

25   investigation to see if you could find out where or how or

VACCARINO - DIRECT - MR. REIN

1   who, as far as, where narcotics came from that they overdosed

2   on, and then you would make attempts to try to get into that

3   dealer so that you can make an arrest on the dealer.

4   Q    When you say, make attempts to try to get into that

5   dealer, what does that mean?

6   A    There's multiple different ways, whether it's done

7   through a CI, observations where if you see them dealing, you

8   arrest certain purchasers, or through the use of undercovers.

9   Q    When you say, a CI, is that a confidential informant?

10  A    Yes, sir.

11  Q    What's an undercover?

12  A    An undercover is a police officer or detective, they're a

13  member of the service who works alongside us in narcotics, and

14  they have, basically, no enforcement capacity.  They will not

15  come out when we make the arrests.  They might come out to

16  call out some stuff if we're observing an area to pick off

17  some of the purchasers, but they're used to mainly try to

18  purchase narcotics from a dealer or get introduced by the CI

19  to a dealer.

20  Q    If you had to estimate, approximately how many

21  narcotics-related investigations have you been involved with

22  in your career?

23  A    At least 2-, 300.

24  Q    I want to direct your attention to the period between

25  approximately February 2017 and September 2018.

VACCARINO - DIRECT - MR. REIN

1    Were you involved in an investigation of narcotics

2    sales and narcotics overdoses in Staten Island during that

3    time?

4    A    Yes, sir.

5    Q    I want to direct your attention now to September 18th, of

6    2018.

7         Did you have the opportunity to participate in the

8    arrest of Keith Wyche and Oneil Allen?

9    A    Yes, sir.

10   Q    Were those arrests in connection with an investigation

11   that you had been conducting since approximately February of

12   2017?

13        MR. WARNER:  Objection.

14        THE COURT:  Overruled.

15   A    Yes, sir.

16        MR. REIN:  Judge, may I, at this time, ask that

17   everyone in the courtroom lower their mask?

18        THE COURT:  Yes.  I am going to ask for very

19   briefly, for everyone to remove your mask.  You'll put them

20   back on as soon as we're done.  Thank you.

21   Q    Detective, I'll ask you to look around the courtroom.

22        Do you see Keith Wyche in the courtroom today?

23   A    Yes, sir.

24   Q    Could you point to that person and identify him with an

25   article of clothing that he's wearing?

VACCARINO – DIRECT – MR. REIN

1    A    He is wearing a blue suit jacket and a blue tie, seated

2    next to Mr. Vitaliano.

3            MR. REIN:  Your Honor, may the record reflect that

4    the witness has identified Defendant Wyche.

5            THE COURT:  So noted.

6    Q    And detective, do you see Oneil Allen in the courtroom

7    here today?

8    A    Yes, sir.

9    Q    Again, I'll ask you to point to him and identify him with

10   an article of clothing that he's wearing.

11   A    He's seated over there.  From the monitor, I can't tell

12   if that's a suit jacket or a sweater, but it looks to be

13   either dash blue or black in color, and he's seated between

14   the male and female attorney.

15           MR. REIN:  Your Honor, may the record reflect that

16   the witness has identified defendant Allen.

17           THE COURT:  So noted.

18           MR. REIN:  If we can put our mask back on.

19           THE COURT:  Yes, please.  Thank you.

20   Q    Detective, I want to direct your attention now to

21   February 18th, 2017.

22           Did you have the opportunity to become involved in

23   an investigation on that date?

24   A    Yes, sir.

25   Q    What was the nature of that investigation?

VACCARINO - DIRECT - MR. REIN

1   A    It was an overdose investigation.

2   Q    Did you learn the name of the person that had overdosed?

3   A    Yes, sir.

4   Q    What was that person's name?

5   A    Is it possible to see the DD5?

6   Q    Would that refresh your recollection?

7   A    Yes.

8        MR. REIN:  Could we show to the witness only, what's

9   been marked as Government Exhibit 3500PV2?

10       THE COURT:  Yes.

11       MR. REIN:  Specifically, the third page.

12  Q    Detective, you could just review that and look up at me

13  if your memory is refreshed.

14  A    Yes, sir.

15  Q    What was the name of the person who had overdosed?

16  A    Vincent Militello.

17  Q    Could you describe for us how did you get involved in

18  that investigation?

19  A    The notification was made to my command that the overdose

20  occurred, and I was the one that responded.

21  Q    Is there reason in particular why you were the one who

22  responded?

