

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

CRH:IC/GMR                                 *271 Cadman Plaza East*
F. #2017R01869                             *Brooklyn, New York 11201*

May 15, 2024

By Hand, Email and ECF

The Honorable Dora L. Irizarry
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

            Re:     United States v. Keith Wyche
                    Criminal Docket No. 18-561 (S-1) (DLI)

Dear Judge Irizarry:

            The government respectfully submits this letter in advance of the sentencing
hearing in the above-referenced case, currently scheduled for June 4, 2024 at 11:00 a.m.  On
February 21, 2023, following a three-week trial, the jury returned a verdict of guilty on all counts
against defendant Keith Wyche ("Wyche") and codefendant Oneil Allen ("Allen").  The jury
found Wyche guilty of Conspiracy to Distribute and Possess with Intent to Distribute Heroin and
Fentanyl, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C); Distribution of and Possession with
Intent to Distribute Heroin and Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and
841(b)(1)(C); Distribution of Fentanyl Causing the Death of John Doe, in violation of 21 U.S.C.
§§ 841(a)(1) and 841(b)(1)(C); and Distribution of Fentanyl Causing Serious Bodily Injury to
Jane Doe, in violation of 18 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  The applicable sentencing
range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") is 360
months to life imprisonment.  Presentence Investigation Report ("PSR") ¶ 108; PSR Addendum
2.  In light of the seriousness of the defendant's conduct, the gravity of the offenses for which he
was convicted, his prior criminal history, and for the additional reasons described below, the
government submits that a custodial sentence of 480 months, which is within the Guidelines
range, is appropriate.

I.      Background

            As proven at trial, between approximately February 2017 and September 2018,
Wyche and Allen conspired to distribute heroin and fentanyl, and in fact distributed heroin and
fentanyl with fatal consequences.  PSR ¶¶ 9-10, 15; PSR Addendum 1.  Specifically, in April
2017, during the course of the conspiracy, defendant Wyche sold fentanyl to John Doe which
resulted in John Doe's death.  Id. ¶ 9.  Then, in October 2017, defendants Wyche and Allen sold

heroin to another victim, Jane Doe, which resulted in Jane Doe's overdose and serious bodily injury.  Id. ¶ 10.  After ingesting the heroin sold to her by the defendants, Jane Doe stopped breathing and required lifesaving interventions to survive, including the administration of Narcan and emergency treatment by medical personnel.  Trial. Tr. 747:4 - 6, 14 - 23.

On April 18, 2017, John Doe's father found John Doe dead inside of his Staten Island home.  Trial Tr. 49:18 - 23.  As he testified at trial, John Doe's father opened a bathroom door in their residence and saw his son fall out of the bathroom with "his head…leaning against the door."  Trial Tr. 49:19 - 20.  He tried to move John Doe but was unable to do so and called 911.  Trial Tr. 49:25 - 50:2.  John Doe's head was "light purple" in color and he had a belt wrapped around his arm in a manner his father knew to be consistent with intravenous drug use. Trial Tr. 50:8 - 51:23.  Eventually, the fire department and emergency personnel arrived at the home.  Trial Tr. 54:5 - 7.  Emergency medical personnel told John Doe's father that John Doe was dead and there was nothing they could do to try and revive him.  Trial Tr. 54:8 - 11.  John Doe was 43 years old.  GX 404 (Medical Examiner's Report).

Following John Doe's death, an investigator with the Office of Chief Medical Examiner for New York City ("OCME") arrived to document the scene and the condition of John Doe's body.  Trial Tr. 75:3 - 77:3.  The investigator found John Doe face down on the floor, observed several glassine envelopes in the toilet and a syringe on the bathroom floor.  Trial Tr. 79:14 - 25, 81:5 - 9.  A subsequent report issued by an OCME forensic pathologist noted a lethal level of fentanyl in John Doe's blood, and his official cause of death was determined to be "acute intoxication due to the combined effects of cocaine, fentanyl."  GX 404.  At trial, a forensic pathologist from OCME described John Doe's death as involving "a terminal shot of fentanyl and that puts him over the edge and caused his death."  Trial Tr. 1052:19 - 20.