23  A    It was so -- when we were in overdose, there was certain

24  days of the week, and whether it was the morning shift or the

25  night shift that you would be on -- not that we called it a

VACCARINO – DIRECT – MR. REIN

1  catch, but basically you were up.  So if any notifications

2  came over, you went and you handled the overdose.

3  Q    So it was basically your turn?

4  A    Yes.

5  Q    After you were notified where did you go, if anywhere?

6  A    I responded to the overdose scene.

7  Q    And where was that?

8  A    In the Arden area of Staten Island.  I believe it was

9  Smyrna and Shotwell.

10  Q    Smyrna and Shotwell, is that the intersection?

11  A    Yes, sir.

12  Q    And can you describe for us when you -- well, first, do

13  you remember approximately what time you got to that location?

14  A    I would need to check the 5s for the exact time.

15  Q    Would that refresh your recollection?

16  A    Yes, sir.

17  Q    And when you say, the 5, is that a police report?

18  A    Yes, sir.

19        MR. REIN:  Could we show the witness Government

20  Exhibit 3500PV2-H2.

21  Q    And detective, are you able to see the exhibit?

22  A    Yes, sir.

23  Q    If you could review it and look up to me if your

24  recollection is refreshed.

25  A    Okay.

VACCARINO – DIRECT – MR. REIN

1  Q    And approximately what time did you get to that location?

2  A    That does not have a time typed for what time I arrived.

3  But I do remember it was daylight.  I just don't remember if

4  it was morning or afternoon, if that helps.

5  Q    Okay.  Can you describe for us when you got to that

6  location, what did you see there?

7  A    There was NYPD personnel already on scene, a female who

8  stated she was the --

9            MR. WARNER:  Objection.

10 Q    Let me stop you there.

11           Without telling us anything that anybody might have

12 told you, just tell us what you saw.

13 A    A female that was the 9-1-1 caller and then auto parked

14 on the side of the road, that is where the overdose had

15 occurred, and there was some items inside the auto.

16 Q    When you say, an auto, are you talking about a car?

17 A    Yes, sir.

18           (Continued on the following page.)

19

20

21

22

23

24

25

VACCARINO - DIRECT - MR. REIN

1    (Continuing)

2              MR. REIN:  Can we show to the witness only what's

3    been marked for identification as Government Exhibits 611A

4    through C.

5              THE COURT:  Yes.

6    DIRECT EXAMINATION(Continued)

7    BY MR. REIN:

8    Q    Can you see the exhibits, Detective?

9    A    Yes, sir.

10   Q    If we can just scroll through them from A through C.

11   This is B we're looking at.

12             Have you had an opportunity to review those

13   Detective?

14   A    Yes, sir.

15   Q    And what are Government's Exhibit 611A through C?

16   A    Photos from inside the auto where the overdose had

17   occurred.

18   Q    When you say inside the auto, you're talking about the

19   one you had seen on February 18, 2017?

20   A    Yes, sir.

21   Q    Are these photographs, which are 611A through C for

22   identification, a fair and accurate depiction of the inside of

23   the car that you saw at Shotwell and Smyrna Avenue on

24   February 18th, 2017 when you were there?

25   A    Yes, sir.

VACCARINO – DIRECT – MR. REIN

1          MR. REIN:  Your Honor, at this time the government

2     offers 611A through C.

3          THE COURT:  Any objection?

4          MR. WARNER:  No.

5          MR. SCHOER:  No objection.

6          THE COURT:  It's admitted.

7          (Government Exhibits 611A through C, were received

8     in evidence.)

9          MR. REIN:  If we could please, your Honor, publish

10    for the jury 611A.

11         THE COURT:  Yes.

12         (Exhibit published.)

13    Q    Detective, could you describe for us what are we looking

14    at in Exhibit 611A.

15    A    The passenger side of the auto, a peach box that came

16    from inside, what looks like that little pencil case, which

17    was for, what we call Narcan, which was the Naloxone kit.  A

18    purse and personal items on the floor of the passenger side.

19    A glove on the driver's seat that might have been left --

20    well, and drinks in the cup holder.

21    Q    I'm going to circle something, you'll see it on your

22    screen.  What is that which I circled?

23    A    A syringe.

24    Q    I'll note that I've drawn a circle on it.  It's located

25    on the passenger seat; is that correct?

VACCARINO – DIRECT – MR. REIN

1   A    Yes, sir.

2        MR. REIN:  If we could scroll down to 611B.

3   Q    Detective, you mentioned a peach box, are you able to see

4   that in this exhibit?