Following John Doe's death, the NYPD began investigating his fatal overdose. PSR ¶ 9; Trial Tr. 261:7 - 262:10.  Additional glassine envelopes found at the scene and the syringe found in the bathroom with John Doe's body were sent to the NYPD's laboratory for testing and found to contain fentanyl.  Trial Tr.  680:23 - 681:6, 688:11 - 12.  Responding NYPD investigators also reviewed text messages contained in John Doe's cell phone and learned that earlier in the morning on the day of his death he had engaged in a narcotics related conversation with someone named "Marco."  PSR ¶ 9; Trial Tr. 268:18 - 269:21.

Even before John Doe's April 2017 fatal fentanyl overdose, the NYPD was investigating overdoses which had occurred in Staten Island earlier in the year.  PSR Addendum 1; Trial Tr. 249:20 - 250:16.  This included a February 18, 2017 non-fatal drug overdose suffered by another man.  PSR Addendum 1; Trial Tr. 249:20 - 250:16.  As part of this investigation, NYPD detectives obtained and reviewed phone records which eventually demonstrated a link between several overdoses, including the February 18, 2017 non-fatal overdose and John Doe's fatal April 2017 overdose.  PSR Addendum 1; Trial Tr. 291:14 - 292:18.

Based upon what they had learned during their investigation, including a review of phone records for the contact number for "Marco" found in John Doe's phone, investigators surveilled a residential street in Staten Island on July 12, 2017.  Trial Tr. 296:20 - 297:14.  While conducting this surveillance, NYPD detectives observed the sale of glassine envelopes

containing heroin and fentanyl by a man in a white Jeep.  PSR Addendum 2; Trial Tr. 298:24 - 299:9.  Detectives were able to obtain the license plate number of the white jeep and, using that information, learned that it was registered to defendant Wyche.  Trial Tr. 306:2 - 7.

On October 27, 2017, NYPD Detectives responded to a non-fatal drug overdose suffered by Jane Doe after she ingested heroin purchased from a drug dealer she knew as "Marco" near South Avenue in Staten Island.  PSR ¶ 10; Trial Tr. 744:3 - 745:10.  As Jane Doe testified at trial, since the summer of 2017, she had been regularly purchasing heroin from two drug dealers she knew as "James" and "Marco."  At trial, she identified "James" as defendant Allen and "Marco" as defendant Wyche.  Trial Tr. 731:18 - 732:14.  Following her overdose, Jane Doe was administered Narcan and taken by ambulance to the hospital where she received treatment.  Trial Tr. 746:19 - 747:6.

NYPD Detectives began investigating Jane Doe's overdose and noted similarities between the circumstances involving John Doe's and Jane Doe's overdoses, including the name of the drug dealer, "Marco."  Trial Tr. 312:4 - 12, 314:7 - 9.  Investigators also examined Jane Doe's phone, saw her communications with the drug dealers she identified as "James" and "Marco" and obtained a phone number for them.  Trial Tr. 316:12 – 17; GX 613A - K.

Relying on confidential informants, including Jane Doe, detectives learned that "James" and "Marco" shared common telephone numbers and worked together to sell heroin and fentanyl.  Id. ¶ 12.  The NYPD learned that on days when they were selling narcotics, the defendants would send a text message to their customers—stating either "Good Morning" or "Rise and Shine"—to let them know they were open for business.  Id.  Eventually, as part of its investigation, the NYPD conducted numerous controlled purchases of narcotics from "James" and "Marco" using confidential informants.  Id. ¶¶ 12, 15.  During these transactions, NYPD detectives observed that "James" was defendant Allen and "Marco" was defendant Wyche.  Id. ¶ 15; Trial Tr. 358:8-11 (describing a sale involving defendant Wyche), 368:4-11 (describing a sale involving defendant Allen).  The transactions followed the same pattern: (1) detectives would arrive at a designated meeting spot with a confidential informant; (2) the informant would be searched for drugs and money; (3) the informant would be given money with which to purchase narcotics; (4) Allen or Wyche would then arrive in a vehicle; (5) detectives would observe an exchange of money; (6) Allen or Wyche would leave; and (7) the informant would return to the detectives and provide them with the narcotics that were purchased.  Trial Tr. 323:24 - 328:13 (describing the procedure for using a confidential information to purchase narcotics). In total, confidential informants purchased narcotics from the defendants on approximately twenty separate occasions between October 2017 and August 2018.  PSR ¶ 15.