5   A    Yes, sir.

6   Q    Describe first, based upon your experience, what is

7   contained in that box?

8   A    So those are the older Narcan kits that they used to give

9   out and that box contained the Naloxone medication inside that

10  you would use with the kit.

11  Q    What is Naloxone?

12  A    From what I was told, if you believe somebody is

13  overdosing and you give them the Naloxone, it could possibly

14  stop the overdose.

15  Q    Can we turn to 611C.  And, Detective, what is 611C?  What

16  are we looking at in 611C?

17  A    The syringe from the previous two photos.

18       MR. REIN:  We can take the exhibit down.

19  Q    Detective, without telling us anything that anybody may

20  have told you, did you have the opportunity to speak with

21  anybody at Symrna and Shotwell when you went there?

22  A    Yes, sir.

23  Q    And, again, without saying anything that anybody told

24  you, who did you speak with?

25  A    I spoke with the members of the service that were on

VACCARINO – DIRECT – MR. REIN

1   scene, as well as the 9-1-1 caller.

2   Q    When you say members of the service, is that just other

3   police officers?

4   A    Yes, sir.  So there was the police officers who responded

5   and were first on scene, as well as the detectives from the

6   detective squad that were there.

7   Q    The 9-1-1 caller that you spoke with, were you able to

8   determine that person's relationship to Vincent Militello?

9   A    Yes, sir.

10  Q    What was the relationship?

11           MR. WARNER:  Objection.

12           THE COURT:  Sustained.

13  Q    Well, was that person, if you know, acquainted with

14  Vincent Militello at all?

15           MR. WARNER:  Objection.

16           THE COURT:  Sustained.

17  Q    After you were at the scene --

18           THE COURT:  Excuse me, one second.

19           Ms. Gonzalez, are you okay?

20           THE JUROR:  Yes, I fine.

21           THE COURT:  Would you like some water?

22           THE JUROR:  No, my eyes are burning.

23           THE COURT:  Okay.  You may continue.

24  BY MR. REIN:

25  Q    After you initially responded to Smyrna and Shotwell,

VACCARINO - DIRECT - MR. REIN

1    where did you go after that?

2    A    To Staten Island University Hospital located on Seguine

3    avenue.

4    Q    What was the purpose of going to the hospital?

5    A    To interview the overdose victim.

6    Q    And did you actually have the opportunity to do that at

7    the hospital?

8    A    Yes, sir.

9    Q    Could you describe what, if any, attempts were made to

10   look for video in the intersection of Smyrna and Shotwell

11   Avenue from February 18th, 2017?

12   A    Initially on scene a canvass was conducted and I believe

13   the squad conducted further up canvass to check for cameras.

14   Q    What's a canvass?

15   A    When you go and basically you're walking around the

16   vicinity of the scene in different directions to see if any of

17   the homes have cameras that could help out with the

18   investigation.

19   Q    What were the results of that canvass?

20   A    There was no video recovered.

21   Q    After you -- well, after February 18th, 2017, did there

22   come a time when you -- again without telling me anything that

23   anybody told you -- had the opportunity to speak with Vincent

24   Militello again?

25   A    Yes, sir.

                    VACCARINO – DIRECT – MR. REIN

1   Q    When was that?

2   A    If I could review the DD5 for the exact date.

3   Q    Would that refresh your recollection?

4   A    Yes, sir.

5              MR. REIN:  Can we show the witness what's been

6   marked as Government Exhibit 3500-PV-8.

7              THE COURT:  Yes.

8   Q    Are you able to see the exhibit?

9   A    Yes, sir.

10  Q    What was the date when you spoke with Vincent Militello

11  again?

12  A    March 3rd, 2017.

13  Q    When you spoke with him, how did you actually communicate

14  with him, was it in person or on the phone?

15  A    Through the telephone.

16  Q    What was the telephone number that you called to speak

17  with him?

18  A    May I review the 5 again?

19  Q    Would that refresh your recollection?

20  A    Yes, sir.

21  Q    If we could just look at the same exhibit, PV8.  Just

22  look up at me if your recollection is refreshed.

23             What was the number that you called?

24  A    (929)321-0460.

25  Q    Without telling us anything that anybody may have told

VACCARINO – DIRECT – MR. REIN

1    you, after speaking with Vincent Militello on March 3rd, 2017,

2    what steps did you take in your investigation?