Investigators subsequently conducted surveillance at a location in New Jersey where Allen resided.  Id. ¶ 14; Trial Tr. 434:15 - 435:4.  On the afternoon of July 15, 2018, an NYPD detective observed Wyche, who was driving an Infinity, sell narcotics to a confidential informant in Staten Island.  Trial Tr. 432:13 - 433:1.  Approximately one hour later, the detective observed Wyche arrive at Allen's residence in Somerset, New Jersey in the same Infinity.  Trial Tr. 435:13 - 21.  Investigators eventually made several other observations of both Allen and Wyche at this same residence in Somerset, New Jersey.  See e.g., Trial Tr. 439:16-443:6 (describing the defendants together); 443:14-451:12 (describing Wyche at the premises).  During

these observations, investigators also observed several vehicles associated with the defendants, and which had been used during narcotics sales, parked in front of the premises. See e.g., Trial Tr. 441:10-14 (describing a Jeep, Infinity, and Lexus); 447:18-448:20 (observing a Jeep and Infinity).

The investigation also revealed that the defendants were obtaining controlled substances from codefendant Kyron Graham. PSR ¶ 13. Law enforcement agents, using Court authorized GPS tracking devices, tracked the defendants to Graham's residence in the Bronx, New York in July and August 2018. Id. They also obtained video surveillance from Graham's residence which showed defendants Wyche and Allen meeting with Graham and obtaining bags containing what were believed to be controlled substances. Id.

Defendants Wyche and Allen were arrested on September 18, 2018. PSR ¶ 19. Search warrants executed on multiple premises and vehicles associated with the defendants revealed, among other things: approximately $9,510 in United States currency; facemasks; drug paraphernalia, including sifters, a coffee grinder, and scales; rubber gloves; multiple full boxes of glassine envelopes; multiple glassine envelopes and plastic bags hidden in the void of a car's passenger seat found to contain cocaine, heroin and fentanyl; and a customer list which included John Doe's name and phone number. Trial Tr. 1168:9-11; 1206:18-1207:16; PSR ¶¶ 16, 23; PSR Addendum 2. Investigators also recovered four cell phones, several of which contained narcotics related conversations between the defendants and their customers. Trial Tr. 1136:2 - 5; GX 201A, 202A, 203A, and 204A.

In October 2018, the grand jury returned an indictment charging Wyche and Allen with Conspiracy to Distribute and Possess with Intent to Distribute Heroin and Fentanyl, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C) (Count 1); Distribution of and Possession with Intent to Distribute Heroin and Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count 2); and Distribution of Fentanyl Causing Serious Bodily Injury to Jane Doe, in violation of 18 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count 4). In addition, Wyche was charged with Distribution of Fentanyl Causing the Death of John Doe, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count 3).[1] On February 21, 2023, following a three-week trial, the jury found defendants Wyche and Allen guilty on all counts of the indictment.

---

[1] In November 2018, the grand jury returned a superseding indictment which added codefendant Kyron Graham and charged him with Conspiracy to Distribute and Possess with Intent to Distribute Heroin and Fentanyl, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C) (Count 1); Distribution of and Possession with Intent to Distribute Heroin and Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count 2). Graham previously pleaded guilty and was sentenced to five years of probation. See Docket Entry dated Oct. 2, 2019.

II.     The Sentencing Guidelines

As stated in the PSR and the Addendum to the PSR, the Probation Department ("Probation") has calculated the defendant's adjusted offense level under the Guidelines as follows:

Group One (Counts 1 and 2)

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2D1.1(c)(13)) | 14 |
| Plus:     Maintaining a Premises for the Packaging of Drugs (U.S.S.G. § 2D1.1(b)(12)) | +2 |
| Total: | __16__ |

Count 3

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2D1.1(a)(2)) | 38 |
| Total: | 38 |

Count 4

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2D1.1(a)(2)) | 38 |
| Total: | 38 |

Grouping Analysis

| Count/Group | Adjusted Offense Level | Units |
|---|---|---|
| Group 1 | 16 | 0 |
| Count 3 | 38 | 1.0 |
| Count 4 | 38 | 1.0 |

Combined Adjusted Offense Level (U.S.S.G. § 3D1.4)

| | |
|---|---|
| Greater of the Adjusted Offense Level | 38 |
| Increase in Level | +2 |
| Total | __40__ |

PSR ¶¶ 32-61; PSR Addendum 2.  Based upon an adjusted offense level of 40 and a criminal history category of III, the Guidelines imprisonment range is 360 months to life.  PSR ¶¶ 108, PSR Addendum 2.  Counts 3 and 4 each have a mandatory minimum term of imprisonment of

240 months.  PSR ¶ 107   The government respectfully submits that the Guidelines calculation set forth in the PSR, as revised by the addendum to the PSR, is accurate and should be adopted by the Court.