3    A    I did request a subpoena of the phone records, which is

4    part of our standard procedure with any overdoses, as well as

5    query CIs to see if they had any possible info or heard about

6    anything as well.

7    Q    You said you requested phone records, who did you request

8    phone records for?

9    A    Vincent Militello.

10   Q    Were there any other phone records that you requested?

11   A    Yes, sir.

12   Q    And whose phone records were those?

13   A    Michael Wassef.

14   Q    This person, Michael Wassef, are you familiar with that

15   person?

16   A    Yes, sir.

17   Q    Can you explain to us how you're familiar with that

18   person?

19   A    Through my time in narcotics he has been arrested by us a

20   few times.  He is also a barber in the barber shop where I go

21   for my haircuts.

22   Q    Were you able to determine an address for Michael Wassef?

23   A    Yes, sir.

24   Q    What was the address that you determined?

25   A    I would need to see my notes for the house number, but I

VACCARINO - DIRECT - MR. REIN

1    do remember the area.

2    Q    First, let's start, what's the area?

3    A    Close proximity to the overdose location, so he's in

4    what's referred to as the Greens, which is approximately a

5    quarter mile to half a mile from the overdose location.

6    Q    And looking at your -- would looking at your report

7    refresh your memory about the actual address you determined?

8    A    Yes, sir.

9             MR. REIN:  Can we show the witness Exhibit PV-8,

10   page 3.

11   Q    Detective, if you could review that and look up when your

12   memory is refreshed.  Is it refreshed?

13   A    Yes.

14   Q    What was the address you determined?

15   A    250 Green Valley Road.

16   Q    Were you able to determine a phone number for Michael

17   Wassef?

18   A    Yes, sir.

19   Q    As you sit here today, do you remember that phone number?

20   A    If I can review my 5, I can tell you what the phone

21   number was.

22            MR. REIN:  Could we show the witness PV-15, page 2.

23   Q    And, Detective, does that refresh your memory?

24   A    Yes, sir.

25   Q    What was the phone number you were able to determine?

VACCARINO – DIRECT – MR. REIN

1    A    (347)500-5837.

2    Q    Once you had that information, what did you do with it?

3    A    I requested a subpoena for that phone number.

4    Q    In response to requesting that subpoena, did you

5    eventually obtain phone records for that number?

6    A    Yes, sir.

7    Q    I want to come back to that in moment, but first, I want

8    to direct your attention to April 18th, 2017, did you have the

9    opportunity to become involved in an investigation on that

10   date?

11   A    Yes, sir.

12   Q    What type of investigation was that?

13   A    An overdose investigation.

14   Q    And how did you become involved in that investigation?

15   A    Same way, I was the person that was up.

16   Q    When you say it was an overdose investigation, can you

17   describe for us the nature of the overdose?

18   A    Can I review the 5, because I've covered a lot of

19   overdoses, I want to make sure I have the right one with the

20   right day.

21   Q    Would that refresh your memory?

22   A    Yes, sir.

23        MR. REIN:  Can we show the witness what's been

24   marked as PV-19.

25   A    Thank you.

VACCARINO – DIRECT – MR. REIN

1   Q    Specifically page 2.

2        Does that refresh your memory?

3   A    Yes, sir.

4   Q    What was the nature of the overdose investigation that

5   you became involved with on April 18th, 2017?

6   A    That was an overdose death.

7   Q    Did you learn the name of the person who had died?

8   A    Yes, sir.

9   Q    What did you learn their name to be?

10  A    Vincent Price.

11  Q    After you were notified of the overdose death of Vincent

12  Price, what investigative steps did you take initially?

13  A    I responded to the scene.

14  Q    Where did you go?

15  A    69 Carlyle Green.

16  Q    And is there a private house at that address?

17  A    Yes, sir.

18  Q    When you got to that location, where, if anywhere, was

19  your attention directed?

20  A    To the first floor bathroom.

21  Q    And can you describe for us when you were directed to

22  that first floor bathroom, what did you see there?

23  A    Mr. Price was deceased face down on the floor.

24  Q    In addition to observing Mr. Price face down on the floor

25  of the bathroom, what else did you observe about the bathroom?

VACCARINO – DIRECT – MR. REIN

1    A    There was a syringe on the floor in the bathroom.

2    Q    Without telling us anything that you might have been told

3    by somebody else, did you have the opportunity to speak with a

4    member of Vincent Price's family when you went to 69 Carlyle

5    Green that day?

6    A    Yes, sir.

7    Q    Who did you speak with?

8    A    His father.

9    Q    While you're investigating an overdose death, can you

10   describe for us why you would speak with family members?