III.    Legal Standard

      As the Court is aware, the Sentencing Guidelines are advisory and not mandatory. See United States v. Booker, 543 U.S. 220, 246 (2005).  However, the District Court "must consult those Guidelines and take them into account when sentencing." Id. at 264.  As the Supreme Court has instructed, courts must "begin all sentencing proceedings by correctly calculating the applicable Guidelines range…[and] the Guidelines range should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007). The Court must also consider the factors specified in 18 U.S.C. § 3553(a) and explain its chosen sentence, including any deviation from the Guidelines range.  United States v. Bonilla, 618 F.3d 102, 109 (2d Cir. 2010).  A sentence should be based on the individual facts of a case and if the Court decides that a sentence outside the Guidelines range is appropriate, the Court must "ensure that the justification is sufficiently compelling to support the degree of the variance." Gall, 552 U.S. at 50.

      Although no longer mandatory, the Sentencing Guidelines are an important tool toward achieving the objective of "similar sentences for those who have committed similar crimes in similar ways." Booker, 543 U.S. at 252.  For that reason, "the Guidelines are not only the starting point for most federal sentencing proceedings but also the lodestar." Molina-Martinez v. United States, 578 U.S. 189, 200 (2016).  Adherence to the Guidelines helps avoid "unwarranted disparities between defendants convicted of similar conduct and with similar criminal backgrounds." United States v. Elfgeeh, 515 F.3d 100, 139 (2d Cir. 2008).

      After determining the applicable Guidelines range, the Court must turn to the factors set forth in Title 18, United States Code, Section 3553 and "impose a sentence sufficient but not greater than necessary" to achieve the purposes of sentencing.  18 U.S.C. § 3553(a). These considerations include the need for the sentence:

    (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).  See also Booker, 543 U.S. at 260.  In addition to these factors, the Court must also consider the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the kinds of sentence and the sentencing range established in the Guidelines; any pertinent policy statements from the United States Sentencing

Commission; the need to avoid unwarranted sentence disparities; and the need to provide restitution to any victims.  18 U.S.C. § 3553(a).

## IV.    The Court Should Sentence the Defendant to 480 Months' Imprisonment

Considering, among other factors, the seriousness of the defendant's conduct, the defendant's prior criminal history and the need for general and specific deterrence, the government submits that a custodial sentence of 480 months, which is within the Guidelines range, is appropriate.  As discussed further below, the defendant's criminal conduct is directly responsible for the death of one person and serious harm to another.  The deaths that he caused were not an aberration, but the foreseeable result of his ongoing involvement in the distribution of lethal drugs.  His criminal conduct is also part of a larger pattern of criminal activity by the defendant.  The government respectfully submits that only a sentence that ensures the defendant spends a substantial portion of the remainder of his life in prison will recognize the seriousness of the defendant's conduct, promote respect for the law, provide adequate deterrence and protect the public, and be sufficient, but not greater than necessary, to achieve the goals of sentencing. See 18 U.S.C. § 3553(a).

### A.    A Departure or Variance from the Sentencing Guidelines is not Warranted

At the outset, the government strongly disagrees with the Probation Department's recommended below guidelines sentence of 25 years custody.  As noted above, in this case, the defendant faces a mandatory minimum of 20 years on counts 3 and 4 and the applicable sentencing Guidelines provide for a sentence of 360 months to life imprisonment.  In the PSR, the Probation Department states that it "has not identified any factors that would warrant a departure from the applicable sentencing guidelines."  PSR ¶ 126.  Nevertheless, the Probation Department recommends a sentence which would result in a downward variance of five years, or 60 months, from the bottom edge of the Guidelines.

"A significant departure or variance from the recommended Guidelines range 'should be supported by a more significant justification than a minor one.'"  United States v. Mumuni Saleh, 946 F.3d 97, 107 (2d Cir. 2019) (quoting Gall, 552 U.S. at 50).  Even when the Court chooses to vary downward and impose a below guidelines sentence on the basis of proposed mitigating factors, the sentence must be reasonable given the totality of the circumstances.  Id. at 112 (citing United States v. Cavera, 550 F.3d 180, 191 (2d Cir. 1991)).