11   A    Well, in this instance his father was also the 9-1-1

12   caller, but if you have family members present that are not

13   9-1-1 callers, you'll ask them about the history of the

14   overdose victim, whether they're a past user, they're a new

15   user, long time, medical history, if they have any medical

16   issues, along that nature.

17   Q    In addition to learning that information, is there

18   anything in particular that you would ask to examine?

19   A    If the cell phone of the victim is present, if we can see

20   the cell phone if they would give consent.

21   Q    Why did you want to see the cell phone?

22   A    To see if there's any narcotics-related conversations on

23   the phone.

24   Q    What types of narcotic-related conversations are you

25   looking for?

VACCARINO – DIRECT – MR. REIN

1  A    Something that would identify a purchase that was

2  possibly made close to the time of the overdose this way you

3  will possibly have a name or phone number of where you can

4  then start to target your investigation.

5  Q    So in this case, did you ask to examine Vincent Price's

6  phone?

7  A    Yes, sir.

8  Q    What was the response that you received when you asked

9  that question?

10  A    The father did allow us to and he signed the consent

11  form.

12  Q    And after Mr. Price's father signed the consent form,

13  what did you do with the phone?

14  A    I checked the phone to see if there were any numbers that

15  were recently called or text messages that were recently made.

16  Q    Did you see any?

17  A    Yes, sir.

18        MR. REIN:  Can we show just the witness what's been

19  premarked for identification as Government Exhibit 612.

20  Q    Detective, do you see the exhibit?

21  A    Yes, sir.

22  Q    What is Government Exhibit 612 for identification?

23  A    It is a photo showing text messages from the phone of the

24  deceased, Vincent Price.

25  Q    And is this photograph, which is marked as Government

VACCARINO – VOIR DIRE – MR. SCHOER

1   Exhibit 612 for identification, a fair and accurate depiction

2   of messages that you observed when you looked at the phone on

3   April 18th, 2017?

4   A    Yes, sir.

5           MR. REIN:  Your Honor, at this time I offer

6   Government Exhibit 612.

7           MR. WARNER:  No objection.

8           THE COURT:  Any objection?

9           MR. WARNER:  No.

10          MR. SCHOER:  Judge, may I have just a brief voir

11  dire?

12          THE COURT:  Yes, you may.

13  VOIR DIRE EXAMINATION

14  BY MR. SCHOER:

15  Q    Detective, with respect to cell phones, you use them

16  often in your investigation?

17          THE COURT:  That's beyond the scope for a voir dire.

18  The voir dire as to this particular exhibit.

19          MR. SCHOER:  Well --

20          THE COURT:  You can ask your questions on

21  cross-examination.  This is voir dire as to this exhibit.

22  BY MR. SCHOER:

23  Q    How is this photograph taken?

24  A    By myself.

25  Q    And what did you take it on?

1    A     A cell phone camera.

2    Q     Was that your personal cell phone camera?

3    A     I don't remember if it was my personal or job cell phone

4    at the time, but it was one of the two.

5    Q     And after you did that, did you send your cell phone to

6    some lab to download the photograph?

7              MR. REIN:  Objection.

8              THE COURT:  I will allow it briefly.

9    A     No, sir.

10   Q     Are you aware of what's called metadata?

11   A     No, sir.

12   Q     Do you know whether any metadata was ever taken with

13   respect to this photo?

14             THE COURT:  No, no, you're going beyond the scope.

15   The question is admissibility of this particular exhibit.

16             MR. SCHOER:  Well, I think, Judge --

17             THE COURT:  That's not the proper subject of voir

18   dire, Mr. Schoer.

19             Are you done?

20             MR. SCHOER:  Yes, yes.  No objection.

21             THE COURT:  It's admitted.

22             (Government Exhibit 612, was received in evidence.)

23             MR. REIN:  Judge, may we publish it for the jury?

24             THE COURT:  Yes.

25             (Exhibit published.)

VACCARINO – DIRECT – MR. REIN

1    DIRECT EXAMINATION (Continued)

2    Q    Detective, can you read for us, looking at the exhibit --

3    well, what is the first -- what exactly are we looking at here

4    in this picture?

5    A    It is a picture I took that shows a text conversation

6    between a phone number that Mr. Price has identified as the

7    name Marco, then a number five after it.