In the instant matter, there is simply no reasonable basis to support a downward variance.  Had the defendant been convicted of causing just one overdose resulting in death or serious bodily injury, the government estimates that the bottom end of the applicable guidelines range would be approximately 25 years.  But the defendant did far more than that.  As discussed herein, the defendant's conduct involved an ongoing narcotics conspiracy that led to the death of one person and seriously injured a second one, and is tied to other overdoses.  The Probation Department sets forth no reasonable basis upon which to impose a below Guidelines sentence and the gravity of the defendant's criminal conduct weighs heavily against it.  Here, having been convicted of causing not one, but two overdoses resulting in either death or serious bodily injury as part of a larger conspiracy to distribute drugs that can seriously harm and kill people, justice demands a more substantial sentence.

B. <u>The Seriousness Nature of the Offense and the Need to Promote Respect for the Law</u>

The sentence in this case must account for the profoundly serious nature of the defendant's crimes.  18 U.S.C. 3553(a)(2).  As the evidence at trial demonstrated, the defendant and codefendant operated a narcotics delivery service, delivering heroin and fentanyl to a large group of paying customers.  Each day, the defendant and codefendant sent out a mass text message, advertising that they were open for business.  Their business had dangerous effects, killing customers or leaving them on the brink of death.  The defendants' operation was brazen and sophisticated.  They took protective measures to safeguard their operation.  This included requiring all new customers to use narcotics in front of them to prove that they were not members of law enforcement and using multiple phones and phone numbers.  <u>See</u> Trial Tr. 321:4-11, 733:24 - 734:8, 751:19 - 24.  The defendants were also aware of the danger posed by the drugs they distributed, equipping themselves with protective equipment, including masks and gloves, to avoid suffering the ill effects of the drugs they sold.  <u>See</u> Trial Tr. 1455:13 - 1456:1.

As discussed above and as proven at trial, the defendant's conduct caused the death of John Doe and the near fatal overdose of Jane Doe.  On April 18, 2017, defendant Wyche sold the fatal dose of fentanyl that killed John Doe, a 43-year-old father.  The defendant is responsible not only for this death, but the pain and anguish caused by the loss of a loved one, as the Court heard as part of the testimony of the victim's father.  On October 27, 2017, the defendant and codefendant sold heroin to Jane Doe which left her seriously injured, requiring emergency, lifesaving intervention.   The defendants are similarly responsible for the trauma caused to this victim as well.  In light of these facts, it is clear that the defendant's crimes are among the most serious offenses to come before this Court.

Importantly, the defendant's offenses did not occur in a vacuum, but were part of a continuing criminal scheme.  As the Court heard at trial, the defendant is linked to additional overdoses occurring in Staten Island, including an overdose which occurred in February 2017.  <u>See</u> Trial Tr. Trial Tr. 249:20 - 250:16.  Phone record analysis conducted by NYPD detectives, and mentioned at trial, demonstrated that the victim of the February 2017 overdose was in contact with a man named Michael Wassif on the date of the overdose and that, on that same date, Wassif was in contact with defendant Wyche.  <u>See</u> Trial Tr. 291:25 - 292:18.  The government submits that, on the basis of the evidence already presented at trial, the February 2017 overdose resulted from the defendant's conduct and may properly be considered by the Court in imposing an appropriate sentence.[2]

In addition, defendant Wyche and codefendant Allen are responsible for a multitude of drug sales.  PSR ¶ 15.  As documented in the PSR, the defendants sold substances containing heroin or fentanyl to confidential informants working on behalf of the NYPD on at least 20 separate occasions.  <u>Id.</u>  These sales were only a small portion of the defendants overall criminal conduct during the time period of their conspiracy.  As evidenced by cell phone

---

[2] The government submits that this incident may also be considered as relevant conduct pursuant to U.S.S.G. § 1B1.3.

8

messages presented at trial, the defendants had numerous customers who they kept plied with lethal narcotics.  See GX 201A, 202A, 203A, and 204A.  Jane Doe and John Doe are just two out of many customers whose addiction led them to buy drugs from the defendants, risking their lives in the process.  The extent of the havoc wrought by the defendants' conduct may never be fully known.  The scale of the defendant's criminal conduct, and its consequences, requires a significant sentence, and certainly a sentence within the Guidelines range.