8            MR. SCHOER:  Objection.

9            THE COURT:  When you say Mr. Price, you mean the

10   decedent?

11           THE WITNESS:  Yes, ma'am.

12           THE COURT:  Overruled.

13   Q    What is the phone number that the phone -- that this

14   phone you took a picture of was communicating with during this

15   exchange?

16   A    (718)730-5862.

17   Q    And starting at the top of the message, can you -- where

18   it says Saturday, April 15th, 2017, do you see that I'm

19   marking that with my finger?

20   A    Yes, sir.

21   Q    Could you read for us what it says underneath that?

22   A    Rise and shine.  I'm around.

23   Q    Who sent that message?

24   A    This phone number sent that to the phone of Mr. Price.

25   Q    And looking at the exhibit, what time was that message --

268

VACCARINO – DIRECT – MR. REIN

1    what's the time associated with that message?

2    A    8:18 a.m.

3    Q    So now moving down to where it says Monday, April 17th,

4    you've seen where I've drawn a line underneath that?

5    A    Yes, sir.

6    Q    Could you read for us what it says as part of this

7    conversation on that date?

8    A    Around, and a question mark.

9    Q    Who sent that message?

10   A    Mr. -- this phone sent that text message to that

11   number --

12   Q    I'm going to -- now I'm drawing a line under where it

13   says Tuesday, April 18th, 2017 -- well, first before I direct

14   your attention there.  In looking at this message, was there

15   any response on that day to that question, around, question

16   mark.

17   A    No, sir.

18   Q    So looking now at Tuesday, April 18th, 2017, could you

19   read for us what it says there?

20   A    The whole series or just stop at the first bubble?

21   Q    What's the first message that you see for that date?

22   A    Anyone around, and a question mark.

23   Q    Is that being sent by the phone that you took a picture

24   of?

25   A    Yes, sir.

VACCARINO – DIRECT – MR. REIN

1   Q   And what is the response to that?

2   A   What you need.

3   Q   And who sent that message?

4   A   The phone number that's identified as Marco with the

5   number five in this phone.

6   Q   After it says what you need, what is the message that was

7   sent by this phone?

8   A   Two need change, only have -- and the way that's written

9   out, hundreds, would mean most likely hundred dollar bills.

10          MR. WARNER:  Objection.

11          THE COURT:  Overruled.

12   Q   Is there a dollar sign there?

13   A   Yes, sir.

14   Q   And what's the next message that was received by this

15   phone after that?

16   A   Okay.

17   Q   And what does the next message say?

18   A   Come out.

19   Q   And what time is reflected for when that last message,

20   come out, was sent?

21   A   9:16 a.m.

22   Q   After you viewed this exchange that you took a picture

23   of, what did you do with --

24          THE COURT:  We're going to stop there because we're

25   almost at 2 o'clock --

PROCEEDINGS

1          MR. REIN:  Okay.

2          THE COURT:  -- and we have a juror that's got to

3    make a flight and I made a promise that we were going to end

4    at two, and I also made you a promise that I'm going to give

5    you instructions that you're going to know by heart by the

6    time you end your instruction, which is not to have any

7    contact or conversations with any of the parties in this case,

8    including any witnesses, the Court, court staff, whether

9    regardless of where you might see them, and remember to report

10   any attempt that anyone might make to try to talk to you about

11   this case or any incident that might occur within your

12   knowledge involving any attempt by anyone to improperly

13   influence any member of the jury, do so promptly.  Remember

14   either speak to my case manager, Christy Carosella, or either

15   one of might have two law clerks.

16          Remember it is important that you not discuss this

17   case or any aspect of this case, including with your family

18   members, friends, neighbors, co-workers, over any kind of

19   medium, internet, in person, telephone, whatever medium you

20   may have to be able to communicate with anyone.

21          And remember that you have to keep an open mind

22   until you've heard all the evidence, got the instructions on

23   the law, and have had an opportunity to deliberate with your

24   fellow jurors.

25          Remember you cannot read, or listen to, or view

PROCEEDINGS

1   anything about this case that might be reported over any kind

2   of media whether it's newspapers, social media, the internet,

3   radio, podcasts, TV or anything like that.  And you cannot do

4   any research or investigation about this case on your own over

5   any kind of media.

6           You must decide this case only on the admissible

7   evidence presented at trial and my instructions on the law.

8           You may not visit or view any location that may be

9   involved in this case or mentioned during the trial.