## C.   The Need to Deter Similar Conduct

The Court must also consider the need to deter similar criminal conduct in the future.  To that end, in imposing sentence, the Court should be mindful of the widespread public health crisis caused by the proliferation of dangerous drugs like heroin and fentanyl.  According to the National Institute on Drug Abuse, 70,601 overdose deaths involving synthetic opioids, such as fentanyl, were reported in 2021.  See Drug Overdose Death Rates, NAT'L INSTS. OF HEALTH, NAT'L INST. ON DRUG ABUSE, https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates (last visited May 13, 2024).  As noted in the PSR, many drug users unknowingly ingest fentanyl after it is added to heroin by drug dealers seeking to increase the potency of their merchandise.  PSR ¶ 8.  "People both knowingly consume fentanyl and other synthetic opioids and unknowingly consume them when they are mixed into or sold as other drugs…."  See Fentanyl, NAT'L INSTS. OF HEALTH, NAT'L INST. ON DRUG ABUSE, https://nida.nih.gov/research-topics/fentanyl (last visited May 13, 2024).  Even in the smallest of doses—including just 2 milligrams—fentanyl can be fatal.  See "One Pill Can Kill," U.S. DRUG ENF'T ADMIN, https://www.dea.gov/onepill (last visited May 13, 2024).  According to the Centers for Disease Control and Prevention, "[f]entanyl and other synthetic opioids are the most common drugs in overdose deaths."  See Fentanyl Facts, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/stopoverdose/fentanyl/index.html (last visited May 13, 2024).

As the Second Circuit recently noted, the district court may properly consider the dangers of fentanyl when evaluating Section 3553(a)'s requirement that a sentence consider the need to deter criminal conduct.  See United States v. Yates, No. 22-3003-cr, 2024 WL 1338762, at *3 (2d Cir. Mar. 29, 2024) (citing United States v. Roy, 88 F.4th 525, 532 (4th Cir. 2023)).  As at least one Court has remarked "it [is] eminently reasonable for the district court to consider fentanyl's lethality and the devastating impact it has wrought upon communities across America."  See Roy, 88 F.4th at 532.  In the instant case, where the defendants frequently sold deadly fentanyl, the sentence imposed by the Court must serve to adequately deter others who would do the same.

## D.   The Defendant's History and Characteristics

The defendant's conduct in this case is not an aberration and he has an extensive criminal history which stretches back over 20 years.  He has previously been convicted of several serious offenses, including weapons possession and narcotics distribution.  PSR ¶¶ 63-68.  As the Court is aware, weapons are a common "tool of the narcotics trade."  See United States v. Bland, 271 F. App'x 37, 39 (2d Cir. 2008) (summary order) (citing United States v. Salazar, 945 F.2d 47, 51 (2d Cir. 1991)).

In October 2003, the defendant was adjudicated a youthful offender in connection with a charge of criminal possession of a loaded firearm in the third degree, a D felony. PSR ¶ 63. In that case, he was observed carrying a loaded firearm. Id. Following his plea of guilty, the defendant was sentenced to one year in jail. Id.

In June 2007, the defendant was convicted of attempted criminal possession of a weapon in the fourth degree, a misdemeanor. Id. ¶ 64. Although only convicted of a misdemeanor, the defendant was arrested pursuant to a warrant which charged him with various drug offenses, including criminal possession of a controlled substance in the third degree. Id.

In July 2007, the defendant was convicted of criminal sale of a controlled substance in the third degree. Id. ¶ 65. In connection with that conviction, he was sentenced to two years in state prison. Id.

In March 2010, the defendant was convicted of false personation and sentenced to a term of probation. Id. ¶ 67. In that case, the defendant misrepresented his identity to law enforcement during a traffic stop. Id.

In conjunction with his instant convictions, the defendant's history demonstrates that he is a lifelong drug trafficker. The defendant's history reflects that he has long been involved in a criminal enterprise that has caused pain, death and harm to the community. It likewise counsels in favor of a significant sentence within the Guidelines range.

V.     Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 480 months imprisonment.

Respectfully submitted,

BREON PEACE
United States Attorney

By:     *Jil Rein*
        Trisa Chen
        Gilbert M. Rein
        Assistant U.S. Attorneys
        (718) 254-7000

cc:     Clerk of Court (DLI) (by hand, email and ECF)
        Gary Schoer, Esq., Counsel to Defendant (by email and ECF)
        Nicole Gervase, U.S. Probation Officer (by email and ECF)