10          I just want to say I appreciate that thus far you've

11   been very prompt.  I appreciate that.  I know some of you are

12   coming from really far away, I know it takes a lot of effort

13   to be on time under those circumstances.  It doesn't look like

14   the weather is going to be so horrendous for the next week or

15   so, but we know that can change at any time, please allow for

16   that.

17          Give yourself a lot of rest, and I'm going to ask

18   for Ms. Gonzalez just to stay behind we wanted to address a

19   concern that you had.

20          And, again, feel free to bring any snacks or

21   anything like that that you may want and layer up.  We'll try

22   to see -- it's been a little warm here today, I'm always

23   afraid to mention anything because then we wind up with a room

24   that's freezing.  And sometimes they shut down the heat over

25   the weekend.  Let's see what happens on Monday.  We'll play it

PROCEEDINGS

1    by ear.  Okay.  Travel safely.

2                 THE COURTROOM DEPUTY:  All rise.  9:30.

3                 THE COURT:  Yes, 9:30 Monday, thank you for your

4    asking.  Remember, you're off the rest of the afternoon,

5    tomorrow you're off.  Monday at 9:30.

6                 (Jury exits courtroom.)

7                 THE COURT:  Ms. Gonzalez, we need you to stay so we

8    can talk to you about your issue.

9                 You can have a seat anywhere, it doesn't matter.

10   And, Detective, you're excused.  We're going to need you to

11   come back Monday at 9:30.

12                THE WITNESS:  Yes, ma'am.

13                THE COURT:  You're still on -- you can all have a

14   seat.  You're still on direct examination by the government so

15   you're free to discuss scheduling and your case with the

16   government.

17                THE WITNESS:  Yes, ma'am.

18                THE COURT:  We will see you back on Monday.  Thank

19   you.

20                THE WITNESS:  Thank you.

21                (Whereupon, the witness was excused.)

22                THE COURT:  So Ms. Gonzalez, I understand that you

23   have some sort of an appointment next week on February 7 that

24   would be --

25                JUROR NUMBER 12:  Actually it's Wednesday at 10 a.m.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

1    I don't know the date, but it is Wednesday at 10 a.m.

2              THE COURT:  Wednesday at 10 a.m.  So Wednesday

3    10 a.m. is February 8th.  And my understanding is that this is

4    for tax preparation.

5              JUROR NUMBER 12:  Correct.

6              THE COURT:  You're going to have to reschedule that

7    appointment, ma'am.  First of all, that's something that you

8    should have raised to the magistrate judge when there was a

9    discussion --

10             JUROR NUMBER 12:  Never mind, never mind.

11             THE COURT:  -- about scheduling.

12             JUROR NUMBER 12:  I'll reschedule, that's fine.

13             THE COURT:  Be sure to be rested, okay, good and

14   rested when you come, okay.  We will see you next week --

15             JUROR NUMBER 12:  Okay.

16             THE COURT:  -- at 9:30.

17             Thank you.

18             THE COURTROOM DEPUTY:  All rise.

19             THE COURT:  Be careful going home.

20             (Juror Number 12 exits the courtroom.)

21             THE COURT:  Okay.  Have a seat.  So first of all,

22   for sake of disclosure, the reason why I had asked if she felt

23   okay, it kind of looked to me like she might have been

24   beginning to nod off.  I know it's hot in here and so I just

25   kind of wanted to jolt her and make sure that she was awake.

PROCEEDINGS

1    So I don't think that she missed anything of the testimony.  I

2    would advise the parties if I thought that that was the case,

3    obviously that's a concern.

4              I did want to -- I did promise that I would review

5    the stipulations and the waivers of jury trial in connection

6    with the forfeiture.  With respect to Mr. Allen, the only

7    thing that I have is that, Mr. Warner, you didn't date your

8    signature so if I could just hand this up so that you could

9    put the date that you signed that on, please.

10             MR. WARNER:  Sure, my apologies.

11             THE COURT:  I want to make sure, Mr. Wyche, did you

12   review this waiver of the forfeiture and jury waiver with your

13   attorneys?

14             DEFENDANT WYCHE:  Yes, I did.

15             THE COURT:  And Mr. Allen, same with you, did you

16   review this waiver of forfeiture and jury waiver with your

17   attorneys?

18             DEFENDANT ALLEN:  Yes, your Honor.

19             THE COURT:  I'm endorsing these and my deputy will

20   have them docketed.

21             MR. SCHOER:  Judge, can we hold the docketing until

22   and if --

23             THE COURT:  They can be docketed under seal.

24             MR. SCHOER:  Then that's fine.  I just --

25             THE COURT:  They can be docketed under seal and

PROCEEDINGS

1  unsealed at the appropriate time.

2           MR. SCHOER:  That's fine, thank you.

3           THE COURT:  Okay.

4           MR. SCHOER:  Yes.

5           THE COURT:  Is there anything else you all want to

6  address besides -- I'd like to get a line up for Monday.

7  We'll have is a full day, so I'd like to have a pretty full

8  line up.

9           MR. REIN:  Yes, Judge.  We expect that Detective

10  Vaccarino's direct examination will be quite long.  That it

11  will probably take up most of the -- definitely the morning,

12  not most of the day on Monday but in addition we'll have the

13  criminalist from the NYPD lab, Rachel Lauth.

14           THE COURT:  I'm sorry, can you spell that.

15           MR. REIN:  Yes, it's Rachel is the first name.  The

16  last name is Lauth, L-A-U-T-H.

17           THE COURT:  L-A-U.  I'm sorry, you have to speak a

18  little louder.

19           MR. REIN:  Let me turn the microphone on.

20  L-A-U-T-H.

21           THE COURT:  G-H?

22           MR. REIN:  Sorry, Judge.  L-A-U T as in Thomas --

23           THE COURT:  T-H?

24           MR. REIN:  Yes.

25           THE COURT:  Okay.

PROCEEDINGS

1          MR. REIN:  Then Detective Arthur Truscelli.

2          THE COURT:  Can you spell the last name.

3          MR. REIN:  Yes, it's, T as in Thomas,

4  R-U-S-C-E-L-L-I.  Then also we'll have available Detective

5  Danielle Comanender.

6          THE COURT:  Spell the last name.

7          MR. REIN:  C, as in Charlie, O-M-A-N-E-N-D-E-R.

8          THE COURT:  How much more do you have on direct with

9  Vaccarino?

10          MR. REIN:  We have quite a bit, Judge.  He's going

11  to, I expect, detail most of the investigation up through

12  September of 2018 when the arrests occurred.  And right now

13  we're obviously just -- we've just almost finished the Vincent

14  Price overdose.

15          THE COURT:  Okay.  I just don't want to have any

16  gaps in the presentations.

17          MR. REIN:  I understand.

18          THE COURT:  We already have a late start and we lost

19  all of this afternoon, so is there anything else the parties

20  wants to address at this time?

21          MR. REIN:  Not for the government.

22          THE COURT:  Remember to take your physical evidence

23  with you.

24          Anything from the defense end of it?

25          MR. SCHOER:  No, your Honor.

PROCEEDINGS

1          MS. TODD:  No, your Honor, thank you.

2          THE COURT:  All right.  Thank you all.

3          MR. SCHOER:  Have a great weekend, Judge.

4          THE COURT:  Have a good weekend.

5          MR. REIN:  Have a good weekend, Judge.

6          THE COURT:  I do want to acknowledge receipt of the

7   government's proposed charge.

8          (Whereupon, the trial adjourned at 2:00 p.m. to

9   resume Monday, February 6, 2023 at 9:30 a.m.)

10                  I N D E X

11  WITNESS                           PAGE

12  **RAUL IRIZARRY**

13  DIRECT EXAMINATION     BY MR. REIN        125

14  CROSS-EXAMINATION      BY MR. VITALIANO   159

15

    DOMINICK LIBRETTI
16
    DIRECT EXAMINATION     BY MS. CHEN        173
17
    VOIR DIRE EXAMINATION BY MS. TODD         184
18
    DIRECT EXAMINATION     BY MS. CHEN        185
19
    CROSS-EXAMINATION      BY MS. TODD        224
20
    CROSS-EXAMINATION      BY MR. VITALIANO   235
21

22  PHILIP VACCARINO

23  DIRECT EXAMINATION     BY MR. REIN        242

24  VOIR DIRE EXAMINATION BY MR. SCHOER       265

25  DIRECT EXAMINATION     BY MR. REIN        267

PROCEEDINGS

1                    E X H I B I T S

2     GOVERNMENT                              PAGE
         421                                  149
3
         332                                  154
4
         422                                  156
5
         333                                  159
6
         301 through 320 and 102             172
7
         516                                  180
8
         638A through F                       185
9
         509                                  198
10
         407, 408, and 105                    241
11
         611A through C                       254
12
         612                                  266
13

14

15

16

17

18

19

20

21

22

23

24

25